# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE on behalf of herself and her minor child SARAH DOE,<br><br>        Plaintiff,<br><br>vs.<br><br>FRANKLIN SQUARE UNION FREE SCHOOL DISTRICT, and HOWARD ZUCKER, in his official capacity as Commissioner of the New York State Department of Health.<br><br>        Defendants. | Case No. 2:21-cv-5012<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

*"Liberty is the soul's right to breathe and, when it cannot take a long breath, laws are girdled too tight."* Henry Ward Beecher (1858)

Plaintiff, JANE DOE[1], by and through her undersigned counsel, sues Defendants, Franklin Square Union Free School District and Howard Zucker in his official capacity as Commissioner of the New York State Department of Health, on behalf of herself and her minor daughter Sarah Doe. Plaintiff alleges as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff is the mother of Sarah Doe ("Sarah"), a ten-year-old child with severe asthma who cannot medically tolerate a mask.

2.      Sarah has had serious respiratory challenges since birth. She has ended up in the emergency room more than once due to severe asthma attacks. She is also prone to anxiety, which is exacerbated by her struggles to breathe when wearing a mask.

3.      On August 27, 2021, Defendant Howard Zucker ("Commissioner Zucker"), Commissioner of the New York State Department of Health ("NYSDOH"), declared that a new

---

[1] To protect the child's medical privacy, the names of the child and her mother are changed in this complaint to pseudonyms. A motion to proceed by pseudonym is being filed concurrently with this complaint.

school mask mandate would be in effect for the upcoming 2021-2022 school year (the "School Mask Mandate").

4.      There is no current declared state-disaster emergency that empowers the executive branch to issue such a declaration. Neither the executive branch nor Commissioner Zucker himself have been empowered by the New York State Legislature to enact declarations with the force of law concerning mask mandates in school in the absence of a declared state-disaster emergency.

5.      Sarah's pediatrician, a New York State licensed physician and Sarah's primary care physician since birth, certifies that it is unsafe for Sarah to wear a mask all day at school and wrote her a medical exemption duly submitted August 24, 2021, in anticipation of Commissioner Zucker's declaration.

6.      This suit arises because the Franklin Square Union Free School District (the "School District") officially denied Sarah's medical exemption last Friday, September 3rd.

7.      This denial violates Sarah's fundamental rights. Sarah and her family have constitutionally protected rights to a medical exemption from a state regulation that can cause Sarah harm.

8.      Pursuant to binding precedent from the United States Supreme Court, the state is not allowed to condition acceptance of a medical exemption written by a state-licensed physician on review or agreement by any third party, even on the advice of a non-treating school district doctor.

9.      The denial also violates Sarah's federal statutory rights. Federal law prohibits and preempts mandatory use of any masks available to school children.

10.     Masks used for a medical purpose, including the purpose of infection mitigation, are regulated by the United States Food and Drug Administration ("FDA").

11.     The FDA has not licensed or approved any mask for use in schools. Rather, masks and face coverings used outside of hospital settings are only authorized for use pursuant to conditions set forth in their Emergency Use Authorization ("EUA") letters.

12.     Pursuant to governing statutes, and the individual letters setting forth the conditions for the mask EUAs, EUA products cannot be mandated or coerced as they are experimental products.

13.     For the reasons set forth in this complaint, Plaintiff respectfully seeks declaratory, injunctive, and other relief to prevent the Defendant from continuing to violate her daughter's fundamental rights, along with her dignity and safety.

## <u>JURISDICTION AND VENUE</u>

14.     This Court has jurisdiction to hear all federal claims asserted in this case under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts to hear suits arising under the laws and Constitution of the United States; the Supremacy Clause of the Constitution of the United States, which allows federal district courts to hear suits alleging preemption of state and local laws by the Constitution and federal laws made in pursuance thereof; and 42 U.S.C. § 1983 and 28 U.S.C. § 1343 in relation to Defendants' deprivation and infringement under color of law of the Individual Plaintiff's rights, privileges, and immunities secured by the United States Constitution and laws, as detailed further herein.

15.     This Court has jurisdiction over the claims asserting violations of the laws and Constitution of the State of New York through its supplemental jurisdiction under 28 U.S.C. § 1367(a), as those claims are so closely related to the Plaintiff's federal question and Section 1983 claims that they form part of the same case or controversy under Article III of the United States Constitution.

16.     This Court has the authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief under 28 U.S.C. § 1343(a); and attorneys' fees and costs under 42 U.S.C. § 1988.

17.     The United States District Court for the Eastern District of New York is the appropriate venue for this action pursuant to 28 U.S.C. § 1391(b)(1) and (2) because it is the district in which Defendant deprived Plaintiff and her daughter of their rights and liberties under the laws and Constitution of the United States and violated the laws and Constitution of the State of New York, as further alleged herein. It is also the district in which a substantial part of the events giving rise to Plaintiff's claims occurred and continue to occur.

## **PARTIES**

18.     Plaintiff Jane Doe is the mother of Sarah Doe. She lives in Nassau County, New York and has standing to bring this case, which presents a justiciable issue for the Court, on behalf of herself and her daughter.

19.     Plaintiff Sarah Doe ("Sarah") is a ten-year-old child with severe asthma whose medical exemption to the school mask mandate is not being honored. She lives with her family in Nassau County and attends the John Street School in the Franklin Square Union Free School District. Her mother has standing to bring suit on her behalf.

20.     Defendant Franklin Square Union Free School District ("School District") is a municipal corporation organized pursuant to the laws of the State of New York and as such, may sue and be sued. The School District's discretionary decision to adopt an official policy of subjecting medical exemptions to review and denial is directly responsible for the deprivation of Sarah's constitutional rights.

21.     Defendant Howard Zucker, M.D. ("Commissioner Zucker"), is the duly appointed

Commissioner of the NYSDOH. He is sued in his official capacity and in that capacity is ultimately charged with enforcing and issuing NYSDOH regulations, including those complained of herein. Acting under color of state law, Commissioner Zucker personally promulgated the School Mask Mandates that deprive and infringe upon or threaten to deprive and infringe upon Plaintiff's rights, privileges, and immunities under the laws and Constitution of the United States, the laws, and Constitution of the State of New York, and under international law so widely adopted and accepted as to establish *jus cogens*.

## FACTUAL BACKGROUND

22.     Plaintiff seeks declaratory and injunctive relief so that her daughter Sarah can safely return to school this fall.

23.     Sarah suffers from asthma and serious respiratory issues she has had since she was a baby. At times, her attacks have been so bad that she ended up in the emergency room in critical condition.

24.     Last year, pursuant to emergency powers granted temporarily to the executive branch, the NYSDOH issued emergency guidance requiring all students to wear masks at school.

25.     Each of these temporary orders stated, "[s]tudents who are unable to medically tolerate a mask, including students where such mask would impair their physical health or mental health are not subject to the required use of a mask."

26.     A FOIL request to the NYSDOH in late 2020 revealed that the NYSDOH did not rely on or possess any documents or studies establishing that masks are safe or effective for adults or children.

27.     It quickly became apparent that Sarah, then a fifth-grade student at the John Street School, could not medically tolerate masks and that use of the masks was impairing her physical

and mental health.

28.     Though Sarah was only ten years old, she had to start carrying her asthma pump to school and she began needing to administer it to herself more and more frequently as her breathing became increasingly difficult due to mask use.

29.     Jane attempted (unsuccessfully) for months to work with the school to provide a reasonable accommodation to her daughter to no avail. They would not even agree to allow Sarah to take her mask off during gym class while running.

30.     The World Health Organization recommends that masks be avoided during exercise, even for people who do not suffer from asthma and other respiratory disabilities.[2]

31.     Sarah's condition got worse. The attacks increased; she began suffering from repeated migraines and grew anxious and depressed.

32.     Until last year, Sarah had gotten all A's and was a model student. Her grades began slipping and she was frequently asked to go to the principal's office for pulling down her mask to try to breathe.

33.     Sarah had always loved school, but she began telling her mother that she was miserable and depressed and that she hated school. Sarah's anxiety became crippling. She stopped being able to eat very much due to the anxiety and she lost so much weight that she is now dangerously underweight. Sarah's doctor advised that she is dangerously underweight at this point and may need to attend a special program to get to a safe weight again.

34.     Jane attempted to help her daughter comply with the school's rules and to work with the school to accommodate her child. But sometimes it got so bad that Sarah reported she almost passed out from lack of breath.

---

[2] WORLD HEALTH ORGANIZATION, https://www.who.int/images/default-source/health-topics/coronavirus/myth-busters/mythbuster---masks-and-exercise.png (last visited Sept. 7, 2021).

35.     Her mother became frightened for her safety. When Sarah's attacks progress beyond a certain point, they can become life-threatening and cannot be solved by her inhaler or doctor's office interventions.

36.     Jane begged the School District to accommodate her child. She pointed out the language of the emergency policies, which clearly specified that the mask policy only applied to children whose physical or mental health was not impaired. She explained that her daughter was dizzy, unable to concentrate, having increasingly frequent and serious asthma attacks, was anxious, and was unable to breathe.

37.     After the school repeatedly ignored and/or denied Jane's requests to exempt her asthmatic child from the mask exemption, Jane was advised by friends and counselors to get a formal exemption letter from Sarah's pediatrician, a New York State licensed physician who has treated Sarah since she was a baby, even though the school did not mention that this was required.

38.     Sarah's pediatrician shared Jane's concern about Sarah's safety and immediately agreed that Sarah needed an exemption.

39.     Jane submitted the physician's exemption on or about April 27, 2021.

40.     Soon after, Jane received a call from Jared T. Bloom, the Superintendent of the School District ("Superintendent Bloom"). Superintendent Bloom stated that the district had a policy not to give *any child* a mask exemption. He informed Jane that Sarah's exemption was therefore denied.

41.     Superintendent Bloom suggested that if Sarah was struggling, she could "request" a mask break and would have to separate herself from her classmates during any break and could not participate in school while taking a break.

42.     Jane reminded Superintendent Bloom that the so-called "requested" mask breaks

were not realistic, or sufficient, and were not being honored for the most part. He ignored her concern.

43.     Jane received follow-up calls from the school nurse, who called to report Sarah for taking mask breaks. The nurse reiterated that pursuant to district policy, "no medical exemptions would be allowed" from the mask mandate.

44.     Jane called the NYSDOH and the Nassau County local health department. Both confirmed that they do not have a policy of reviewing or denying mask exemption requests and that the regulations simply allow students to opt-out if they are having trouble breathing or feel that the mask is impairing their physical or mental health.

45.     Jane was forced to email the school to ask that their denial of her daughter's medical exemption be put in writing, again reiterating that New York State guidelines which are followed by Nassau County provide for a medical exemption for students and provide that any student whose mental or physical health might be impaired by wearing a mask could opt-out.

46.     Superintendent Bloom repeatedly told Jane that the NYSDOH did not allow exemptions and advised her to call Commissioner Zucker. When Jane called the NYSDOH, they would tell her that they do not review or deny medical exemptions from doctors. Jane continued to reiterate her request that the School District put the denial in writing throughout the month of May and into June.

47.     The School District put Jane off, claiming that updated guidelines on masks were expected any day.

48.     On June 4, 2021, Commissioner Zucker wrote a letter to Dr. Walensky, Director of the United States Centers for Disease Control ("CDC"), alerting the CDC that the NYSDOH planned to ease mask restrictions to comport with the more lenient recommendations the CDC

recommended for summer camp participants. Based on the science available, he indicated that the NYSDOH intended to make mask use optional for all students. The letter concluded, "[i]f there is any data or science that you are aware of that contradicts moving forward with this approach, please let me know as soon as possible. We plan to make this guidance effective on Monday June 7."

49. Upon information and belief, no such data or science was provided to contradict the new proposed NYSDOH policy of allowing mask use to be optional in school.

50. On June 8, 2021, the School District provided Jane with a written denial of the medical exemption for Sarah stating: "[t]he medical note that your doctor provided was reviewed by our district physician, Dr. Marino, and after speaking with Sarah's doctor it was determined by Dr. Marino that the mask was not creating difficulty with her asthma; therefore, there was no reason for this medical accommodation."

51. Dr. Marino, the School District's hired consultant who recommended that the School District deny Sarah's exemption, is an osteopath who has no expertise in Sarah's particular condition and has never met or treated Sarah. He refused to even speak to Sarah's mother about her condition. Dr. Marino is unqualified to make any determination about Sarah's medical needs or to provide sufficient informed consent under New York State law to override a treating doctor's opinion about use of an experimental medical product.

52. The School District letter also grossly misstated the facts. Alarmed at the misrepresentation in the School District's letter, Sarah's doctor wrote a follow up letter correcting the record on his position about Sarah's need for a mask:

> "I requested a mask exemption for [Sarah]. After speaking with Dr. Marino, he refused to grant it. It was not my decision to deny her mask medical exemption. Dr. Ron Marino made the decision to deny her medical exemption. He overruled my request for my patient's medical needs."

53.     Nothing in the law or in the emergency regulations permit schools to review or deny mask medical exemptions.

54.     Despite the second letter from Sarah's doctor clarifying that Sarah <u>does</u> need an exemption, the School District still refused to honor Sarah's mask exemption.

55.     Jane requested that Sarah at least be allowed to resume remote school, which was still an option in the School District. The School District then denied this request, stating: "virtual will not likely be the best option."

56.     On June 11, 2021, Jane submitted a 504-plan requesting that Sarah's classroom at least receive air conditioning and that Sarah could wear a face shield rather than a mask.

57.     At that point, it was over 90 degrees most days. School teachers and administrators were yelling at Sarah and harassing her any time she took her mask down to try to breathe. She was frightened and traumatized and losing more and more weight.

58.     On June 16, 2021, the School District told Jane that her request for any of these other reasonable accommodations was also denied.

59.     The School District suggested that if Sarah had a severe attack and went to the nurse rather than administered the inhaler herself as she'd been doing, they might allow a short exemption if the nurse concurred during the attack that it was severe enough for Sarah to need an exemption in the future.

60.     The school nurse is not a licensed physician or pulmonologist and has no expertise in Sarah's condition.

61.     Jane was not willing to allow her daughter to get to the point of a "severe" attack or risk serious harm so that a nurse could decide whether to honor Sarah's treating physician's advice.

62.     Jane hired the firm of Siri Glimstad, who wrote a letter to the School District on June 16, 2021. The letter alerted the School District that their policies were unlawful and constituted violations of Sarah's constitutional and statutory rights. Sarah's attorneys demanded that the School District institute an exemption for the remainder of the school year and respond with a confirmation that they would provide an exemption for the following year.

63.     On June 24, 2021, Governor Cuomo announced that the state disaster emergency was over, and with it, his emergency orders were no longer in effect.

64.     Before the start of this school year, Jane attempted to ascertain whether there would be another mask mandate imposed for the 2021-2022 academic year. She was told that no guidance had been issued yet but that guidance might be forthcoming.

65.     Proactively, Jane submitted another medical exemption from Sarah's pediatrician through counsel on August 24, 2021.

66.     On August 27, 2021, attorneys for the School District sent an email response stating that they were waiting for updated guidance from the NYSDOH and would send a response about whether masks would be required and Sarah's medical exemption accepted or denied the following week.

67.     On September 2, 2021, counsel for the School District sent a letter stating that the exemption would be denied based on the recommendation of the Dr. Marino. Dr. Marino based this decision on review of the CDC website which makes generalized representations about asthma and face masks. Specifically, the School District's attorneys stated that "in its guidance dated April 7, 2021, the CDC has taken the position that people with moderate to severe asthma are at an increased risk to be hospitalized for COVID-19 and therefore should wear a mask to cover their nose and mouth to reduce the risk of severe illness. *See CDC Guidance: People with*

*Moderate to Severe Asthma* (last updated 4.7.2021) (https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html)."

68.     The website cited by School District counsel, and apparently relied upon by the School District doctor, is vague and contains generalized statements that are not evidence-based or reliable.

69.     The CDC webpage is not a substitute for medical advice from a treating physician and offers no links to any studies or reputable data to support the assertions made therein.

### *Mask Mandates Lack Scientific Support*

70.     Use of masks to prevent getting or spreading COVID-19 is simply not supported by science.

71.     In fact, when Governor Cuomo announced a COVID-19 pandemic emergency in March 2020, public health authorities universally discouraged healthy people from wearing masks. The consensus in the scientific community was that prolonged use of masks by the general public could do more harm than good.

72.     Dr. Robert Redfield, director of the Centers for Disease Control ("CDC") testified before the House Foreign Affairs Subcommittee to advise against use of masks outside of hospital settings. The World Health Organization advised that use of masks by untrained healthy people outside of hospitals was likely to do more harm than good and was not recommended. Dr. Anthony Fauci, director of the National Institutes of Allergy and Infectious Disease (NIAID) testified to the United States Senate that healthy people should not wear masks.

73.     These initial recommendations were evidence-based. The science does not support an assumption that masks can stop the spread of SARS-CoV-2 or that prolonged mask use by the general public (especially children) is safe.

### *The Physical Properties of Masks Establish That They Cannot Prevent*

*Transmission of SARS CoV-2.*

74.    From a physical standpoint, the properties of masks versus the SARS-CoV-2 virus prove that masks simply cannot prevent the virus from exiting the nose and mouth of infected individuals into the air around them to be breathed in by others.

75.    The SARS-CoV-2 virus has a diameter of 60 nm to 140 nm [nanometers (a billionth of a meter)].  Medical and non-medical facemasks' thread diameter, on the other hand, ranges from 55 μm to 440 μm [micrometers (one millionth of a meter)], which is more than 1,000 times larger than the diameter of the virus.  Due to the difference in sizes between SARS-CoV-2 diameter and facemasks thread diameter (the virus is 1000 times smaller), SARS-CoV-2 can easily pass through any face mask.

76.    Multiple scientists and experts in this field have described the physical impossibility of stopping a virus with a mask as "like trying to stop a mosquito by putting up a chain link fence."

77.    Historians and public health scholars similarly describe the known futility of the masks employed during influenza 1918, often referencing the famous quote that "it is like trying to keep out dust with chicken wire."

78.    The physical impossibility of filtering the SARS-CoV-2 virus with masks is exacerbated by the lack of any seal between the wearer's face and the mask, which allows breath to exit wholesale sans any filtering whatsoever into the air around the wearer to be breathed in by others.

79.    The Occupational Safety and Health Agency sets standards for the use of masks to prevent infection by viruses.  OSHA certified masks seal effectively around the nose and mouth and prevent the inhalation or exhalation of viruses into the air by those wearing them

but can only be used with an external source of oxygen being pumped into the mask, much like a diver wearing an oxygen tank. The face coverings commonly used by or available to the public at large are not such masks, and are therefore not designed to, nor do they, prevent or reduce infection by the SARS-CoV-2 virus.

80.     Recently, Dr. Michael Osterholm, the Director for Infectious Disease Research and Policy at the University of Minnesota who served on the Biden transition team's COVID-19 task force, appeared on several news programs to discuss the lack of science justifying mask policy in the United States.

81.     In a PBS interview held August 3, 2021, Dr. Osterholm revisited his concern about the lack of scientific data justifying mask mandates and policy. He explained that the theories based on droplet reduction are outdated now that it is universally understood that SARS-CoV-2 is spread by aerosols. "People thought it was transmitted by respiratory droplets falling within six feet of us. Today we know that is not the science. We know these are transmitted with aerosols. If you want to know the difference – all those plexiglass plates you saw that were put up that supposedly separated you from me with six feet have no real purpose today at all. To understand and really the best way I can tell people…if you are in a room with someone and they are smoking and you smell it, you are getting basically inhaled aerosols."[3]

82.     Anyone who wears a cloth mask with a normal sense of smell can attest that they are still able to smell aromas through the mask. They are therefore able to catch and pass on SARS-CoV-2.

### *Scholarly Studies Establish Masks Have No Benefit.*

---

[3] Christiane Amanpour, PUBLIC BROADCASTING SERVICE, https://www.pbs.org/wnet/amanpour-and-company/video/do-masks-provide-much-protection-we-think-bglhwy/ (last visited Sept. 7, 2021).

83.     Scholarly studies reflect the physical reality that masks cannot stop the transmission of SARS-CoV-2.

84.     The first and only randomized, controlled trial evaluating the impact of mask-wearing on the spread of SARS-CoV-2 in six thousand individuals concluded that there was no statistically significant difference among the masked and unmasked controls sufficient to show that masks are effective in reducing or preventing infection from SARS-CoV-2.[4]

85.     A study by the Centers for Disease Control published in the *Emerging Infectious Disease Journal* in May 2020 found that ten randomized control trial studies of the use of face masks to control the influenza virus, a virus essentially the same size as the SARS-CoV-2 virus, showed no significant reduction in influenza transmission with the use of face masks.[5] These studies covered a wide range of environmental settings from University dorms to households, but the results were the same in each context.

86.     Similarly, a study of nearly two thousand United States Marine Corp recruits published in the *New England Journal of Medicine* on November 11, 2020, indicated that masks did not reduce or prevent the spread of SARS-CoV-2.[6]

87.     The WHO announced in 2020 that "at present, there is no direct evidence (from studies on COVID-19) on the effectiveness face masking of healthy people in the community

[4] Henning Bundgaard et al., *Effectiveness of Adding a Mask Recommendation to Other Public Health Measures to Prevent SARS-CoV-2 Infection in Danish Mask Wearers: A Randomized Controlled Trial*, 174 ANNALS OF INTERNAL MEDICINE 335 (2021) available at https://www.acpjournals.org/doi/pdf/10.7326/M20-6817 (last visited on Aug. 3, 2021).

[5] Xiao J, et al., *Nonpharmaceutical Measures for Pandemic Influenza in Nonhealthcare Settings—Personal Protective and Environmental Measures*, 26 EMERGING INFECTIOUS DISEASES 967(2020), available at https://wwwnc.cdc.gov/eid/article/26/5/19-0994_article (last visited on Aug. 3, 2021).

[6] Andrew G. Letizia, M.D. et al., *SARS-CoV-2 Transmission among Marine Recruits during Quarantine*, 383 The New England Journal of Medicine 2407 (2020), available at https://www.nejm.org/doi/full/10.1056/NEJMoa2029717 (last visited on Aug. 3, 2021).

to prevent infection of respiratory viruses, including COVID-19."[7]

### *Prolonged or Improper Mask Use Can Cause Harm*

88.     Politically, it is popular to dismiss the lack of science and follow slogans such as "something is better than nothing." However, not only does the data show that masks are ineffective, it also shows that prolonged, or improper use of masks can cause harm to the wearer and increase risk of serious respiratory disease.

89.     For example, a randomized, controlled trial conducted on 1,607 health care workers in 2015 found that "the rate of influenza-like illness is significantly higher" in the cloth mask controls than in those who wore no mask. The study concluded that "moisture retention, reuse of cloth masks and poor filtration made cloth masks more likely to lead to increased risk of infection for the wearer" and finished by stating that "cloth masks should not be recommended" and "guidelines need to be updated."[8]

90.     During a pandemic for a virus that is usually mild but can in some cases develop into a deadly respiratory illness, any intervention which could increase the likelihood of severe respiratory symptoms would understandably be unacceptable to some people, particularly the parent of a child who is at risk of serious respiratory complications.

91.     Another study shows that the temperature of the perioral skin rises after use of face masks for even one hour.[9] Coupled with prolonged casual use, moisture retention, reuse,

---

[7] *Advice on the use of masks in the context of COVID-19: interim guidance, 5 June 2020*, WORLD HEALTH ORGANIZATION (2020), available at https://apps.who.int/iris/handle/10665/332293 (last visited on Aug. 3, 2021).

[8] C. Raina MacIntyre et al., *A cluster randomised trial of cloth masks compared with medical masks in healthcare workers*, 5 British Medical Journal e006577 (2015), available at https://pubmed.ncbi.nlm.nih.gov/25903751/ (last visited on Aug. 3, 2021).

[9] Scarano A., et al., *Facial Skin Temperature and Discomfort When Wearing Protective Face*

and touching, the Mask Mandate creates the perfect breeding ground for dangerous viral, bacterial, and fungal infections. These again can lead to increased respiratory illness and death.

92.    A study by Anthony Fauci, M.D. and others in 2008 established that most of the deaths in the pandemic of 1918 were not from influenza, but rather from secondary bacterial infections that developed into pneumonia.[10] Certainly, any intervention that creates increased risk of localized bacterial and fungal infections should be avoided during a pandemic.

93.    Many COVID-19 deaths are also associated with secondary fungal infection. A recent study from India found that cloth mask use significantly increases the risk of developing Coronavirus disease-associated mucormycosis ("CAM")(a deadly fungal infection of the lungs seen in primarily in COVID-19 patients in India sometimes referred to as "Black Fungus" infection).[11] "Use of surgical or cloth masks for prolonged periods was found to be associated with an increased risk of CAM."

94.    In short, science does not support the proposition that the School Mask Mandate can or will reduce or prevent the spread of SARS-CoV-2; rather, it shows it may cause increased risk of viral, bacterial, and fungal infection and put children more at risk.

95.    Masks have become a political, not a scientific issue. Virtue signaling, shaming

*Masks: Thermal Infrared Imaging Evaluation and Hands Moving the Mask*, 17 *Int J Environ Res Public Health* 4624 (2020), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7369838/ (last visited on Sept. 7, 2021).

[10] Morens D.M., et al., *Predominant role of bacterial pneumonia as a cause of death in pandemic influenza: implications for pandemic influenza preparedness*, 198 *J Infect Dis*. 962 (2008), available at https://pubmed.ncbi.nlm.nih.gov/18710327/ (last visited Sept. 7, 2021).

[11] Umang Arora, et al., *Novel risk factors for Coronavirus disease-associated mucormycosis (CAM): a case control study during the outbreak in India,* MEDRXIV (forthcoming 2021), available at https://doi.org/10.1101/2021.07.24.21261040 (last visited on Sept. 7, 2021).

and rejection of any discussion of the actual evidence have become common in the public discourse and to a large extent the messaging from public health officials, who universally cautioned at the start of the pandemic that prolonged use of masks in healthy and asymptomatic people could lead to worse public health outcomes. They have no basis for changing these early recommendations now other than the political pressure that they are under.

96.     Dr. Osterholm describes the politicization of mask mandates as hindering honest and evidence-based recommendations: "needless to say, [mask policy] is a political hot button the likes of which I have never seen."[12]

97.     The political narrative is that the WHO, CDC, and Anthony Fauci and all other public health officials did think that masks, including cloth masks, were safe and effective at the start of the pandemic, but they each initially intentionally lied to the public when they advised against prolonged mask use in order to conserve PPE for medical professionals.

98.     But the evidence, when examined, does not support this narrative. In fact, as will be shown at trial, the evidence at the start of the pandemic showed that mask use by healthy or asymptomatic people is more harmful than helpful on an individual and general level; and, the evidence has not changed in any major way. Internal emails from Dr. Fauci reflect that he understood this very well.

99.     Though use of cloth masks may provide a false sense of security and hope that is comforting to some people in the face of a pandemic, the evidence does not support masking as

---

[12] PUBLIC BROADCASTING SERVICE, *Do Masks Provide as Much Protection as We Think?*, available at https://www.pbs.org/wnet/amanpour-and-company/video/do-masks-provide-much-protection-we-think-bglhwy/ (last visited Sept. 7, 2021); *see, also*, Michael T. Osterholm, COMMENTARY: My views on cloth face coverings for the public for preventing COVID-19, UNIV. OF MINNESOTA CENTER FOR INFECTIOUS DISEASE RESEARCH AND POLICY, available at https://www.cidrap.umn.edu/news-perspective/2020/07/commentary-my-views-cloth-face-coverings-public-preventing-covid-19 (last visited Sept. 7, 2021) .

a real tool to combat COVID-19. Placing vulnerable children, like Sarah, at risk of unnecessary harm is not justified by the emotional needs of adults who long for a security blanket.

100. Breathing is one of the most important and necessary physiological functions to sustain life and health. The human body requires a continuous and adequate oxygen supply to all organs and cells for normal function and survival. Breathing is also an essential process for removing metabolic byproducts, like carbon dioxide, occurring during cell respiration.

101. Masks are detrimental to human breathing function because they force users to rebreathe their own expelled air over extended periods of time, increasing levels of carbon dioxide and other detrimental elements in the body. They also impede the airflow and make it difficult to breathe, particularly for people with anxiety or respiratory issues. These concepts, though sometimes vilified by the public discourse as overblown, are not hard to prove and can easily be established in a hearing.

102. As will be further developed at trial, serious health effects that can be induced by prolonged mask use include but are not limited to fungal, bacterial and viral infection in the mouth and respiratory tract, fatigue, loss of concentration, headaches, loss of brain function, long-term neurodegenerative disease, lack of normal cognitive development, increased susceptibility to viral infections and illnesses, cardiovascular disease, hypertension, exacerbation of existing chronic disease, premature aging, premature death, hypoxia, hypercapnia, shortness of breath, increased lactate concentration, acidosis, toxicity, chronic inflammation, self-contamination, increase in stress hormone levels, increased muscle tension, immunosuppression, panic attacks, anxiety, claustrophobia, mood disturbances, and compromised cognitive performance.

103. Sarah has experienced many of these adverse impacts and cannot medically tolerate wearing a face covering for extended periods.

104. Other countries are beginning to rollback or question the safety and efficacy of any mask mandates for school children. In March, Ireland's Department of Health announced it won't require masks in schools because they "may exacerbate anxiety or breathing difficulties for some students." This is precisely the reason that Sarah needs a medical exemption.

105. In the U.K., elementary students are not generally required to wear masks at all. An article published in the New York Times August 27, 2021 (updated September 1, 2021) quoted a well-respected British specialist explaining the reasons for the differing policy on face masks in the U.K.

> "The U.K. has always, from the beginning, emphasized they do not see a place for face coverings for children if it's avoidable," said Dr. Shamez Ladhani, a pediatric infectious-disease specialist at St. George's Hospital in London and an author of several government studies on the virus and schools. The potential harms exceed the potential benefits, he said.[13]

106. In addition to adverse physical repercussions, prolonged mask use imposes psychological trauma on many children, including Sarah.

107. Historically, masks have been used as a form of torture in prisons, to isolate prisoners from one another and to dehumanize them.

108. Masks break down the social structure that human beings naturally require and can lead to depression, feelings of disconnection and other serious psychological consequences.

109. No peer-reviewed data has established that use of masks in schools is safe for children, physically or psychologically.

110. Sarah's licensed physician certifies that she is at risk of harm and requires a mask exemption to safeguard her health. There is no rational reason, leave aside compelling reason, for

---

[13] Dana Goldstein, *In Britain, Young Children Don't Wear Masks in School*, THE NEW YORK TIMES (published on Aug. 27, 2021), available at https://www.nytimes.com/2021/08/27/us/students-masks-classrooms-britain.html (last visited Sept. 7, 2021).

the School District or the state to override that medical exemption determination.

### *The Mask Mandate Violates Federal Law Governing Experimental Use Products and Devices.*

111.    Pursuant to federal law, masks and face coverings are regulated devices and require FDA approval or authorization when used for a medical purpose. Mitigating the spread of infectious disease is defined as a medical purpose.

112.    None of the currently available face coverings for COVID-19 is approved or licensed by the federal government for use by children. Rather, face coverings for use by lay people outside of hospitals are only allowed conditionally by Emergency Use Authorization ("EUA").

113.    By the express terms of their EUA letters, and the governing statutes that regulate EUA products, a primary condition is that masks may not be mandated.

114.    The EUA letters issued by the FDA clarify that masks and face coverings, even surgical masks, have not been established as safe or effective for use in mitigating infection.

115.    In fact, the FDA has labeled masks experimental devices requiring, *inter alia*, that the user must be advised of his right to refuse to use the experimental device or product. *See* 21 U.S.C. § 360bbb-3(e)(1)(A) ("Section 360bbb-3").

116.    Commissioner Zucker's school mask mandate violates and is preempted by federal law.

117.    The FDA takes the position that the terms and conditions of EUAs preempt state and local laws. *See* 21 U.S.C. § 360(k)(a), "General rule Except as provided in subsection (b), no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement that would impose obligations that are inconsistent with those terms and conditions." *See, also,* Emergency Use Authorization of Medical Products

and Related Authorities: Guidance for Industry and Other Stakeholders at 39-40 available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/emergency-use-authorization-medical-products-and-related-authorities:

> "FDA believes that the terms and conditions of an EUA issued under section 564 preempt state or local law, both legislative requirements and common-law duties, that impose different or additional requirements on the medical product for which the EUA was issued in the context of the emergency declared under section 564… To the extent state or local law may impose requirements different from or in addition to those imposed by the EUA for a particular medical product within the scope of the declared emergency or threat of emergency (e.g., requirements on prescribing, dispensing, administering, or labeling of the medical product), such law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and 'conflicts with the exercise of Federal authority under [§ 564].'"

118.    The Mask EUAs also each specify that "emergency use of face masks must be consistent with, and may not exceed, the terms of this letter….".

119.    Further, the Mask EUAs state that the products must not be labeled in such a manner that would misrepresent the product's intended use; for example, the labeling must not state or imply that the product is intended for antimicrobial or antiviral protection or related uses or is for use such as infection prevention or reduction.

120.    Similarly, in its Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency (Revised),[14] the FDA stated in three instances that face masks are not intended to reduce or prevent infection:

> The product is not intended for any use that would create an undue risk in light of the public health emergency, for example the labeling does not include uses for antimicrobial or antiviral protection or related uses *or uses for infection prevention or reduction or related uses* and does not include particulate filtration claims.

---

[14] FOOD AND DRUG ADMINISTRATION, *Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency* (Revised May 2020), https://www.fda.gov/media/136449/download (last visited on Aug. 3, 2021).

*Id.* at 7-8.

121. The School Mask Mandate and subsequent communication to Sarah from the School District not only misleads Sarah's family and the public by implying that masks can be used for antiviral protection and to stop the spread of COVID-19, but conflicts with the EUA's terms and is preempted under the Supremacy Clause.

### The Use of Face Coverings by the General Population is Experimental, and the Mask Mandate is a Forced Human Experiment.

122. The School Mask Mandate is a grand experiment on our children that robs families of the right to decide whether to be subjected to medical experimentation in direct violation of international, federal, and state law.

123. Masks are traditionally worn by healthcare workers, who are trained in their use, and who typically only wear them for single use in limited circumstances and for short periods of time, replacing them frequently and refraining from touching them or putting them down.

124. The function of masks in healthcare is generally to keep secretions and droplets from falling into sterile surgical procedures, not to prevent the spread of viruses.

125. Before the COVID-19 pandemic, the only time masks were required for use by lay people in public spaces in the United States was during the 1918 flu pandemic. Even then, they were only mandated in certain cities for a matter of a few weeks – certainly not for months or years.

126. Scientific consensus on the short-term and long-term medical and psychological impact on the public (and children in particular) from large-scale, forced, prolonged use of face coverings does not exist.

127. The existing data tends to show that masks are ineffective and potentially unsafe when used by the general public to stop the spread of disease.

128.     While there is insufficient data to support mask use by adults, the complete dearth of studies examining the safety or effectiveness of mask use for children is shocking given the rush to impose mandates on kids and to deny and overrule treating physicians who certify that a mask is not safe for a particular child.

129.     Children are still developing and in addition to being subject to different psychological and physiological health impacts than adults, children are inherently less able to observe strict protocols, such as washing and sterilizing hands before putting a mask on or taking it off, refraining from ever touching a mask, replacing a mask after a certain number of hours, or whenever it is inadvertently touched, ensuring a tight seal around the mask, and all of the other rules governing mask use in hospital settings.

130.     A paper published in February 2021 reviewing available data on the safety of face masks for children found that there had only been two studies done on children regarding mask use, and neither was relevant. "The lack of paediatric studies" forced the authors to look at adult studies and hope that the same findings would apply to children. The paper stressed that further study was needed to provide any evidence-based guidelines for mask-use in child populations.[15]

131.     A recent opinion published by leading experts in the field states in no uncertain terms that there is no evidence to support mask mandates.[16] The authors of the opinion are Dr. Marty Makary, a professor at the John's Hopkins School of Medicine and editor-in-chief of Medpage Today, and Dr. H. Cody Meissner, chief of pediatric infectious diseases at Tufts

---

[15]  Martin Eberhart, Stefan Orthaber & Reinhold Kerbl, *The impact of face masks on children—A mini review,* 110 ACTA PAEDIATRICA 1778) (2021), available at https://onlinelibrary.wiley.com/doi/10.1111/apa.15784 (last visited on Sept. 7, 2021).

[16]  Marty Makary & H. Cody Meissner, *Opinion: The Case Against Masks for Children*, THE WALL STREET JOURNAL (published Aug. 8, 2021), available at https://www.wsj.com/articles/masks-children-parenting-schools-mandates-covid-19-coronavirus-pandemic-biden-administration-cdc-11628432716?reflink=desktopwebshare_permalink (last visited Sept. 7, 2021).

Children's Hospital and advisor on the FDA advisory panel for COVID-19. Noting the potential for serious psychological and physical harm, the authors concluded that forced mask use on children is impermissible medical experimentation and constitutes "child abuse" in their expert opinions.

132.    It is by now well-settled that medical experiments, better known in modern parlance as clinical research, may not be performed on human subjects without the prior, free, and informed consent of the individual.

133.    In short, forced human experiments are so universally recognized as unethical, illegal, and abhorrent that the right of informed consent constitutes a *jus cogens* norm under international law.

134.    The globally recognized standards established under international law are binding upon the United States and, when violated, create a cause of action enforceable by citizens of the United States damaged thereby.

### *A Brief History of the Universal Prohibition on Human Experimentation Without Consent.*

135.    One of the chilling horrors that emerged from the rubble of World War II was the discovery that Nazi doctors had been conducting medical experiments, including experiments with various vaccines, on unwilling victims in concentration camps.

136.    On August 8, 1945, the prevailing Allies, acting "in the interest of All the United Nations" established an International Military Tribunal (the "IMT").

137.    Under the aegis of this law, U.S. military tribunals tried "lower-level" war criminals, such as doctors accused of conducting medical experiments without their subjects' consent. [17]

---

[17] Sources for the historical facts set forth herein can be found in *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009), which explains in detail the history and reasons why the prohibition against nonconsensual human

138.    In August 1947, Military Tribunal 1, staffed by American Judges and prosecutors and conducted under American procedural rules, issued final judgment against fifteen doctors who were found guilty of war crimes and crimes against humanity for conducting nonconsensual experiments, which included the testing of drugs for immunization against malaria, epidemic jaundice, smallpox, and cholera, as well as use of experimental medical devices.

139.    Seven of the convicted doctors were sentenced to death and the remaining eight were sentenced to terms of imprisonment. Their argument that the experimentation was for the greater good was unavailing.

140.    The tribunal emphasized that "in every instance appearing in the record, subjects were used who did not consent to the experiments; indeed, as to some of the experiments, it is not even contended by the defendants that the subjects occupied the status of volunteers."

141.    The final Judgment concluded that "manifestly human experiments under such conditions are contrary to the principles of the law of nations as they result from usages established among civilized peoples, from the laws of humanity, and from the dictates of public conscience." The doctors were convicted of war crimes and crimes against humanity.

142.    As part of its final judgment, to alert the world that it is a war crime to subject people to medical treatments and experiment without their free and informed consent, the tribunal promulgated the Nuremberg Code on Permissible Medical Experiments. Point One of the Nuremberg Code states: "**The voluntary consent of the human subject is absolutely essential.**"

143.    This universal acceptance of informed consent as the most basic and fundamental human right has since been repeatedly ratified and adopted around the globe, in laws, treaties, regulations, and ethical guidelines for medical research. For example, in 1964, the World Medical

---

experimentation should be regarded as a *jus cogens* norm.

Association adopted the Declaration of Helsinki, which provides that human subjects "must be volunteers and informed participants in the research project." Declaration of Helsinki at Art. 20.

144. Although themselves non-binding, the principles underlying the Declaration of Helsinki and the Nuremberg Code have been incorporated into international conventions, as well as the laws and regulations of countries around the world, including the United States of America, which are binding in United States courts.

145. The International Covenant on Civil and Political Rights of the United Nations ("ICCPR"), which went into effect in 1976, provides in Article I that "all peoples have the right of self-determination" and in Article 7 that "no one shall be subjected without his free consent to medical or scientific experimentation."

146. The informed consent principles of the Declaration of Helsinki were also incorporated by a 2001 Directive of the European Parliament and the Council of the European Union.

147. In addition, 35 members of the Council of Europe have signed the Convention on Human Rights and Biomedicine, which provides that informed consent is required for a subject's involvement in medical research.

148. In 2005, the General Conference of UNESCO adopted the Universal Declaration on Bioethics and Human Rights, requiring prior, free, and informed consent for participation in medical treatments and research.

149. The United States clearly regards itself as bound by the provisions of the Nuremberg Code and the Declaration of Helsinki.

150. The highest courts in the United States also recognize that the right to informed consent codified in the Nuremberg Code is a fundamental right guaranteed by the U.S.

Constitution.

151.    These principles have been adopted by statutes and regulations in the United States as well as case law.

152.    In 1979, the Department of Health, Education and Welfare issued the Belmont Report, which addressed the issue of informed consent in the human experimentation setting. The Report identified respect for self-determination by "autonomous persons" as the first of three "basic ethical principles" which "demands that subjects enter into the research voluntarily and with adequate information."

153.    Ultimately, the principles of the Belmont Report, which itself was guided by the Nuremberg Code and the Declaration of Helsinki, were adopted by the FDA in its regulations requiring the informed consent of human subjects for medical research. *See* 21 C.F.R. § 50.20.[18]

154.    The Department of Health and Human Services has similarly adopted this standard in its regulations governing grants for medical research. *See* 45 C.F.R. § 46.116.

155.    The State of New York has also adopted the principle of informed consent for all medical treatment. *See* § 2805-d NY Pub Health L § 2440 (2012) of the New York Public Health Law (requiring informed consent for medical treatment). Additionally, New York recognizes a common law right to informed consent, under which forced medical interventions are batteries.

156.    For these and other reasons, the prohibition against nonconsensual human experimentation must be regarded not only as established by U.S. law and regulations, but also as so broadly recognized by all nations as to constitute a *jus cogens* norm under international law.

---

[18] The exceptions to this standard are extremely narrow, and require certification by a researcher and an independent physician that, for example, "[t]he human subject is confronted with a life-threatening situation necessitating the use of the test article"; informed consent cannot be obtained from the subject; time does not permit obtaining informed consent from the subject's legal representative; and "there is available no alternative method of approved or generally recognized therapy that provides an equal or greater likelihood of saving the life of the subject." 21 C.F.R. § 50.23. *See also* 21 C.F.R. § 50.24 (providing a similarly narrow exception to informed consent requirements for emergency research).

157. Plaintiff does not consent to allow her daughter to be part of an experiment.

158. Sarah was severely harmed by her school's refusal to honor her medical exemption last year. Sarah has not recovered from that trauma yet. She is still severely underweight, and she suffers from crippling anxiety as well as depression and fear about the upcoming year. Her mother fears for her physical, mental and emotional safety if she has to start wearing a mask at school again this week.

159. Plaintiff seeks declaratory and injunctive relief so her daughter can attend school without being subjected to unwanted and unlawful medical experimentation and denial of her basic right to exercise a medical exemption from a state experiment that puts her at risk of harm.

160. All conditions precedent to bringing this lawsuit have been performed, excused, or waived.

## COUNT I

### DECLARATORY JUDGMENT ACTION BASED UPON
### FEDERAL PREEMPTION / VIOLATION OF THE SUPREMACY CLAUSE
*Against All Defendants*

161. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

162. Federal laws and regulations governing the use and administration of masks preempts any and all contrary or inconsistent laws of the States and/or local governments.

163. The Mask Mandate is patently contrary to United States law, and thus preempted and invalid.

164. Title 21 United States Code, section 360bbb-3(e)(1)(A)(ii), and regulations and internal protocols of the United States Food and Drug Administration promulgated thereunder, provide in relevant part that all individuals to whom an investigational product is to be

administered under an Emergency Use Authorization be informed "of the option to accept or refuse administration of the product. . .."

165.    Because the masks at issue in this mandate are each investigational products, only permitted for use under an Emergency Use Authorization, the laws and regulations of the United States prohibit state and local governments from requiring them for any person who does not consent to their administration, including Plaintiff and her daughter.

166.    Plaintiff does not consent to allow her daughter to be forced to use this experimental device, especially as it would be against the medical advice of her child's treating physician.

167.    As well, Title 21, Part 50 of the Code of Federal Regulations governs the protection of human subjects in the conduct of all clinical investigations regulated by the U.S. Food and Drug Administration.

168.    21 C.F.R. section 50.20 provides that, "[e]xcept as provided in §§ 50.23 and 50.24, no investigator may involve a human being as a subject in research covered by these regulations unless the investigator has obtained the legally effective informed consent of the subject or the subject's legally authorized representative."

169.    Masks are experimental and still under investigation pursuant to the terms of their EUAs. Studies are being conducted on a population-wide basis, including studies examining New York State school children such as Sarah.

170.    None of the exemptions provided in sections 50.23 and 50.24 apply to Plaintiff or her daughter. Plaintiff is a fit parent and thus competent to make a decision concerning medical treatment and experimentation for her daughter.

171.    The Mask Mandate violates federal law and regulations governing the administration of experimental medicine and is preempted.

172.    Plaintiff has no adequate remedy at law available against Defendants for the injuries and the irreparable harm she and her daughter will imminently suffer as a direct result of the School Mask Mandate.

WHEREFORE, Plaintiff respectfully requests that the Court enter a declaratory judgment that Commissioner Zucker's School Mask Mandate violates and is preempted by the laws and regulations of the United States governing the administration of investigational medical products, for an injunction prohibiting enforcement of the Mask Mandate by Commissioner Zucker, his agents or assigns, and by the School District, for attorneys' fees, costs pursuant to 42 U.S.C. § 1988, and such further relief as the Court deems just.

## COUNT II

### VIOLATION OF SUBSTANTIVE DUE PROCESS
### 42 U.S.C. § 1983

*Against All Defendants*

173.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

174.    Plaintiff has a protected Fourteenth Amendment right to life, and to protect her daughter's life, secured by the Due Process Clause of the United States Constitution, which includes the right to refuse non-consensual administration of any objectionable medical product, and/or to be free from the forced administration of medical procedures and devices that Plaintiff reasonably believes may cause her daughter harm.

175.    Binding precedent from the Supreme Court of the United States holds that states cannot condition acceptance of a medical exemption written by a state-licensed physician on the consent of the state or any third party. The School District is violating the Plaintiff's fundamental right to make medical decisions for her daughter in accordance with the advice of her chosen

licensed physician. *See, e.g.*, *Doe v. Bolton*, 410 U.S. 179 (1973) (holding that a state cannot overrule or impose corroboration requirements on medical exemptions written by state-licensed physicians); *Whalen v. Roe*, 429 U.S. 589 (1977) (citing *Doe* for the well-recognized holding that states cannot condition a person's right to follow their chosen physician's medical advice on the consent of the state or a third party). To the extent that Commissioner Zucker has issued an unofficial policy instructing schools to review or deny medical exemptions written by a state-licensed physician, he is also violating Plaintiff's fundamental right in the same regard.

176. As well, or in the alternative, Plaintiff has protected liberty interests, secured by the Due Process Clause of the United States Constitution, international protocols and treaties adopted by and entered into by the United States, and by the laws and regulations of the United States, to be free from burdens on rights deemed "fundamental" in nature.

177. The School Mask Mandate violates several fundamental rights, including but not limited to the right to be free from forced medical experimentation (also referred to as the right to "informed consent" or the right to "bodily integrity").

178. This right is not only acknowledged as a fundamental right pursuant to United States Supreme Court jurisprudence but is also recognized as a *jus cogens* norm under the laws of nations.

179. As set forth more fully above, masks are defined as experimental products and their forced use constitutes forced participation in medical experimentation.

180. As well, or in the alternative, Plaintiff has fundamental right, secured by the Due Process Clause of the Fourteenth Amendment of the United States Constitution, to make medical decisions on behalf of her daughter. Plaintiff has not been found to be an unfit parent, and thus is vested with the authority to choose between competing medical opinions about what is safest for

her daughter, and whether to consent to allow her daughter to participate in using an experimental medical product.

181.    The School District and Commissioner Zucker are violating Plaintiff's fundamental parental rights by attempting to usurp her authority to decide between competing medical opinions and follow the advice of her treating physician.

182.    As well, or in the alternative, Plaintiff and her daughter have the right to breathe fresh air, unimpeded by an experimental medical device which can impede breathing. Breath is the very source of life and health, and each person has a self-defense right to protect against state mandates that threaten one's life or health.

183.    Both facially and as applied, the Mask Mandate promulgated by Commissioner Zucker and applied by the School District, is not sufficiently tailored to violate the fundamental rights at stake.

184.    Considering the serious rights at stake, and the dearth of evidence to show this policy is effective, there is no rational reason to mandate masks in school for any child. Forcing a child to use an experimental medical device when her licensed physician has certified she may be at harm from the device simply shocks the conscience.

185.    Plaintiff has no adequate remedy at law available against Defendants for the injuries and the irreparable harm she and her daughter will imminently suffer as a direct result of the School Mask Mandate.

WHEREFORE, Plaintiff respectfully requests that the Court enter a declaratory judgment that Defendants' Mask Mandate violates Plaintiff's substantive Due Process rights, for an injunction prohibiting enforcement of the Mask Mandate, for attorneys' fees, costs pursuant to 42 U.S.C. § 1988, and such further relief as the Court deems just.

## COUNT III

### VIOLATION OF NEW YORK STATE'S RECOGNIZED COMMON LAW RIGHTS TO REFUSE UNWANTED MEDICAL TREATMENT AND MAKE MEDICAL DECISIONS FOR ONE'S CHILDREN

*Against All Defendants*

186.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

187.    New York law recognizes the long-established common law right to refuse unwanted medical care. *See, e.g.*, *Matter of Westchester Cty. Med. Ctr. on Behalf of O'Connor*, 72 N.Y.2d 517, 528 (1988) ("It has long been the common-law rule in this State that a person has the right to decline medical treatment, even life-saving treatment, absent an overriding State interest….").

188.    Under New York law, the state also recognizes the concurrent parental right to determine the course of a child's care when there are conflicting medical opinions about what is best for the child. *See, e.g.*, *Matter of Hofbauer*, 47 N.Y.2d 648 (1979) (citing *Doe v. Bolton*, 410 U.S. 179, 199 (1973), for the holding that fit parents have a protected right under NY and federal law to decide on the course of treatment and to select which physician's advice to follow in cases of disagreement between physicians).

189.    Informed consent is further protected pursuant to New York Public Health Law §2805-d (the "Medical Malpractice Act") which codifies the principle of informed consent from common law into a statutory protection. Pursuant to the Medical Malpractice Act, and related sections of the Public Health Law, the School District, which is forcing Plaintiff's daughter to use an experimental medical product against the advice of her treating physician, has failed to disclose the risks and lack of data on mask use in children generally, and more specifically in children

suffering from anxiety, migraines and asthma, and has failed to obtain consent to override the treating physician's recommendation against use of masks. To the extent that the School District believes that Sarah's asthma will be better treated by using a mask, that decision is not supported by science and cannot be forced on Sarah or her family. Nor is the school in the position to provide Sarah's family with sufficient information to be able to follow their unsolicited medical advice.

190.    Plaintiff has no plain, adequate nor complete remedy to protect the constitutional and/or legal rights and redress the wrongs and illegal acts complained of herein, other than to seek immediate and continuing injunctive relief.

WHEREFORE, Plaintiff respectfully requests that the Court enter a declaratory judgment that Commissioner Zucker's Mask Mandate is unlawful under New York law, and for an injunction prohibiting enforcement of the Mask Mandate, for attorneys' fees, costs pursuant to 42 U.S.C. § 1988, and such further relief as the Court deems just.

## COUNT IV

## DECLARING THE MASK MANDATE UNCONSTITUTIONAL UNDER THE UNITED STATES CONSTITUTION AND CORRESPONDING SEPARATION OF POWERS CLAUSE OF THE NEW YORK CONSTITUTION

191.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

192.    NYSDOH regulations, including the mask mandate issued by Commissioner Zucker pursuant to powers given through emergency NYSDOH regulation, have the force of law commensurate with a statute.

193.    The United States Constitution establishes three separate but equal branches of government: the legislative branch makes the laws, the executive branch enforces the laws, and the judicial branch interprets the laws. The Framers structured the government in this way to

prevent one branch of government from becoming too powerful and to create a system of checks and balances.

194.    The Constitution of the State of New York similarly requires that statutes be passed by each separate house of the New York legislature before they can have the force of law.

195.    Specifically, Article III, section 13 of the Constitution of the State of New York provides that "The enacting clause of all bills shall be 'The People of the State of New York, represented in Senate and Assembly, do enact as follows,' and no law shall be enacted except by bill."

196.    The Mask Mandate, issued by emergency declaration by Commissioner Zucker, through executive branch department action taken over two months after the state disaster emergency was declared over, unbalances this constitutional framework by allowing the executive branch to issue directives with the force of law without proper delegation from the legislature.

197.    Plaintiff has no plain, adequate nor complete remedy to protect the constitutional and/or legal rights and redress the wrongs and illegal acts complained of herein, other than to seek immediate and continuing injunctive relief.

198.    Absent an injunction, the harm to Plaintiff and her legal and constitutional rights exceeds any harm that the Defendant would suffer if prohibited from continuing to implement and enforce a directive that violates the separation of powers set forth in the New York and United States Constitution.

199.    Neither Commissioner Zucker nor the NYSDOH have been delegated specific authority to issue laws *sua sponte* mandating the use of experimental face coverings.

200.    The school mask mandate violates the Supremacy Clause of the United States Constitution as well as the New York State Constitution. *See, e.g.*, *Boreali v. Axelrod*, 71 N.Y.2d

1, 517 (1987) (Public Health Council exceeded its authority under enabling statute when it promulgated code banning smoking indoors).

201.    Plaintiff has no plain, adequate nor complete remedy to protect the constitutional and/or legal rights and redress the wrongs and illegal acts complained of herein, other than to seek immediate and continuing injunctive relief.

WHEREFORE, Plaintiff respectfully requests that the Court enter a declaratory judgment that Defendant's Mask Mandate is unconstitutional and beyond the scope of permissibly delegated powers of the NYSDOH, for an injunction prohibiting enforcement of the Mask Mandate, for attorneys' fees, costs pursuant to 42 U.S.C. § 1988, and such further relief as the Court deems just.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury for all matters so triable.

DATED this 7th day of September 2021.

Gibson Law Firm, PLLC

*/s/ Sujata S. Gibson*

**Sujata S. Gibson,**
*Attorney for Plaintiff*
Gibson Law Firm, PLLC
407 N Cayuga St, Suite 201
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law


Robert F. Kennedy, Jr., Children's Health Defense, *Of Counsel pending admission*
Mary Holland, Children's Health Defense, *Of Counsel pending admission*