UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
JANE DOE on behalf of herself and
her minor child, SARAH DOE,

                  Plaintiff,

   -against-

FRANKLIN SQUARE UNION FREE
SCHOOL DISTRICT, and MARY
BASSETT, in her official capacity as
Commissioner of the New York State
Department of Health

                  Defendants.
------------------------------------------------x

**MEMORANDUM AND ORDER**

Case No. 2:21-5012-FB-SIL

*Appearances:*
*For the Plaintiff*:

SUJATA S. GIBSON
Gibson Law Firm, PLLC
407 N. Cayuga Street, Suite 201
Ithaca, New York 14850

ROBERT F. KENNEDY, JR.
MARY HOLLAND
Children's Health Defense

*For the Defendants*:

ADAM I. KLEINBERG
Sokoloff Stern LLP
179 Westbury Avenue
Carle Place, New York 11514

TODD ALAN SPIEGELMAN
Office of the Attorney General
State of New York
28 Liberty Street, 17th Floor
New York, New York 10005

**BLOCK, Senior District Judge:**

      Plaintiff brings this action on behalf of herself and her minor daughter

against defendants Franklin Square Union Free School District (the "School

1

District") and the Commissioner of the New York State Department of Public Health in her official capacity (the "Commissioner")[1] alleging that the Commissioner's regulation requiring that New York State's school students wear masks (the "Mask Mandate") violates their constitutional substantive due process rights.

Plaintiff has moved for a preliminary injunction to prohibit defendants from enforcing the Mask Mandate. That motion is denied as a matter of law based on the parties' submissions. But plaintiff also has two state law claims, and the Court has ordered a factual hearing as to whether preliminary injunctive relief should be fashioned based on those claims.

## I.    Background

The web that has entangled our nation in dealing with the myriad challenges spawned by the COVID-19 pandemic has ensnared our children. Now that the new school year has begun, the debate rages as to whether they should be required to be masked while attending school. Our country is being challenged to rationally decide how to best protect the health of our children in uncharted waters that make all of us medical guinea pigs. Indeed, there is no conclusive study as to either the short-term or long-term effects that mask wearing could have on children.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Mary Bassett, the Commissioner of Health, has been substituted for former Commissioner Howard Zucker.

Nonetheless, for the following reasons, I am constrained to deny plaintiff's request for preliminary injunctive relief based on her alleged constitutional violations. However, since the Court is sensitive to the concerns that parents have for their children, it believes that a full exploration of the national mask mandate dynamics at play and the reach of the Commissioner's actions is warranted, as well as the reasons why the Court, *sua sponte*, ordered a hearing on the state law claims to determine whether they might separately merit preliminary injunctive relief.

The logical starting point is to comprehend the balance struck by our founding fathers between the powers of the federal government and those of the states, which informs us as to which level of government they decided should be responsible for enacting laws affecting our country's health and safety, and the standards that judges must employ in assessing the constitutionality of those laws.

## A.    The Tenth Amendment and the Police Power

The Tenth Amendment reads:

> The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

U.S. Const. Am. X.

By contrast, unlike those of the federal government, the States' powers do not flow from the Constitution, and they do not need Constitutional authorization to act. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 535-36 (2012): "Our

cases refer to this general power of governing, possessed by the States but not by the Federal Government, as the 'police power.'" *Id.*

The police power has traditionally encompassed "the authority to provide for the public health, safety, and morals . . . ." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569 (1991). The protection of public health is one of the historical underpinnings of the police power. *See, e.g., Stone v. State of Mississippi*, 101 U.S. 814, 818 (1879) ("No one denies . . . that it extends to all matters affecting the public health or the public morals."); *Mugler v. Kansas*, 123 U.S. 623 (1887) (police power entitles the legislature to enact measures "for the protection of the public morals, the public health, or the public safety.").

In the landmark *Slaughter-House Cases*, the Supreme Court noted that the police power incorporates the principle "that every person ought so to use his property as not to injure his neighbors; and that private interests must be made subservient to the general interests of the community." 83 U.S. 36, 62 (1872). Thus, "[the police power] extend[s] to the protection of the lives, health, and property of the citizens . . .  and demand[s] the application of the maxim, *salus populi suprema lex.*" *Bos. Beer Co. v. State of Massachusetts*, 97 U.S. 25, 33 (1877).[2]

---

[2] "[S]alus populi suprema lex, derived from Cicero, is typically translated as 'let the good of the people be the supreme law.'" Stephen R. Miller, *Community Rights and the Municipal Police Power,* 55 SANTA CLARA L. REV. 675, 687 (2015).

In 1905, the Supreme Court applied the police power to vaccine mandates in *Jacobson v. Commonwealth of Massachusetts*. 197 U.S. 11 (1905). Explicitly citing the police power, the Court upheld a broad construction of the States' powers to regulate public health and reaffirmed that public health is the domain of the states and their legislatures. *Id.* at 24-25. A matter of public health is "for the legislative department to determine in the light of all the information it had or could obtain." *Id.* at 30. Consistent with the historical conception of the police power, the *Jacobson* court noted that, at least where the police power is concerned, liberty of the individual is tempered by the common good:

> The possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community. Even liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will. It is only freedom from restraint under conditions essential to the equal enjoyment of the same right by others. It is, then, liberty regulated by law.

*Id.* at 26-27.

*Jacobson* established a two-part test for judicial review of public health regulations: Such a regulation should only be struck down if it (1) "has no real or substantial relation" to public health, or (2) "is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id.* at 31.

But *Jacobson* predates judicially established tripartite nuanced tiers of review to assess a statute's constitutionality. Under those tiers, if the right

infringed is fundamental or the law relies upon a suspect classification, strict scrutiny is applied. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). Under that standard, a law is upheld only if it is narrowly tailored to a "compelling state interest." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). If the law does not infringe upon a fundamental right but "incidentally" burdens a First Amendment right or implicates a quasi-suspect classification such as one predicated on gender, intermediate scrutiny would apply. *See United States v. O'Brien,* 391 U.S. 367, 376 (1968) (First Amendment); *Craig v. Boren,* 420 U.S. 190 (1976) (gender discrimination). Under that standard the law must also be narrowly tailored but must need be "no greater than is essential" to the furtherance of an important or substantial governmental interest. *O'Brien,* 391 U.S. at 376-77. In all other cases, rational basis review is the standard. *See San Antonio*, 411 U.S. at 17. Under that standard, the law would be constitutionally flawed only if it was not "rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440.

Thus, courts are challenged today with the task of harmonizing *Jacobson* and the test it iterates with the tripartite modern standards of review typically used by courts evaluating constitutional challenges.

Further complicating the challenge is some inconsistency in the Supreme Court's substantive due process jurisprudence. In *Rochin v. California*, 342 U.S.

165 (1952), the defendant swallowed morphine capsules during a search, whereupon sheriff deputies took him to a hospital to have his stomach pumped to recover evidence. The Supreme Court held 8-0 that such conduct violated the Due Process Clause because it "shocks the conscience." *Id*. at 209. Three years later, it articulated the modern formulation of rational basis review in *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483 (1955).  Nevertheless, courts have continued to invoke the "shocks the conscience" standard in substantive due process cases. For example, in *Maniscalco v. New York City Department of Education*, 2021 WL 4344267 (Sept. 23, 2021) *aff'd* No. 21-2343 (2d Cir. Oct. 15, 2021),[3] Judge Cogan held that a mandatory vaccination order for employees of the city's Department of Education was not "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at *3 (quoting *Hurd v. Fredenburgh*, 984 F.3d 1075, 1087 (2d Cir. 2021)).

Although the interplay between the "shocks the conscience" standard and rational basis review is not clear, it appears that the former is generally reserved for evaluating individual governmental actions not embodied in a statute, regulation or similarly binding statement of policy. Since the Mask Mandate is a regulation, the

---

[3] The Second Circuit affirmed Judge Cogan's denial of a temporary restraining order "for substantially the reasons stated in [his] thoughtful memorandum decision of September 23, 2021 . . . ." *Maniscalco v. N.Y.C. Dep't of Educ.,* No. 21-2343 (2d Cir. Oct. 15, 2021).

Court applies the tripartite levels of scrutiny rather than the "shocks the conscience" standard.

One circuit court has recently applied the more permissive *Jacobson* standard. *See In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020) (overturned on unrelated grounds). As stated in *Abbott*:

> [W]hen faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some real or substantial relation to the public health crisis and are not beyond all question, a plain, palpable invasion of rights secured by the fundamental law.

*In re Abbott*, 954 F.3d at 784.

However, at least in the context of the free exercise clause, the Supreme Court has rejected *Abbott's* embrace of *Jacobson. See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (applying strict scrutiny). And the Second Circuit has followed suit. *See Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 635 (2d Cir. 2020) (noting that reliance on *Jacobson* is "misplaced" in the context of a free exercise challenge to COVID-19 restrictions); *see also Hopkins Hawley LLC v. Cuomo*, 518 F. Supp. 3d 705, 712 (S.D.N.Y. 2021) (Crotty, J.) ("Have those decisions abrogated *Jacobson*'s relevance in all Constitutional cases arising from the pandemic? . . . . Or can they be cabined to the free exercise context in which their holdings arose?").

Thus, the continued vitality of the *Jacobson* test is in flux. However, in the present case, the Court concludes that rational basis review is the applicable standard; that under that standard the plaintiff's challenge to the Mask Mandate's constitutionality is not viable; and that it also fails under the more deferential *Jacobson* test embraced by *Abbott.*

### B.    The Mask Mandate

New York's Mask Mandate, applicable to P-12 school children, is a convoluted mix of the Commissioner's regulation; the Commissioner's implementing "determination" embracing "[f]indings of necessity," which adopt as "requirements" recommendations of the Centers for Disease Control and Prevention ("CDC"); a Department of Health "interim" guidance document "for classroom instruction;" and "guidelines" which the State's Education Department has promulgated.

### 1.    The CDC

The Supreme Court has recognized that courts should generally defer to "the reasonable medical judgments of public health officials," *Sch. Bd. of Nassau Cty., Fla. v. Arline,* 480 U.S. 273, 288 (1987), and the CDC "is the federal agency responsible for protecting the public health of the country by providing leadership and direction in the prevention and control of diseases." *Smith v. Potter,* 187 F. Supp. 2d 93, 97 (S.D.N.Y. 2001).

Although recognizing that its guidelines are not dispositive, the Seventh

Circuit has cogently articulated the significance and importance of the CDC's

COVID-19 pandemic determinations.

> [E]ven if not dispositive, implementation (and proper execution) of
> guidelines that express an expert agency's views on best practices are
> certainly relevant to an objective reasonableness determination. . . .
> This is particularly true here, where the CDC Guidelines provide the
> authoritative source of guidance on prevention and safety mechanisms
> for a novel coronavirus in a historic global pandemic where the public
> health standards are emerging and changing.

*Mays v. Dart*, 974 F.3d 810 (7th Cir. 2020), *cert. denied*, No. 20-990, 2021 WL

4507625 (U.S. Oct. 4, 2021).

Thus, the CDC has consistently been cited as an acceptable rationale for

government officials during the pandemic. *See, e.g., Denis v. Ige*, No. CV 21-

00011 SOM-RT, 2021 WL 1911884, at *10 (D. Haw. May 12, 2021) ("In the

midst of a pandemic, it is clearly reasonable for state and local officials to follow

the CDC's guidance."); *Henry v. DeSantis,* 461 F. Supp. 3d 1244, 1255 (S.D. Fla.

2020) ("The Executive Orders explain the Governor used scientifically-based-

research policies from the U.S. Centers for Disease Control. There is nothing

arbitrary about the Governor's actions. Using science, medicine, and data, the

Governor took reasonable steps clearly related to the legitimate interest in

protecting the public health."); *Beahn v. Gayles,* No. GJH-20-2239, 2021 WL

3172272, at *10 (D. Md. July 26, 2021) ("Plaintiffs also do not allege facts

suggesting that the policy lacked a rational basis; indeed, as the Directives were issued in response to rising COVID-19 infection rates and based on CDC guidance regarding reopening schools"); *Harris v. Univ. of Massachusetts, Lowell,* No. 21-CV-11244-DJC, 2021 WL 3848012, at \*6 (D. Mass. Aug. 27, 2021) ("Defendants' affidavits attest that the Vaccine Policy was supported by, among other things, CDC guidance and research that the vaccines were safe and effective at reducing the incidence and severity of COVID-19 . . . .")

## 2.    The Underlying Regulation

Title 10, Section 2.60 of the Commissioner's regulations, effective August 27, 2021, provides:

> (a) As determined by the Commissioner based on COVID-19 incidence and prevalence, as well as any other public health and/or clinical risk factors related COVID 19 disease spread, any person who is over age two and able to medically tolerate a face-covering may be required to cover their nose and mouth with a mask or face-covering when
>
> (1) in a public place and unable to maintain, or when not maintaining, social distancing; or
> (2) in certain settings as determined by the Commissioner, *which may include schools* . . . and which may distinguish between individuals who are vaccinated against COVID-19 and those that are not vaccinated. The Commissioner shall issue findings regarding the necessity of face-covering requirements at the time such requirements are announced.

N.Y. Comp. Codes R. & Regs. tit. 10, § 2.60 (emphasis added). Subdivision (e) of the regulation provides that "face-coverings shall include, but are not limited to, cloth masks, surgical masks, and N-95 respirators that are worn to completely

11

cover a person's nose and mouth."  Section 2.60 expires 90 days from its filing, sunsetting on November 25, 2021. *See* N.Y. Comp. Codes R. & Regs. tit. 10, § 2.60, *Regulatory Impact Statement*.

### 3.    The Findings of Necessity

On the same date that the regulation took effect, the Commissioner promulgated "[f]indings of necessity" which "demonstrate[d] the necessity for the implementation of layered prevention strategies, which include[d] face-coverings/masks." The Commissioner noted that "CDC research supports that there are no significant health effects or changes in oxygen or carbon dioxide levels from mask wear." There was no separate finding prescinding between children and the adult population.

Given these findings, the Commissioner issued a number of "masking requirements" that same day including the following for "P-12 school settings:"

> After careful review and consideration of CDC recommendations for face coverings/masks in school settings, *I hereby adopt such recommendations, imposing them as requirements*, where applicable, until this determination is modified or rescinded. Accordingly, universal masking of teachers, staff, students, and visitors to P-12 schools over the age of two *and able to medically tolerate a face covering/mask and regardless of vaccination status*, is required until this determination is modified or rescinded. Such requirement is subject to applicable CDC-recommended exceptions.

New York State Dep't of Health, *Comm'n's Determination on Indoor Masking Pursuant to 10 NYCRR 2.60* (Aug. 27, 2021) (emphasis added).

These CDC masking recommendations were hyperlinked by the Commissioner to the CDC's document entitled *Guidance for COVID-19 Prevention in K-12 Schools*, Centers for Disease Control and Prevention (updated Aug. 5, 2021) ("Prevention Strategies") https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html. Thus, they constitute the CDC's recommendations that the Commissioner adopted as requirements.

The CDC recognized that "in general, people do not need to wear masks when outdoors." In that regard, it recommended "that people who are not fully vaccinated wear a mask in crowded outdoor settings or during activities that involve sustained close contact with other people."

Other than differentiating between indoor and outdoor mask wearing, the CDC recognized an exception for any masking for "[a] person who cannot wear a mask, or cannot safely wear a mask, because of a disability as defined by the Americans with Disabilities Act ["ADA"] (42 U.S.C. 12101 et seq.)."

The CDC recommended in Section 1 of its Prevention Strategies that "all teachers, staff and eligible students be vaccinated as soon as possible." However, it recognized that because "schools have a mixed population of both people who are fully vaccinated and people who are not fully vaccinated . . . these variations require K-12 administrators to make decisions about the use of COVID-19 prevention strategies in their schools and are reasons why CDC recommends

universal indoor masking regardless of vaccination status at all levels of community transmission."

The CDC recognized, however, that "schools should consider multiple factors when they make decisions about implementing layered prevention strategies," and "[s]ince schools typically serve their surrounding communities, decisions should be based on the school population, families and students served, as well as their communities." Per the CDC's Prevention Strategies:

> The primary factors to consider include:
> - Level of community transmission of Covid-19.
> - Vaccination coverage in the community and among students, teacher and staff.
> - Strain on health systems capacity for the community.
> - Use of frequent SARS-CO-V-2 screening testing for students, teachers, and staff who are not fully vaccinated.
> - COVID-19 outbreaks or increasing trends in the school or surrounding community.
> - Ages of children served by K-12 schools and the associated social and behavioral factors that may affect risk of transmission and the feasibility of different prevention strategies.

Therefore, a careful reading of the Commissioner's regulatory language and the CDC's binding "recommendations" tell us that (1) school children must always wear masks indoors unless they cannot be "medically tolerate[d];" (2) each school district can adopt a broad swath of additional "preventive strategies;" (3) outdoor mask wearing is also required "in crowded outdoor settings or during activities that involve sustained close

contact with other people;" and (4) the school districts must always comply

with the ADA.

### 4.      Guidance for Wearing Masks: Help Slow the Spread
of COVID-19

Defendants attach to their papers a second CDC masking document,

"Guidance for Wearing Masks: Help Slow the Spread of COVID-19" (April 19,

2021) ("April 2021 Guidance for Wearing Masks").

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-

guidance.html. Possibly because this document applies to the general population,

and not specifically to schoolchildren, the Commissioner's determination did not

link to it.

Nonetheless, in addition to recommending that masks should be worn by

people two years old or older while in public, it notes that "[m]ost people with

underlying medical conditions can and should wear masks," and that "[i]f you have

asthma, you can wear a mask." April 2021 Guidance for Wearing Masks.

However, it recommends that those with asthma "[d]iscuss with [their] healthcare

provider if [they] have any concerns about wearing a mask." *Id.*

### 5.      Interim NYSDOH Guidance for Classroom
Instruction in P-12 Schools During the 2021-2022
Academic Year (Sept. 2, 2021)

Defendants also attach to their papers a New York State Department of

Health document providing "guidance" for "the minimum expectations for

classroom instruction in P-12 schools." New York State Dep't of Health, *Interim*

*NYSDOH Guidance for Classroom Instruction in P-12 Schools During the 2021-*

*2022 Academic Year* (Sept. 2, 2021). It provides in relevant part:

> 4. Masks:
>
> a) In accordance with the Commissioner's determination issued pursuant to 10 NYCRR 2.60, all students, personnel, teachers, administrators, contractors, and visitors must wear masks at all times indoors, regardless of vaccination status.
>
> b) People with medical or developmental conditions that prevent them from wearing a mask may be exempted from mask requirements, as documented by a medical provider.
>
> c) People do not need to wear masks when eating, drinking, singing, or playing a wind instrument; when masks are removed for these purposes, individuals must be spaced six feet apart. This may mean that meals cannot be eaten in classrooms that have been arranged to accommodate shorter distances between students during instruction time. Students should not be excluded from in-person learning in order to meet a minimum distance requirement.
>
> d) All mask requirements must be applied consistently with any state and federal law (e.g., Americans with Disabilities Act).

*Id.* at 2. It also recommends means by which "improved ventilation can make

classrooms more comfortable for students wearing masks." *Id.* at 8.

This "guidance," also embraces the "School Guidance developed by the

[CDC]" and gives the school districts "the authority to decide how to implement that

'Guidance' based on local conditions, needs, and input from their Local Health

Department (LHD)." However, "[u]ltimately, the decision to adopt certain

mitigation measures will reside with the local community based on local

circumstances, unless otherwise required in this document or other relevant

guidance, regulations, or orders." *Id.*

### 6.   Education Department Guidelines

As explained in its overview, the State Education Department's Guide

focuses on the implementation of the additional "layered approach to mitigation

strategies." New York State Dep't of Health, *Comm'n's Determination on Indoor*

*Masking Pursuant to 10 NYCRR 2.60* (Aug. 27, 2021). In that regard, it states:

> As transmission levels rise, schools should be prepared to take steps
> such as increasing physical distancing to minimize transmission.
> Schools should plan for all contingencies and be prepared to pivot to
> remote instruction as necessary. These plans should be clearly
> communicated to students, families, staff, and community stakeholders.

*Id.* The practical upshot of the Commissioner's regulation, its cryptic adoption of the

CDC's recommendations and its Prevention Strategies, the Health Department's

guidance, and the Education Department's guidelines is that the school districts and

their administrators do not know what precisely they can or cannot do to implement

the Mask Mandate. For instance, there is no guidance as to how a school district is

to determine if wearing a mask cannot be medically tolerated, either indoors or

outdoors, or how to implement the outdoor mask mandate. But one thing is perfectly

clear: neither the Commissioner's regulation, nor Prevention Strategies, nor any

Health or Education Department's guidance or guidelines, render nugatory

mandatory masking for schoolchildren.

As shown by this case, all this has left the School District adrift. At oral argument, the Court pressed the parties to identify the precise policies at issue. When asked whether there was a written mask policy, the School District's counsel replied "No. . . . [a]ll we have is a reopening plan." 9.24.21 Tr. at 12.[4] This is hardly an articulation that gives comfort to the Court or the School District's parents.

Nor has plaintiff managed to do much better. During oral argument, her counsel described the applicable policy as follows:

> Some of the policy is reflected—the school district policy is reflected in that reopening plan and some of it has been admitted in emails from superintendents and from the school district papers themselves in this case. But the specific policy we are challenging as un-Constitutional is the school district's decision to substantively review and overrule treating physicians, and the manner in which they are doing it.

9.24.21 Tr. at 13.

Notwithstanding the Court's displeasure with the complexities and uncertainties of New York State's prolix school Mask Mandate materials, the Court is tasked with deciding whether the Commissioner's regulation can nonetheless pass constitutional muster.

---

[4] 9.24.21 Tr. refers to the transcript of the in-court oral argument of September 24, 2021.

18

C.    **The Other States**

State approaches to mask mandates fall into one of three buckets: (1) states, such as New York and Massachusetts, that require masks at a statewide level; (2) states, such as Georgia, that allow localities, municipalities, or school boards to decide whether mask mandates are appropriate for their community; and (3) states, such as Texas, that prohibit mask mandates.

1.    **Bucket 1: Statewide Mandates - Massachusetts**

On September 27, 2021, the Massachusetts Department of Elementary and Secondary Education issued detailed guidelines governing COVID-19 related safety measures in public schools, including a mask mandate.

The Massachusetts school mask mandate provides, like New York's, that masks must be used indoors; however, they are optional outdoors. Similar to New York, the Massachusetts mandate provides an exemption for medical reasons. And it specifically provides exceptions for behavioral and pedagogical reasons, such as a band class. It differs from New York's mandate in one critical aspect: "if a school demonstrates a vaccination rate of 80 percent or more of all students and staff in the school . . . vaccinated individuals in that school would no longer be subject to the mask requirement." Massachusetts Dep't of Elementary and Secondary Educ., *Extension of DESE Mask Requirement* (Sept. 27, 2021). The

Massachusetts mask mandate is in place until November 1, 2021, and must be reviewed by the Commissioner "as warranted by public health data." *Id.*

Other than its 80% vaccination rate provision, Massachusetts and fifteen other states, including New York, essentially fall into this bucket.

### 2.    Bucket 2: The Hybrid Approach - Georgia

In Georgia, the decision whether to require children to wear masks is left to individual school boards. "At least 56 of Georgia's 180 traditional school districts are now requiring masks in at least some schools, up from only a handful of districts before class started in August. The rules cover nearly 950,000, or about 55%, of Georgia's 1.7 million public school students."[5]

An example of one such district is Baldwin County. Its mandate reads, in relevant part:

> Effective Wednesday, August 11th, masks will be required for students, staff, and visitors when inside all Baldwin County School District facilities and on school buses, regardless of vaccination status. Masks will not be required during breakfast/lunch or outdoor activities. This decision is based on updated information regarding the spread of the Delta variant, the increase in the number of positive COVID-19 cases in Baldwin County, and the change in the community transmission level from moderate to substantial spread.

---

[5] Jeff Amy, *Mask mandates spread in Georgia schools as child cases soar*, AP (Aug. 25, 2021) https://apnews.com/article/health-education-georgia-coronavirus-pandemic-c157ce983cf256641379d14ae71ff40a.

Some districts, such as Glynn County, attempt to split the difference by encouraging, but not requiring, masks. Glynn's operating procedures change based on the severity of the pandemic in the area. When the virus afflicts less than or equal to 1% of the school system or 2% of the school, the school is in "Normal Operations" and "[a]s per CDC and DPH guidance, masks are *recommended* inside school facilities." (emphasis added). When rates exceed 1% in the system or 2% in the school, masks become required. And when the rates are greater than or equal to 3% in the system and 5% of the school, in-person instruction is suspended, and distance learning is implemented.[6]

Twenty-six states fall into this bucket.

---

[6] Like many school systems that do not require masking, Glynn County must occasionally revert to remote learning.

> But many other districts tried to open their doors as mask-optional. Some switched positions within days, while others held out for weeks. During that time, infections leaped. More than 1% of school-age children in Georgia have tested positive for COVID-19 in the past two weeks. Children between the ages of 5 and 17 are now more likely than adults as a whole to test positive for COVID-19. The state Department of Public Health reported more than 30 infection clusters in schools statewide, the highest since the epidemic began.

Jeff Amy, *Mask mandates spread in Georgia schools as child cases soar*, AP (Aug. 25, 2021) https://apnews.com/article/health-education-georgia-coronavirus-pandemic-c157ce983cf256641379d14ae71ff40a

### 3.    Bucket 3: Prohibition on Mask Mandates - Texas

Some states not only do not require masks but prohibit school districts from

requiring masks. Texas is one such state. According to executive order GA-38,

enacted on July 29, 2021:

> no governmental entity, including a . . . school district . . . may require
> any person to wear a face covering or to mandate that another person
> wear a face covering.

The order does not cite any scientific evidence in support of its position;

rather, it simply states that it is necessary "to ensure the ability of Texans to

preserve livelihoods while protecting lives." *See* GA-38.

Several large school districts elected to defy the order. For example, the

Dallas Independent School District requires masks, and declared:

> Governor Abbott's order does not limit the district's rights as an
> employer and educational institution to establish reasonable and
> necessary safety rules for its staff and students. Dallas ISD remains
> committed to the safety of our students and staff.[7]

As of September 21, 2021, twenty-nine school districts have sued the

Governor in an attempt to strike down his anti-mask mandate order.[8] And the

---

[7] Brian Lopez, *Gov. Greg Abbott's order banning mask mandates in Texas schools faces lawsuit, defiance by big-city districts*, THE TEXAS TRIBUNE (Aug. 10, 2021) https://www.texastribune.org/2021/08/09/texas-mask-order-schools/.

[8] Joshua Fechter, *Gov. Greg Abbott and local officials are fighting several legal battles over mask mandates. Here's what you need to know.*, THE TEXAS TRIBUNE (Sept. 21, 2021) https://www.texastribune.org/2021/09/21/texas-school-mask-mandates/.

Governor, in turn, has sued some 15 more. In addition, the U.S. Department of Education has opened an investigation of the Texas Education Agency, having determined that Texas's anti-mask mandate order may be "preventing school districts in the state from considering or meeting the needs of students with disabilities."[9]

The status of Texas's order remains in flux, but eight states, including Florida, have jettisoned mask mandates.

## II.     The Facts

The following facts are from the Complaint and plaintiff's submissions. "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." *Park Irmat Drug Corp. v. Optumrx, Inc.,* 152 F. Supp 3d 127, 132 (S.D.N.Y. 2016).

### A.     The Complaint

Sarah suffers from asthma and "cannot medically tolerate wearing a mask." Complaint at ¶ 1.  Plaintiff unsuccessfully sought a medical exemption for her daughter from the school district based principally on a physician's letter. *Id.* at ¶¶ 36-37. She also unsuccessfully petitioned the school district to permit Sarah to

---

[9] Brian Lopez, *Texas' ban on school mask mandates draws federal investigation for possibly violating the rights of students with disabilities*, THE TEXAS TRIBUNE (Sept. 21, 2021) https://www.texastribune.org/2021/09/21/texas-schools-mask-mandates-education-department/

attend school remotely. *Id.* at ¶ 55. Finally, she submitted written proposals for accommodations to the School District to allow Sarah to attend school under various conditions, including the use of a face shield instead of a face mask and a guarantee that Sarah's classrooms have air-conditioning. *Id.* at 56. The School District also rejected that proposal.[10] *Id.* at 58.

## B.   Plaintiff's Submissions

Plaintiff relies upon several studies and government declarations to bolster her argument. To support her contention that there is no scientific evidence that masks are an effective measure against the transmission of COVID-19, she points to product labeling requirements in FDA Emergency Use Authorizations for face masks, surgical masks, and respirators. *See* Gibson Aff. Exs. 1-3. To further that argument, she cites several scientific studies.

First, Plaintiff points to a study comparing cloth and medical mask usage in adult healthcare workers, which concluded that rates of influenza infection were higher in participants who used cloth masks compared to those who used surgical masks. *See* C. R. MacIntyre *et al.*, *A cluster randomised trial of cloth masks compared with medical masks in healthcare workers*, BMJ OPEN (2015). But that study had nothing to do with mask use by children or even the general public;

---

[10] On October 15, 2021, the Court held a second hearing in this case. The School District represented that it has provided Sarah with air-conditioning. *See* 10.15.21 Tr. at 8.

indeed, its authors recognized that "[f]urther research is needed to inform the widespread use of cloth masks globally," and limited its findings to a precaution that cloth masks were not appropriate in the healthcare setting. *Id.* at 4.

Next, plaintiff relies on a study published by the CDC evaluating the effectiveness of various personal protective measures against influenza, including hand hygiene, respiratory etiquette (for example, the covering of one's face with a tissue when sneezing or coughing), and mask usage. Xiao J, Shiu E, Gao H, et al. *Nonpharmaceutical Measures for Pandemic Influenza in Nonhealthcare Settings—Personal Protective and Environmental Measures*, EMERGING INFECTIOUS DISEASES (2020). The study reported no statistically significant decrease in influenza transmission with the use of masks. *Id.* at 11-12. However, the authors of the study do not represent that face masks in general are inadvisable: indeed, they note that "[i]n theory, transmission should be reduced the most if both infected members and other contacts wear masks, but compliance in uninfected close contacts could be a problem." *Id.* at 12. In addition, while the authors did not find a statistically significant reduction in influenza transmission with use of a mask, they nonetheless noted that "face masks might be able to reduce the transmission of other infections and therefore have value in an influenza pandemic when healthcare resources are stretched." *Id.* at 15.

Plaintiff also submits a study published in the New England Journal of Medicine, examining COVID-19 transmission in U.S. Marine Corps recruits. A.G. Letizia, A. Ramos, et al *SARS-CoV-2 Transmission among Marine Recruits during Quarantine*, 383 New Eng. Journal of Medicine 2407 (2020). That study found that after two weeks, 2.8% of recruits strictly observing mitigation measures that included masks tested positive for COVID-19, and 1.7% of those who did not undertake mitigation measures did. *Id.* at 2412. But that study tested conditions that are hardly typical for school students: The recruits were required to undertake a two-week home quarantine prior to reporting for duty, and upon reporting, undertook a *second*, strictly supervised, quarantine. Indeed, the authors noted that "[o]ther settings in which young adults congregate are unlikely to reflect similar adherence to measures intended to reduce transmission." *Id.* at 2413.

In addition, plaintiff relies on *Effectiveness of Adding a Mask Recommendation to Other Public Health Measures to Prevent SARS-CoV-2 Infection in Danish Mask Wearers*, a study in the Annals of Internal Medicine. Henning Bundgaard *et al.*, *Effectiveness of Adding a Mask Recommendation to Other Public Health Measures to Prevent SARS-CoV-2 Infection in Danish Mask Wearers: A Randomized Controlled Trial*, ANNALS OF INTERNAL MEDICINE (2020). That study did not find a statistically significant relationship between mask wearing and lower rates of COVID-19 transmission.  However, it only examined

adults and was undertaken "in a setting where mask wearing was uncommon and was not among other recommended public health measures . . . ." *Id.* at 5. The study emphasizes that it did not measure the effect of masking as source control, and notes that its findings "do not provide data on the effectiveness of widespread mask wearing in the community in reducing SARS-CoV-2 infections." *Id.* at 7.

Plaintiff cites *Novel risk factors for Coronavirus disease-associated mucormycosis (CAM): a case control study during the outbreak in India*, for the proposition that mask usage can cause coronavirus disease-associated mucormycosis ("CAM"), a fungal disease. Arora, *et al.*, *Novel risk factors for Coronavirus disease-associated mucormycosis (CAM): a case control study during the outbreak in India*, MEDRXIV (2021).  However, that study, which was undertaken in India, could not obtain information about the frequency of laundering or discarding of masks, which affects fungal growth. It further noted that CAM is strongly associated with diabetes, poor glycemic control, and systemic steroid use.

The only scientific material plaintiff cites that deals with mask use in children is a "mini review" published in Acta Pædiatrica, a peer-reviewed international medical journal. Martin Eberhart, *et al.*, *The impact of face masks on children – A mini review*, 110 ACTA PÆDIATRICA 1778 (2021).  This document notes, however, that there was "a lack of information on the consequences of

children wearing face masks," and that "[a]s using face masks could be a long-term preventive measure in the COVID-19 era, further studies are needed, particularly to explore the impact on pre-existing respiratory problems in children and adults." *Id.* at 1782. The review also acknowledges that "[f]ake news about the negative effects of face masks has been rising.  This has included false reports about face masks causing an increasing number of illnesses and even deaths among children." *Id.* at 1779. The review cites to only two pediatric studies. The first was of 106 children in Singapore and concluded that masks did not affect a child's heart rate, respiratory rate, or oxygen saturation. The second study was of 24 children in the United Kingdom. It did not collect physiological data—only subjective information from the children—whose "main complaint was that their face was hot." *Id.* at 1779.

The review also contained eight adult studies, one of which concluded that "face masks did not cause any clinically relevant changes in oxygen or carbon dioxide concentration." *Id.* at 1781.

Plaintiff's scientific materials are ill-fitted to her arguments. Most of the studies deal with mask usage by adults in environments very different from that of a school—for example, a high-risk hospital ward, MacIntyre, *supra*, or a locked down and quarantined Marine training camp, Letizia, *supra*. The only evidence she musters with respect to mask wearing by children is a "mini review," which

acknowledges that there is "a lack of information on the consequences of children wearing face masks." Eberhart, *supra*.

Some of plaintiff's arguments mirror spurious claims publicly aired by one of her attorneys, Robert F. Kennedy Jr., and the organization he founded, Children's Health Defense ("CHD"), which have been criticized for spreading false information about vaccines and the pandemic.[11] For example, in an article misleadingly titled "*California is Still Masking Children Despite Proven Physical and Psychological Danger*," CHD represents that "thousands" of scientists decry mask use in children, which CHD claims causes "cognitive fog," "depression," "despair," "detrimental psychological harms," and "dehydration," while "lower[ing] children's oxygen levels in the blood," "suppress[ing] the immune system," and "collect[ing] and coloniz[ing] viruses, bacteria, microbes, and mold."[12] Reputable sources have debunked these unfounded claims.[13]

---

[11] *See*, *e.g.*, Jonathan Jarry, *The Anti-Vaccine Propaganda of Robert F. Kennedy, Jr.*, McGill Office for Science and Society (Apr. 16, 2021), https://www.mcgill.ca/oss/article/covid-19-health-pseudoscience/anti-vaccine-propaganda-robert-f-kennedy-jr.

[12] Beth Giuffre, *California is Still Masking Children Despite Proven Physical and Psychological Danger*, Children's Health Defense (Jul. 9, 2021) https://ca.childrenshealthdefense.org/school/ca-still-masking-children-despite-proven-physical-psychological-danger/.

[13] *See, e.g.*, Dr. Kimberly Frodl, *Debunked myths about face masks*, Speaking of Health, Mayo Clinic Health System (Jul. 10, 2020) https://www.mayoclinichealthsystem.org/hometown-health/speaking-of-health/debunked-myths-about-face-masks; Keeley LaForme, *Myths about Masks and Other Coronavirus Facial Coverings*, Newsroom: Johns Hopkins All

For his part, Kennedy has tirelessly spread a wide variety of pseudoscience, including anti-vaccine propaganda (both during the COVID-19 pandemic and before it) and the myth that 5G cellular phone service causes "almost unimaginably devastating impacts on our health + environment."[14] Although plaintiff parrots some of the claims raised by CHD, she wisely does not submit them or any of their references to the risks of masking as one of her exhibits.

## C.    Defendants' Submissions

In contrast to the materials submitted by plaintiff, defendants embrace the findings and recommendations of the CDC. Their submissions all focus on the reduced spread of COVID-19 in schools with mask mandates.

First, defendants submit the abstract of an article examining COVID-19 transmission in North Carolina public schools based on research conducted by the ABC Science Collaborative, a public health organization associated with Duke

---

Children's Hospital (Jul. 22, 2020) https://www.hopkinsallchildrens.org/ACH-News/General-News/Myths-about-Masks-and-Other-Coronavirus-Facial-Cov.
[14] *See* Keziah Weir, *How Robert F. Kennedy Jr. Became the Anti-vaxxer Icon of America's Nightmares*, VANITY FAIR (May 13, 2021); Robert F. Kennedy Jr. (@RobertKennedyJr), TWITTER (Jan. 7, 2020, 7:50PM), https://twitter.com/robertkennedyjr/status/1214710810921955328?s=21. Indeed, he has been listed amongst the so-called "Disinformation Dozen," the top twelve spreaders of pandemic-related false information on social media. *See*, *e.g.*, Jonathan Jarry, *A Dozen Misguided Influencers Spread Most of the Anti-Vaccination Content on Social Media*, McGill Office for Science and Society (Mar. 31, 2021) https://www.mcgill.ca/oss/article/covid-19-health/dozen-misguided-influencers-spread-most-anti-vaccination-content-social-media.

University. Kanecia Zimmerman, *et al.*, *Incidence and Secondary Transmission of SARS-CoV-2 Infections in Schools*, 147 Pediatrics (2021). That research concludes that mitigation measures that included masks had lower COVID-19 transmission rates in schools than those school rates in surrounding communities. *Id.* at 6.  In addition, the Science Collaborative notes that "[m]ost of the cases of secondary transmission . . . were related to absent face coverings."  *Id.*  It concluded that "[p]roper masking is the most effective mitigation strategy to prevent secondary transmission in schools when COVID-19 is circulating and when vaccination is unavailable, or there is insufficient uptake." *Id.* at 3.

Defendants also attach a series of CDC-published Morbidity and Mortality reports, each authored by groups of physicians, professors, and members of the CDC COVID-19 Response Team.  Those reports examined COVID-19 transmission in schools in Utah,[15] Missouri,[16] Georgia,[17] and Wisconsin.[18] Each

---

[15] Rebecca Hershow *et al.*, *Low SARS-CoV-2 Transmission in Elementary Schools—Salt Lake County, Utah, December 3, 2020–January 31, 2021*, 70 MORBIDITY AND MORTALITY WEEKLY REPORT 442 (2021).

[16] Patrick Dawson, *et al.*, *Pilot Investigation of SARS-CoV-2 Secondary Transmission in Kindergarten Through Grade 12 Schools Implementing Mitigation Strategies — St. Louis County and City of Springfield, Missouri, December 2020*, 70 MORBIDITY AND MORTALITY WEEKLY REPORT 449 (2021).

[17] Jenna Gettings, *et al.*, *Mask Use and Ventilation Improvements to Reduce COVID-19 Incidence in Elementary Schools — Georgia, November 16–December 11, 2020*, 70 MORBIDITY AND MORTALITY WEEKLY REPORT 779 (2021).

[18] Amy Falk, *et al.*, *COVID-19 Cases and Transmission in 17 K–12 Schools — Wood County, Wisconsin, August 31–November 29, 2020*, 70 MORBIDITY AND MORTALITY WEEKLY REPORT 136 (2021).

report concluded that in schools with mitigation measures including masks, the COVID-19 transmission rate was lower than in the surrounding community.

Each study recommended that mask usage guidelines be adopted as part of school reopening. For example, the CDC's study of Utah's school reopening concluded that "in-person elementary schools can be opened safely with minimal in-school transmission when critical prevention strategies *including mask use* are implemented." Hershow, *supra* at 447 (emphasis added). In the study examining Missouri schools, the authors recommended that "K–12 schools should continue implementing SARS-CoV-2 mitigation strategies that include mask use policies . . . ." Dawson, *supra* at 453.

The CDC's Georgia study focused on kindergarten through fifth grade and found that "[a]djusting for county-level incidence, COVID-19 incidence was 37% lower in schools that required teachers and staff members to use masks," but it did not produce a statistically significant result with respect to schools that required mask use among students. Gettings, *supra* at 779. The authors concluded that "[b]ecause universal and correct use of masks can reduce SARS-CoV-2 transmission . . . and is a relatively low-cost and easily implemented strategy, findings in this report suggest universal and correct mask use is an important COVID-19 prevention strategy in schools as part of a multicomponent approach." *Id*.

Defendants' studies are better tailored to the issue before the Court than plaintiff's. Unlike plaintiff's submissions, they examined the transmission of the virus in school-aged children and in the school environment.

Thus, defendants have provided ample support for their position. Notably, since their submissions, a recent decision by Judge Kahn of the Northern District of New York cited two subsequent studies supporting school mask mandates. *L.T. v. Zucker*, No. 121CV1034LEKDJS, 2021 WL 4775215, at *10 n.15 (N.D.N.Y. Oct. 13, 2021).[19]

The first study found that "the odds of a school-associated COVID-19 outbreak in schools without a mask requirement were 3.5 times higher than those in schools with an early mask requirement," and the second found that "[c]ounties without school mask requirements experienced larger increases in pediatric COVID-19 case rates after the start of school compared with counties that had school mask

---

[19] Megan Jehn, *et al.*, *Association Between K–12 School Mask Policies and School-Associated COVID-19 Outbreaks — Maricopa and Pima Counties, Arizona, July–August 2021*, CENTERS FOR DISEASE CONTROL AND PREVENTION MORBIDITY AND MORTALITY WEEKLY REPORT, Vol. 70, September 24, 2021, and Samantha E. Budzyn, *et al.*, *Pediatric COVID-19 Cases in Counties With and Without School Mask Requirements — United States, July 1–September 4, 2021*, CENTERS FOR DISEASE CONTROL AND PREVENTION MORBIDITY AND MORTALITY WEEKLY REPORT, Vol. 70, September 24, 2021

requirements." *Id.*[20] The Court's research has not disclosed any subsequent studies to add to plaintiff's submissions.

### III.    The Constitutional Issues

Because plaintiff's submissions lacked clarity as to the precise basis for her constitutional contention that she was entitled to preliminary injunctive relief, the Court held a hearing to attempt to understand it. During the hearing, plaintiff's counsel clarified that "the specific policy we are challenging as unconstitutional is the school district's decision to substantively review and overrule treating physicians, and the manner in which they are doing it." 9.24.21 Tr. at 19; *see also* 9.24.21 Tr. at 34 ("Can [the School District] deny a medical exemption by a treating physician?"; 9.24.21 Tr. at 9 ("[W]hat's unconstitutional, in my opinion . . . is that the school district has taken it upon themselves, without any kind of regulatory authority,[21] to intervene in [the plaintiff-doctor] relationship, to

---

[20] As recounted in a recent article in Newsday, Long Island's leading newspaper: At the end of this past September—one month after the reopening of its schools— "Long Island reported the second-highest number of COVID-19 cases among students for any region in the state . . . ." John Hildebrand, *Report Card: LI has second-highest number of COVID-19 cases for kids, school staff in state*, NEWSDAY (Sept. 29, 2021) https://www.newsday.com/long-island/education/long-island-school-covid-ranking-1.50373619. The defendant school district is located in Long Island.

[21] The Court has also considered and rejects plaintiff's allegation questioning the Commissioner's power to act. The Mask Mandate is within the Commissioner's delegated authority. *See Boreali v. Axelrod*, 71 N.Y.2d 1 (1987); *Citizens for an Orderly Energy Policy v. Cuomo*, 78 N.Y.2d 398, 410 (1991).  In any event,

second guess the treating physician, to overrule them . . . .").

In her extensive brief, plaintiff bloused out her principal contention by identifying the fundamental rights which she contends are violated by the Mask Mandate:

> the right to be free from nonconsensual medical interventions and other rights derived from the fundamental right to choose what happens to one's own body; the right to a medical exemption; the right of parents to make medical determinations for their child in accordance with their physician's independent medical judgment; and the right to breathe unencumbered by an experimental medical product.

Pl. Brief. at 18.

## A.   The Standard

Where "a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020).

Because the Court finds that plaintiff has not demonstrated a likelihood of success on the merits, it need not consider the other two preliminary injunction requisites.[22]

---

plaintiff did not rely upon this argument in her motion papers or at either oral argument.

[22] The Court notes, however, that as Judge Cogan wrote: "In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable

35

**B.      Existing Law on School Mask Mandates**

To date, only a few federal court cases have directly examined school mask

mandates.

In *Resurrection School v. Hertel*, a religious school challenged Michigan's

school mask mandate "because it interferes with the school's religiously oriented

disciplinary policies and prevents younger students from partaking fully in a

Catholic education." 11 F.4th 437, 447 (6th Cir. 2021). The case arose in the

religious liberty context, and much of the Sixth Circuit's analysis focused on that

issue. Once the court determined that rational basis review applied, it upheld the

mandate: "Defendants cite more than ample evidence that requiring masks in the

school setting minimizes the spread of COVID-19." *Id.* at 460.

---

harm. . . . Because plaintiffs allege that their substantive due process rights have
been violated, no further showing of irreparable injury is necessary." *Maniscalco v.
New York City Department of Education*, 2021 WL 4344267, at *2 (Sept. 23,
2021) (internal quotation and citation omitted); *but see KM Enterprises, Inc. v.
McDonald*, No. 11-CV-5098, ADS ETB, 2012 WL 540955, at *3 (E.D.N.Y. Feb.
16, 2012) ("[E]ven if a constitutional claim was asserted, "merely asserting a
constitutional injury is insufficient to automatically trigger a finding of irreparable
harm."); *Pinckney v. Bd. of Educ. of Westbury Union Free Sch. Dist.*, 920 F. Supp.
393, 400 (E.D.N.Y. 1996) ("[O]ther courts have found that the mere allegation of a
constitutional infringement in and of itself does not constitute irreparable harm.").
Moreover, for reasons stated, *supra*, an injunction would clearly not be in the
public's best interest.

In *W.S. by Sonderman v. Ragsdale*, a group of Georgia public school students challenged the Cobb County School District's mask mandate. No. 1:21-CV-01560-TWT, 2021 WL 2024687, at *1 (N.D. Ga. May 12, 2021). Because "[t]he mandate neither discriminates against a protected class nor infringes a fundamental right," the court applied rational basis review. *Id.* at *2. Expressly noting that Cobb County relied on guidance from the CDC and Georgia state public health authorities, the court upheld the mandate. *Id.* at *2.

In *Oberheim v. Bason*, a group of parents brought suit on behalf of their children to challenge a mask mandate promulgated by the Montoursville Area School District.  No. 4:21-CV-01566, 2021 WL 4478333, at *1 (M.D. Pa. Sept. 30, 2021).  The court rejected arguments that students had a fundamental right to attend class without a mask, or that the mask mandate infringed a parent's fundamental right to raise their children without undue interference. *Id.* at 7.  Like plaintiff here, the parents in *Oberheim* argued that masks are not effective in preventing the spread of COVID-19. The court rejected that argument, too, noting that "such a dispute is left to the resolution of the policymakers[.]" *Id.* at 8. Ultimately, the court applied rational basis review. Because the school district relied upon the decree of state public health authorities in crafting it, the court upheld the mandate. *Id.*

In addition, defendants have submitted a copy of *M.F. v. Cuomo*, a decision from the state Supreme Court of Nassau County.  *M.F. v. Cuomo*, No. 607277/21 (N.Y. Sup. Ct. Jun. 21, 2021). Plaintiff was the mother of four school-aged children. She raised many of the same arguments made by plaintiff here, including that the Mask Mandate violates the Nuremberg Code, that face masks are experimental devices, and that they are ineffective. *Id.* at 5. The court rejected them, holding the analogy "too strained for . . . credence." *Id*. at 6. Applying rational basis review, the court upheld the mandate. *Id.* at 7.

In addition to these cases, some federal courts have considered mask mandates in broader circumstances. They have uniformly found that public mask mandates do not implicate fundamental rights, and that such mandates easily clear rational basis review. *See e.g. Forbes v. County of San Diego,* No. 20-CV-00998-BAS-JLB, 2021 WL 843175 (S.D. Cal. Mar. 4, 2021) (mask mandates do not implicate fundamental rights); *Oakes v. Collier County*, 515 F. Supp. 3d 1202, 1206-07 (M.D. Fla. 2021) ("Some may disagree with the public health efficacy of mask orders. But federal courts do not sit in a policy-checking capacity to second guess the wisdom of state legislative acts."); *Whitfield v. Cuyahoga County Public Library Foundation*, No. 1:21 CV 0031, 2021 WL 1964360, at *2 (N.D. Ohio May 17, 2021) ("[T]here is no general constitutional right to wear, or to refuse to wear a face mask in public places.").

### C.    Substantive Due Process and Fundamental Rights

"[T]he Due Process Clause of the Fourteenth Amendment embodies a substantive component that protects against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 460 (2d Cir. 1996) (quoting *Daniels v. Williams,* 474 U.S. 327, 331 (1986)). In general, a regulation "need only be reasonably related to a legitimate state objective." *Id.* at 461 (citing *Reno v. Flores*, 507 U.S. 292, 303-06 (1993)). However, when the regulation infringes a fundamental right, it must, as noted, be "narrowly tailored to serve a compelling state interest." *Flores*, 507 U.S. at 302. A right is fundamental if it is "implicit in the concept of ordered liberty," *Palko v. Connecticut,* 302 U.S. 319, 325-26 (1937), or "deeply rooted in this Nation's history and tradition," *Moore v. E. Cleveland,* 431 U.S. 494, 503 (1977).

In some cases, identifying the right at issue as fundamental is straightforward. For example, because the right to assemble for religious worship is clearly protected by the Free Exercise Clause of the First Amendment, the Supreme Court had concluded that COVID-related limits on attendance at churches and synagogues were subject to strict scrutiny, rather than *Jacobson*'s lesser standard. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020) (per curiam); *see also Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 632 (2d Cir. 2020) ("[A] policy that

expressly singles out religion for less favored treatment, as here, is subject to strict scrutiny.").

Here, plaintiff asserts several rights that she claims trigger strict scrutiny. For the following reasons, the Court does not agree that fundamental rights are implicated.

### 1.    Right to a Medical Exemption

Plaintiff principally argues that the Constitution entitles her to a medical exemption from the Mask Mandate (and, indeed, any "public health law," Pls.' Mem. of Law at 14). She cites *Jacobson v. Massachusetts*, for the proposition that it would be "cruel and inhuman in the last degree" to require someone to be vaccinated "if it be apparent or can be shown with reasonable certainty that he is not at the time a fit subject of vaccination, or that vaccination, by reason of his then condition, would seriously impair his health, or probably cause his death." 197 U.S. 11, 39 (1905). But *Jacobson* reached that conclusion as a matter of statutory interpretation, not constitutional law. Indeed, the opinion flatly rejects the notion that the Constitution requires what plaintiff calls "strict harm avoidance." *See id.* at 29 (noting that quarantines and military conscription restrict freedom of choice).

In any event, the Mask Mandate includes a medical exemption, requiring compliance by only those "over age two *and able to medically tolerate a face-covering*." N.Y. Comp. Codes R. & Regs. tit. 10, § 2.60 (emphasis added).

40

Plaintiff's real complaint concerns *who* should decide whether the exemption

applies.

In that regard, she argues that she has a fundamental right to act on the good-

faith medical judgment of her own physician. She cites several cases in which the

Supreme Court has held that the lack of an adequate medical exemption to an

abortion restriction places an undue burden on a woman's fundamental right to the

procedure. *See Ayotte v. Planned Parenthood of N. New England,* 546 U.S. 320

(2006); *Stenberg v. Carhart*, 530 U.S. 914, 937 (2000). Those cases assume that

the woman's physician will decide medical necessity. An earlier case, *Doe v.

Bolton*, 410 U.S. 179 (1973), was more explicit:

> [M]edical judgment may be exercised in the light of all factors—
> physical, emotional, psychological, familial, and the woman's age—
> relevant to the well-being of the patient. All these factors may relate to
> health. This allows the attending physician the room he needs to make
> his best medical judgment.

*Id.* at 192.  Based on that reasoning, the Supreme Court struck down regulations

requiring hospital committee approval and the concurrence of two consulting

physicians before an abortion. *See id.* at 196-200.

The context in which those cases arose makes them inapposite for two

reasons. First, it has long been understood that the right to independent medical

judgment is part and parcel of the fundamental right to terminate a pregnancy. *See

Singleton v. Wulff*, 428 U.S. 106, 117 (1976) (allowing physicians to challenge

abortion restrictions because "the constitutionally protected abortion decision is one in which the physician is intimately involved."). It does not follow that there is a standalone fundamental right to have one's own physician determine the need for compliance with every public health measure.[23]

Second, a treating physician is obliged to consider the health of his or her patient above all else. That is entirely appropriate for a decision as intimate and personal as terminating a pregnancy. But the Mask Mandate is directed at a matter of *public* health. That is, the state must weigh the health concerns of an individual against the threat to the health of everyone else present in the classroom or other public place. A personal physician is ill-equipped to balance those competing concerns.

### 2.    Right to Refuse Medical Treatment

Plaintiff next invokes the right to refuse unwanted medical treatment. There is no question that the right is fundamental. *See Washington v. Glucksberg*, 521

---

[23]Plaintiff argues that the Supreme Court expanded the right to non-abortion cases in *Whalen v. Roe*, 429 U.S. 589 (1977), in which it noted that a New York law requiring notification to the state of all prescriptions of Schedule II drugs did not deprive anyone "of the right to decide independently, with the advice of his physician, to acquire and to use needed medication." *Id.* at 603. At the same time, however, it acknowledged that a state could validly limit dosages and refills and could even ban certain drugs outright. And in another case, it held that physicians could be prosecuted under the federal Controlled Substances Act for prescribing drugs outside "the usual course of professional practice." *United States v. Moore*, 423 U.S. 122, 138 (1975).

U.S. 702, 722 n.17 (1997) ("[In *Cruzan v. Director, Missouri Department of Health,* 497 U.S. 261 (1990)], we concluded that the right to refuse unwanted medical treatment was so rooted in our history, tradition, and practice as to require special protection under the Fourteenth Amendment.").

Once again, however, context matters. *Glucksberg* involved an individual's right to physician-assisted suicide; *Cruzan,* the right to refuse life-prolonging hydration and nutrition. While the Mask Mandate was obviously intended as a health measure, it no more requires a "medical treatment" than laws requiring shoes in public places, *see Neinast v. Bd. of Trustees of Columbus Metro. Library*, 346 F.3d 585, 593-94 (6th Cir. 2003), or helmets while riding a motorcycle, *see Picou v. Gillum*, 874 F.2d 1519, 1522 (11th Cir. 1989).

In a true "right to refuse treatment" case, the state's interest in preserving life and the individual's right to bodily integrity implicate a single person. Like the abortion context, it is completely distinguishable from the Mask Mandate's attempt to balance the competing interests of the individual and public health.

### 3.   Parents' Right to Make Educational Decisions

Plaintiff next argues that "the state has no valid reason to intervene" in her wish to follow the medical advice of her daughter's physician. Pls.' Mem. of Law at 28. It is true that the presumption that parents will act in their children's best interests gives them a fundamental right to make many decisions on their behalf.

*See Troxel v. Granville*, 530 U.S. 57, 65 (2000). Thus, a state cannot require a parent to send their child to public school, *see Runyon v. McCrary*, 427 U.S. 160, 176-77 (1976) (citing *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925)), or forbid private schools from teaching certain subjects, *see id.* (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923)).

It should, however, be obvious by now that even fundamental rights are not absolute. In *Wisconsin v. Yoder*, 406 U.S. 205 (1972), the Supreme Court stressed that *Pierce* and *Meyer* lend "no support to the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society." *Runyon*, 427 U.S. at 177.

More recently, the Second Circuit held that "*Meyer, Pierce*, and their progeny do not begin to suggest the existence of a fundamental right of every parent to tell a public school what his or her child will and will not be taught." *Leebaert v. Harrington*, 332 F.3d 134, 141 (2d Cir. 2003). "[R]ecognition of such a fundamental right," it explained, "requiring a public school to establish that a course of instruction objected to by a parent was narrowly tailored to meet a compelling state interest before the school could employ it with respect to the parent's child—would make it difficult or impossible for any school authority to

44

administer school curricula responsive to the overall educational needs of the community and its children." *Id.*

What is true for curricular requirements is just as true for other educational regulations like the Mask Mandate. No one is forcing plaintiff to send her child to public school or to live in New York State, but once she made those decisions, she must comply with their rules. Her authority stops, so to speak, at the schoolhouse door. And for good reason. Like a physician with a patient, a parent may justifiably be expected to act in the child's best interest. But it is that very motivation—laudable in itself—that might lead the parent to misjudge what is best for the health of the community as a whole. That is precisely why we, as a society, have entrusted public institutions to make such decisions.

In sum, the Court concludes that the Mask Mandate does not impinge upon any fundamental right. Therefore, strict scrutiny is not the standard by which plaintiffs' constitutional claims must be evaluated. Nor do plaintiff's claims call for intermediate scrutiny. As with the handful of all the other cases that have passed upon the constitutionality of mask mandates, it will evaluate the mandate under rational basis review, noting in passing that it easily passes the more deferential *Jacobson* test that it has "a real or substantial relation" to public health. 197 U.S. at 31.

**D.     Substantive Due Process and Rational Basis Review**

The Supreme Court has emphasized that application of rational basis review

"is not a license for courts to judge the wisdom, fairness, or logic of legislative

choices." *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993) (quoting *FCC v. Beach*

*Communications, Inc.*, 508 U.S. 307, 313 (1993)). Laws subject to rational basis

review are "accorded a strong presumption of validity." *Id.* at 319. Indeed, the

government need not actually articulate its rationale; rather, government action

passes muster "if there is any reasonably conceivable state of facts that could

provide a rational basis." *Id.* at 320 (quoting *Beach Comm'ns*, 508 U.S. at 313). It is

the burden of the party challenging a law to "negat[e] every conceivable basis

which might support it." *Id.* (citing *Lehnhausen v. Lake Shore Auto Parts Co.*, 410

U.S. 356, 364 (1973)).

Notably, even before *Maniscalco* there was a significant body of post-

pandemic caselaw upholding vaccination mandates based upon rational basis

review analysis. *See, e.g., Klaassen v. Trustees of Indiana Univ.*, No. 1:21-CV-238

DRL, 2021 WL 3073926 (N.D. Ind. July 18, 2021), *aff'd*, 7 F.4th 592 (7th Cir.

2021); *Norris v. Stanley*, No. 1:21-CV-756, 2021 WL 3891615 (W.D. Mich. Aug.

31, 2021); *Children's Health Def., Inc. v. Rutgers State Univ. of New Jersey*, No.

CV2115333ZNQTJB, 2021 WL 4398743 (D.N.J. Sept. 27, 2021) (collecting cases);

*see also Phillips v. City of New York*, 775 F.3d 538, 540 (2d Cir. 2015) (upholding

school vaccine mandate for "various vaccine-preventable illnesses" prior to pandemic). None has held otherwise.

Plaintiff has submitted documents to support her argument that masks are inimical to a child's health. But this evidence is thin compared to the contrary documents that defendants have submitted, which clearly satisfy the rational basis review standard.

This is not to say that the Mask Mandate is not without flaws. The degree of difficulty the Court had to endure to understand its reach and application has also made it difficult for the defendant school district (and presumably others throughout the state) to grapple with the application of the current prolix array of the regulation, recommendations and requirements, guidelines and guidance. Nonetheless, as recently articulated by Judge Cogan in *Maniscalco*:

> [W]here good faith arguments can be made on both sides of the many issues raised by the pandemic, it is up to local government, not the courts, to balance the competing public health and business interests.

2021 WL 4344267 at *4; (internal quotations and citation omitted). The same principle applies here.

### E.    Other Laws

Plaintiff also contends that the Mask Mandate is preempted by various federal laws, including Section 564 of the Food, Drug, and Cosmetic Act (the "FCDA"), and the Nuremberg Code. Pls.' Mem. of Law at 15. These arguments

47

are without merit.

First, Section 564 does not include a private right of action. It "confers powers and responsibilities to the Secretary of Health and Human Services in an emergency," not "an opportunity to sue the government." *See Bridges v. Houston Methodist Hosp.*, No. CV H-21-1774, 2021 WL 2399994, at *2 (S.D. Tex. June 12, 2021). Nor is a private right of action separately supplied by the Supremacy Clause: It is "not the source of any federal rights and certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325 (2015).

Citing the Nuremberg Code, plaintiff argues that the Mask Mandate violates the international norm that one cannot be coerced into medical experimentation without consent.  The Mask Mandate is not an experiment or clinical trial; it is a school safety measure.[24] *See Bridges*, 2021 WL 2399994, at *2. Recasting it as an unlawful human experiment is an irrational leap of logic.

## IV.   The State Claims

Although plaintiff is not entitled to preliminary injunctive relief based on her constitutional claims, the Court nonetheless had concerns for her daughter's health. Accordingly, based on some passing allegations in the Complaint, representations

---

[24] The Complaint regrettably equates the Mask Mandate to the Nazi experiments. Plaintiff's counsel is admonished to avoid such irrational and incendiary language. *See* Fed. R. Civ. P. 11.

made at oral argument by plaintiff's counsel, and a subsequently submitted

affidavit from Sarah's mother, the Court deemed the Complaint amended to assert

two state claims: (1) for failure of the school district to afford her a "medical

tolerance" exemption; (2) for failure of the school district to comply with the

ADA.[25]

Plaintiff's affidavit details her failed efforts "to work with my daughter's

school district to accommodate her medical need for an exemption from the mask

requirement." Doe Aff. at ¶ 2. It lays out a litany of problems Sarah has had to

endure while she tried to comply with the School District's mask mandate last

year. Principally, she could not "breathe with the mask on for prolonged periods,"

and had to use her asthma pump "many times" as "she struggle[d] to breathe." *Id.*

at ¶ 9. After school began, and the State's Mask Mandate became the law, Sarah's

condition "got worse." She had become "dangerously underweight by the end of

last year," her "anxiety and fear about not being able to breathe again returned and

she was unable to keep any weight on." *Id.* at ¶ 16.

---

[25] The Court views the requirement that the School District must comply with the
ADA as adopting the federal statute as state law, thereby raising a state claim. *See,
e.g., Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145 (1st Cir. 2009)
(Massachusetts state civil rights act incorporates federal analysis). But since the
ADA is a standalone federal statute, the Court also granted the plaintiff leave to
amend her Complaint to directly invoke the Court's federal jurisdiction. This has
yet to be done.

After school began, and the school district denied her requests for relief, she got worse: "Her hair has started to fall out, and her attacks and migraines" returned. *Id.* at ¶ 17. On September 27, 2021 "Sarah started having a lot of difficulty breathing" but "[t]he teachers and administrators were rude to her and dismissive, acting annoyed and saying things like 'I don't want to deal with this today.'" *Id.* ¶ 18-19. When she got home her mother "was afraid she would wind up in the hospital again." *Id.* at ¶ 20.

Her doctor had recommended a medical exemption, which the school district had not honored. Her mother stated in the affidavit that "[e]ven if we could just do a shield or mesh mask, I think her situation would improve." *Id.* at ¶ 23.

The affidavit concludes by "pray[ing] for some relief from this Court" because "[m]y daughter's physical, emotional, and psychological health are suffering harm every day and I do not know what to do." *Id.* at ¶ 24.

Primarily on the strength of this affidavit, the Court ordered a factual hearing to determine whether preliminary injunctive relief might be warranted on the state law claims. It believed it had the power to do this since it had ongoing federal jurisdiction over the litigation. *See* 28 U.S.C. § 1331. It did express concern, however, whether it should exercise supplemental jurisdiction over purely state law claims, which would seem to be the province of Article 78 review. *See Maniscalco* 2021 WL 4344267, at *5-6. The Second Circuit has opined that, conceptually,

50

district courts may have supplemental jurisdiction over an Article 78 claim, but that there are usually good reasons to decline exercising that jurisdiction. *See Carver v. Nassau Cty. Interim Fin. Auth.*, 730 F.3d 150, 155 (2d Cir. 2013) (citing *City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 164-68 (1997)).

The Court nonetheless ordered the factual hearing but recognized that it might have to grapple with the question of jurisdiction if it concluded that plaintiff's medical condition warranted preliminary injunctive relief. However, the parties have advised the Court that they are engaging in settlement negotiations and have requested an adjournment of the hearing pending the conclusion of their negotiations. *See* Oct. 18, 2021 Mot. To Adj. Conf. Accordingly, the Court has adjourned the hearing to November 3, 2021. Presumably, the school district will consider the current health of Sarah and revisit the issue of whether she should be given either a medical exemption or some relief under the ADA.[26]

## V.    Coda

These are difficult times for school districts to comprehend and apply the morass of the Commissioner's regulation, the Commissioner's "determination," the CDC's recommendations and requirements, and all the guidelines and guidance

---

[26] To the extent that the School District asserted at oral argument that it relied on the CDC Guidance that children with asthma can wear masks, it should also be mindful that the CDC recommended that those with asthma "[d]iscuss with [their] healthcare provider if [they] have any concerns about wearing a mask." *Guidance for Wearing Masks: Help Slow the Spread of COVID-19.*

affecting the application of the Mask Mandate. The School District is to be complimented for its willingness to give it another go in Sarah's case. It obviously understands that medical conditions are not static and that an open-minded approach is in everyone's best interest. It also obviously realizes that serious concerns over the health and welfare of its student population in the face of the pandemic should be sensitively handled by the School District's administrators to obviate the need for its students' parents to initiate costly and protracted litigation.

Finally, the Court notes that the Mask Mandate is set to expire on November 25, 2021. The State will have the opportunity to assess the wisdom of transforming its current complex mix of its regulation, recommendations, guidance and guidelines into a simpler, more manageable format. Now that all school district personnel will likely be required to be vaccinated after the final decision in *Maniscalco* is rendered, it may also consider whether the current rigidity of its immutable "one size fits all" regulation is still warranted, or whether a more malleable approach, such as that adopted by Massachusetts or the other states in the second bucket, which recognize the statistical variations of diverse communities, might be more appropriate.[27]

---

[27] Currently, anyone over the age of 12 can get the vaccine. Approval for 5-to-11-year-olds to be vaccinated could come as early as November. *See Sharon LaFraniere & Noah Weiland, Pfizer Requests Nod to Vaccinate Children* 5 to 11, N.Y. TIMES, Oct. 8, 2021, at A1. Indeed, Dr. Anthony Fauci, Chief Medical Advisor to the President, noted that "it's entirely possible if not very likely that

The Court, of course, recognizes that it is not its province to usurp the function of the legislature, nor to base its decision on its own personal views. Its function is simply to apply the law of the land, which it has endeavored to do. But given the imponderables and the country's divisiveness over the issue of mask mandates for children it has decided to veer from the conventional format of the traditional legal opinion—to which it generally subscribes—in order to educate the public about the current state of reputable scientific studies and the various ways our states have addressed the problem. *See* Richard Posner, <u>Reflections on Judging</u> 11 (2013); *see also* Frederic Block, <u>Disrobed: An Inside Look at the Life and Work of a Federal Trial Judge</u> 1-4 (2012).

---

vaccines will be available for children from 5 to 11 within the first week or two of November." Humeyra Pamuk, *Fauci says vaccines for kids between 5-11 likely available in November*, Reuters (Oct. 24, 2021) <u>https://www.reuters.com/business/healthcare-pharmaceuticals/fauci-says-vaccines-kids-between-5-11-likely-available-november-2021-10-24/</u>.

## VI.    Conclusion

For the all the foregoing reasons, plaintiff's motion for a preliminary injunction on her constitutional claims is denied, but the issuance of preliminary injunctive relief on her state law claims will be held in abeyance pending the resolution of the parties' settlement negotiations.

**SO ORDERED.**

 /S/ Frederic Block                           
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
October 26, 2021