# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF NEW YORK

JANE DOE on behalf of herself and her minor child SARAH DOE,

                Plaintiff,

vs.

FRANKLIN SQUARE UNION FREE SCHOOL DISTRICT, and MARY T. BASSETT, in her official capacity as Commissioner of the New York State Department of Health.

Case No. 2:21-cv-5012

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

*"Liberty is the soul's right to breathe and, when it cannot take a long breath, laws are girdled too tight."* Henry Ward Beecher (1858)

Plaintiff, JANE DOE[1], by and through her undersigned counsel, sues Defendants, Franklin Square Union Free School District and Mary T. Bassett[2] in her official capacity as Commissioner of the New York State Department of Health, on behalf of herself and her minor daughter Sarah Doe. Plaintiff alleges as follows:

## PRELIMINARY STATEMENT

1.     Plaintiff is the mother of Sarah Doe ("Sarah"), a ten-year-old child with disabilities, including asthma and anxiety, which prevent her from medically tolerating a mask.

---

[1] To protect the child's medical privacy, the names of the child and her mother are changed in this complaint to pseudonyms. A motion to proceed by pseudonym is being filed concurrently with this complaint.

[2] Pursuant to Fed. R. Civ. Pro. 25(d), Mary T. Bassett is herein substituted in her official capacity for previously named Howard Zucker, who was sued in his official capacity, as Commissioner Bassett succeeded Commissioner Zucker in office today, January 20, 2022. References to action taken by Commissioner Zucker while he was in office will remain in his name, but are meant to be attributable to the office, as he was sued in his official capacity.

2.      Sarah has had serious respiratory challenges since birth. She has ended up in the emergency room more than once due to severe asthma attacks. She is also prone to anxiety, which is exacerbated by her struggles to breathe when wearing a mask.

3.      In August 2021, Howard Zucker ("Commissioner Zucker"), who was at the time the Commissioner of the New York State Department of Health ("NYSDOH"), announced that he would soon be declaring a new school mask mandate would be in effect for the upcoming 2021-2022 school year (the "School Mask Mandate").

4.      There is no current declared state-disaster emergency that empowers the executive branch to issue such a declaration. Neither the executive branch nor Commissioner Zucker himself were empowered by the New York State Legislature to enact declarations with the force of law concerning mask mandates in school in the absence of a declared state-disaster emergency.

5.      Sarah's pediatrician, a New York State licensed physician and Sarah's primary care physician since birth, determined that it is unsafe for Sarah to wear a mask all day at school and wrote her a full medical exemption duly submitted August 24, 2021, in anticipation of Commissioner Zucker's declaration.

6.      This suit arises because the Franklin Square Union Free School District (the "School District") summarily denied Sarah's medical exemption on Friday, September 3rd.

7.      The School District has admitted they adopted an official policy that only paraplegic children are entitled to a mask exemption and all others will be summarily denied.

8.      The School District does not have data to support the theory that no other child besides a paraplegic child might need a medical exemption from the mask mandate.

9.     Pursuant to the School District's mask exemption policy, Sarah and multiple other disabled children who need a mask exemption, and whose licensed physicians have certified same, are being denied reasonable accommodation and recklessly endangered and harmed.

10.     On Tuesday, September 7, 2021, Plaintiff filed a complaint in federal court on behalf of her daughter.

11.     For the reasons set forth in this complaint, Plaintiff respectfully seeks declaratory, injunctive, compensatory, punitive, nominal, and other relief to prevent the Defendant from continuing to violate her daughter's fundamental rights, along with her dignity and safety, as well as the rights and safety of all other similarly situated disabled children in this School District and others that have adopted similar arbitrary and dangerous policies.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction to hear all federal claims asserted in this case under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts to hear suits arising under the laws and Constitution of the United States; the Supremacy Clause of the Constitution of the United States, which allows federal district courts to hear suits alleging preemption of state and local laws by the Constitution and federal laws made in pursuance thereof; and 42 U.S.C. § 1983 and 28 U.S.C. § 1343 in relation to Defendants' deprivation and infringement under color of law of the Individual Plaintiff's rights, privileges, and immunities secured by the United States Constitution and laws, as detailed further herein.

13.     This Court has supplemental jurisdiction over the claims asserting violations of the laws and Constitution of the State of New York through its supplemental jurisdiction under 28 U.S.C. § 1367(a), as those claims are so closely related to the Plaintiff's federal question and Section 1983 claims that they form part of the same case or controversy under Article III of the

United States Constitution.

14.    This Court has the authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief under 28 U.S.C. § 1343(a); and attorneys' fees and costs under 42 U.S.C. § 1988.

15.    The United States District Court for the Eastern District of New York is the appropriate venue for this action pursuant to 28 U.S.C. § 1391(b)(1) and (2) because it is the district in which Defendant deprived Plaintiff and her daughter of their rights and liberties under the laws and Constitution of the United States and violated the laws and Constitution of the State of New York, as further alleged herein. It is also the district in which a substantial part of the events giving rise to Plaintiff's claims occurred and continue to occur.

## PARTIES

16.    Plaintiff Jane Doe is the mother of Sarah Doe. She lives in Nassau County, New York and has standing to bring this case, which presents a justiciable issue for the Court, on behalf of herself and her daughter.

17.    Plaintiff Sarah Doe ("Sarah") is a ten-year-old child with disabilities who requires a medical exemption from the mask mandate to safeguard her from harm and whose medical exemption to the school mask mandate is nonetheless not being honored. She lives with her family in Nassau County and attends the John Street School in the Franklin Square Union Free School District.

18.    Defendant Franklin Square Union Free School District ("School District") is a municipal corporation organized pursuant to the laws of the State of New York and as such, may sue and be sued. The School District's discretionary decision to adopt an official policy of subjecting medical exemptions to review and denial is directly responsible for the deprivation of

Sarah's constitutional rights.

19.     Defendant Mary T. Bassett ("Commissioner Bassett"), is the duly appointed Commissioner of the NYSDOH as of today, January 20, 2022. She is sued in her official capacity and in that capacity is ultimately charged with enforcing and issuing NYSDOH regulations, including those complained of herein. Commissioner Zucker was previously named in this suit in his official capacity, encompassing all acts or omissions carried out by Commissioner Bassett or her predecessor relevant to this complaint. Acting under color of state law, Commissioner Zucker personally promulgated the School Mask Mandates that deprive and infringe upon or threaten to deprive and infringe upon Plaintiff's rights, privileges, and immunities under the laws and Constitution of the United States, the laws, and Constitution of the State of New York, and under international law so widely adopted and accepted as to establish *jus cogens*. Commissioner Bassett, acting in her official capacity, has declined to repeal the Mask Mandate or issue guidance to school districts to ensure that they cease to adopt policies under which unqualified school officials are overruling treating physicians and failing to accommodate medical exemptions for vulnerable disabled children.

## FACTUAL BACKGROUND

20.     Sarah suffers from asthma and serious respiratory issues she has had since she was a baby.

21.     At times, her attacks have been so severe that they could not be treated in the doctor's office and she was transferred to the emergency room in critical condition.

22.     During the 2020-2021 school year, pursuant to emergency powers granted temporarily to the executive branch, Commissioner Zucker issued emergency guidance requiring all students to wear masks at school.

23.     Each of these temporary orders stated, "[s]tudents who are unable to medically tolerate a mask, including students where such mask would impair their physical health or mental health are not subject to the required use of a mask."

24.     A FOIL request to the NYSDOH in late 2020 revealed that the NYSDOH did not rely on or possess any documents or studies establishing that masks are safe or effective for adults or children.

25.     As the schoolyear progressed, it became apparent that Sarah, then a fifth-grade student at the John Street School, could not medically tolerate masks and that use of the masks was impairing her physical, mental health and emotional health.

26.     Though Sarah was only ten years old, she had to start carrying her asthma pump to school and she began needing to administer it to herself more and more frequently as her breathing became increasingly difficult due to the mask requirement.

27.     Jane attempted (unsuccessfully) for months to work with the school to provide a reasonable accommodation to her daughter to no avail.

28.     At first, Jane attempted to start with an exemption from masks during physical activity. Sarah was having increasingly frequent attacks after running with a mask, and her mother became scared.

29.     Another child in the class with similar respiratory issues even collapsed during gym class because he could not breathe properly with a mask on.

30.     The School District would not even agree to allow Sarah (or the other child) to take masks off during gym class while running.

31.     The World Health Organization recommends that masks be avoided during

exercise, even for people who do not suffer from asthma and other respiratory disabilities.[3]

32.     Sarah's condition got worse. The attacks increased; she began suffering from repeated migraines and grew anxious and depressed.

33.     Until then, Sarah had gotten all A's and was a model student. Her grades began slipping and she was frequently asked to go to the principal's office for pulling down her mask to try to breathe.

34.     Sarah always previously loved school, but she began telling her mother that she was miserable and depressed and that she hated school.

35.     Sarah's anxiety became crippling.

36.     Jane attempted to help her daughter comply with the school's rules and to work with the school to accommodate her child. But sometimes it got so bad that Sarah reported she almost passed out from lack of breath.

37.     Her mother became frightened for her safety. When Sarah's attacks progress beyond a certain point, they can become life-threatening and cannot be solved by her inhaler or doctor's office interventions.

38.     Jane begged the School District to accommodate her child. She pointed out the language of the emergency policies, which clearly specified that the mask policy only applied to children whose physical or mental health was not impaired. She explained that her daughter was dizzy, unable to concentrate, having increasingly frequent and serious asthma attacks, was anxious, and was unable to breathe.

39.     After the school repeatedly ignored and/or denied Jane's requests to exempt her asthmatic child from the mask exemption or accommodate her in any way, Jane was advised to

---

[3] WORLD HEALTH ORGANIZATION, https://www.who.int/images/default-source/health-topics/coronavirus/myth-busters/mythbuster---masks-and-exercise.png (last visited Sept. 7, 2021).

get a formal exemption letter from a doctor, even though the school never mentioned that this was required.

40.     Jane made an appointment with Sarah's pediatrician, a New York State licensed physician who has treated Sarah since she was a baby.

41.     Sarah's pediatrician shared Jane's concern about Sarah's safety and immediately agreed that Sarah needed an exemption.

42.     Jane submitted the physician's exemption on or about April 27, 2021.

43.     Soon after, Jane received a call from Jared T. Bloom, the Superintendent of the School District ("Superintendent Bloom"). Superintendent Bloom stated that the district had adopted an official policy not to give *any child* a mask exemption. He informed Jane that Sarah's exemption was therefore denied.

44.     School district attorneys subsequently affirmed that the official policy in the Franklin Square Union Free School District is to deny any medical exemption except in cases where a child is a paraplegic.

45.     No peer-reviewed science supports this position.

46.     Superintendent Bloom suggested that if Sarah was struggling, she could "request" a mask break and would have to separate herself from her classmates during any break and could not participate in school while taking a break.

47.     Jane reminded Superintendent Bloom that the so-called "requested" mask breaks were not realistic, or sufficient, and were not being honored for the most part. He ignored her concern.

48.     Jane received follow-up calls from the school nurse, who called to report Sarah for taking mask breaks. The nurse reiterated that pursuant to official district policy, "no medical

exemptions would be allowed" from the mask mandate.

49.     Jane called the NYSDOH and the Nassau County local health department. Both confirmed that the state and local health departments <u>do</u> <u>not</u> have a policy of reviewing or denying mask exemption requests and that the regulations simply allow students to opt-out if they are having trouble breathing or feel that the mask is impairing their physical or mental health.

50.     Jane was forced to email the school to ask that their denial of her daughter's medical exemption be put in writing, again reiterating that New York State guidelines which are followed by Nassau County provide for a medical exemption for students and provide that any student whose mental or physical health might be impaired by wearing a mask could opt-out.

51.     Superintendent Bloom repeatedly told Jane that the NYSDOH did not allow exemptions and advised her to call Commissioner Zucker. When Jane called the NYSDOH, they would tell her that they do not review or deny medical exemptions from doctors and that she is entitled to have a medical exemption if her daughter's doctor submits an exemption.

52.     Jane continued to reiterate her request that the School District put the denial in writing throughout the month of May and into June.

53.     The School District put Jane off, claiming that updated guidelines on masks were expected any day and that they may be dropping the mask requirement entirely.

54.     The NYSDOH publicly acknowledged that there was a lack of science supporting continued school mask mandates.

55.     On June 4, 2021, Commissioner Zucker wrote a letter to Dr. Walensky, Director of the United States Centers for Disease Control ("CDC"), alerting the CDC that the NYSDOH planned to ease mask restrictions to comport with the more lenient recommendations the CDC recommended for summer camp participants. Based on the science available, he indicated that

the NYSDOH intended to make mask use optional for all students. The letter concluded, "[i]f there is any data or science that you are aware of that contradicts moving forward with this approach, please let me know as soon as possible. We plan to make this guidance effective on Monday June 7."

56.     Upon information and belief, no data or science was provided to Commissioner Zucker which contradicted his new proposed NYSDOH policy of allowing mask use to be optional in school.

57.     Upon information and belief, no reliable peer-reviewed data or science *exists* that would justify the mask mandate for children as safe and effective, especially for disabled children.

58.     Nonetheless, on June 8, 2021, the School District provided Jane with a written denial of the medical exemption for Sarah stating: "[t]he medical note that your doctor provided was reviewed by our district physician, Dr. Marino, and after speaking with Sarah's doctor it was determined by Dr. Marino that the mask was not creating difficulty with her asthma; therefore, there was no reason for this medical accommodation."

59.     Dr. Marino, the School District's hired consultant who recommended that the School District deny Sarah's exemption, is an osteopath who has no expertise in Sarah's particular condition and has never met or treated Sarah. He refused to even speak to Sarah's mother about her condition.

60.     Dr. Marino is unqualified to make any determination about Sarah's medical needs or to provide sufficient informed consent under New York State law to override a treating doctor's opinion about use of an experimental medical product.

61.     The School District letter also grossly misstated the facts. Sarah's doctor had never suggested that that the mask was not exacerbating Sarah's asthma. In fact, Sarah's doctor stated

the opposite.

62.     Alarmed at the misrepresentation in the School District's letter, Sarah's doctor

wrote a follow up letter correcting the record on his position about Sarah's need for a mask:

> "I requested a mask exemption for [Sarah]. After speaking with Dr. Marino, he refused to grant it. It was not my decision to deny her mask medical exemption. Dr. Ron Marino made the decision to deny her medical exemption. He overruled my request for my patient's medical needs."

63.     Nothing in the law or in the emergency regulations permit schools to review or

deny mask medical exemptions written by licensed treating physicians.

64.     The decision to subject medical exemptions written by doctors to school district

review and denial is a discretionary policy adopted by the defendant school district.

65.     Despite the second letter from Sarah's doctor clarifying that Sarah does need an

exemption, the School District still refused to honor Sarah's mask exemption.

66.     Jane requested that Sarah at least be allowed to resume remote school, which was

still an option in the School District. The School District then denied this request, stating: "virtual

will not likely be the best option."

67.     On June 11, 2021, Jane submitted a 504-plan requesting that Sarah's classroom at

least receive air conditioning and that Sarah could wear a face shield or mesh mask rather than a

regular cloth mask.

68.     At that point, it was over 90 degrees most days. School teachers and administrators

were yelling at Sarah and harassing her any time she took her mask down to try to breathe. She

was frightened and traumatized and losing more and more weight.

69.     One employee of the School District even began following Sarah around and

filming her and denigrating her for needing to take down her mask to breathe.

70.     Sarah's Principal encouraged this behavior and joined in, yelling at Sarah and

harassing her repeatedly.

71.     Sarah suffered severe anxiety and emotional harm from the continued harassment at the hands of School District employees.

72.     Sarah stopped being able to eat very much due to the anxiety being unable to breathe, and from the constant harassment at school. She lost so much weight from the stress that she became dangerously underweight.

73.     Sarah's doctor advised that she might need to attend a special program to get to a safe weight again.

74.     On June 16, 2021, the School District told Jane that her request for any accommodation – including air conditioning, mesh mask or even joining the already existing remote learning option – were denied.

75.     The School District suggested that if Sarah had a severe attack and went to the nurse rather than administered the inhaler herself as she'd been doing, they might allow a short exemption if the nurse concurred during the attack that it was severe enough for Sarah to need an exemption in the future.

76.     The school nurse is not a licensed physician or pulmonologist and has no expertise in Sarah's condition.

77.     Jane was not willing to allow her daughter to get to the point of a "severe" attack or risk serious harm so that a nurse could decide whether to honor Sarah's treating physician's advice.

78.     Jane does not have the means to hire an attorney. Nonetheless, with great difficulty, she hired the firm of Siri Glimstad for the limited (and far more affordable) purpose of assisting her with communication and negotiations with the school regarding the mask

exemption.

79.     The attorneys at Siri Glimstad wrote a letter to the School District on June 16, 2021. The letter alerted the School District that their policies were unlawful and constituted violations of Sarah's constitutional and statutory rights.

80.     Sarah's attorneys demanded that the School District institute an exemption for the remainder of the school year and respond with a confirmation that they would provide an exemption for the following year.

81.     School ended soon thereafter.

82.     On June 24, 2021, Governor Cuomo announced that the state disaster emergency was over, and with it, his emergency orders were no longer in effect.

83.     Before the start of the following school year, Jane attempted to ascertain whether there would be a new mask mandate imposed for the 2021-2022 academic year. She was told that no guidance had been issued yet but that guidance might be forthcoming.

84.     Proactively, Jane submitted another medical exemption from Sarah's pediatrician through counsel on August 24, 2021. Sarah's doctor certified that she is not medically able to tolerate a mask and requires an exemption if a new mask mandate were to be put in place.

85.     On August 27, 2021, attorneys for the School District sent an email response stating that they were waiting for updated guidance from the NYSDOH and would send a response about whether masks would be required, and Sarah's medical exemption accepted or denied the following week.

86.     On September 2, 2021, counsel for the School District sent a letter stating that the exemption would be denied based on the recommendation of Dr. Marino.

87.     Dr. Marino has never treated Sarah. He admits he overruled her long-time

physician's medical determination on the basis of generic language from the CDC website which makes vague representations about asthma and face masks. Specifically, School District stated that "in its guidance dated April 7, 2021, the CDC has taken the position that people with moderate to severe asthma are at an increased risk to be hospitalized for COVID-19 and therefore should wear a mask to cover their nose and mouth to reduce the risk of severe illness. *See CDC Guidance: People with Moderate to Severe Asthma* (last updated 4.7.2021) (https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html)."

88.     The website cited by School District counsel, and apparently relied upon by the School District doctor, is vague and contains generalized statements that are not evidence-based or reliable and have nothing to do with whether Sarah poses a direct threat to others.

89.     Nothing on the page cited provides a reasonable basis to conclude that all children with asthma and anxiety can safely wear a mask all day at school. Rather, it simply offers that some people (it is unspecified if they mean adults or children) with asthma should wear a mask to avoid the risk of COVID-19 for themselves. Because some people with asthma can tolerate a mask for an unspecified period of time or purpose does not mean that all people with asthma can tolerate a mask or that Sarah specifically can tolerate a mask all day every day at school without risk to her physical, emotional or mental health.

90.     There is no peer reviewed evidence that establishes to any reliable degree that prolonged daily mask use for children with asthma, anxiety or other disabilities is safe in all cases.

91.     The CDC "FAQ" pages on masks that Dr. Marino relied on are not a substitute for medical advice from a treating physician and offer no links to any studies or reputable data to support the assertions made therein.

92.     Rather, the CDC webpages invariably conclude that people should talk to their doctors if they have concerns.

93.     It is not safe to substitute generalized internet advice for the clinical judgment of a treating physician.

94.     Jane scrambled to get representation in place to file a federal suit as quickly as possible after the denial. It was extremely difficult, as she does not have money to provide any retainer.

95.     On September 7, 2021, she filed a complaint.

96.     On September 8, 2021, she filed an emergency motion.

97.     Shortly after filing for relief, Jane started school.

98.     Her condition deteriorated rapidly under the stress and difficulty breathing.

99.     In addition to remaining dangerously underweight, and unable to eat properly due to her anxiety caused by the mask mandate, Sarah started losing her hair in clumps and developing depression.

### Mask Mandates Lack Scientific Support

100.    Use of masks to prevent getting or spreading COVID-19 is simply not supported by hard data.

101.    In fact, when Governor Cuomo announced a COVID-19 pandemic emergency in March 2020, public health authorities universally discouraged healthy people from wearing masks. The consensus in the scientific community was that prolonged use of masks by the general public could do more harm than good.

102.    Dr. Robert Redfield, director of the Centers for Disease Control ("CDC") testified before the House Foreign Affairs Subcommittee to advise against use of masks outside of hospital settings.

103.    The World Health Organization advised that use of masks by untrained healthy

people outside of hospitals was likely to do more harm than good and was not recommended.

104.    Dr. Anthony Fauci, director of the National Institutes of Allergy and Infectious Disease (NIAID) testified to the United States Senate that healthy people should not wear masks. He also went on national television and stated the same, specifying that it might make people "feel" better (using air quotes) but might have unintended consequences and do more harm than good.

105.    These initial recommendations universally issued by all of the public health authorities were evidence-based.

106.    The science does not support an assumption that masks can stop the spread of a virus as small as COVID-19 or that prolonged mask use by the general public (especially children) is safe.

### The Physical Properties of Masks Establish That They Cannot Prevent Transmission of SARS CoV-2.

107.    From a physical standpoint, the properties of masks versus the SARS-CoV-2 virus prove that masks simply cannot prevent the virus from exiting the nose and mouth of infected individuals into the air around them to be breathed in by others.

108.    The SARS-CoV-2 virus has a diameter of 60 nm to 140 nm [nanometers (a billionth of a meter)].  Medical and non-medical facemasks' thread diameter, on the other hand, ranges from 55 μm to 440 μm [micrometers (one millionth of a meter)], which is more than 1,000 times larger than the diameter of the virus.  Due to the difference in sizes between SARS-CoV-2 diameter and facemasks thread diameter, SARS-CoV-2 can easily pass through any face mask.

109.    Scientists and experts in this field routinely describe the physical impossibility of stopping a virus with a mask as "like trying to stop a mosquito by putting up a chain link fence."

110.    Historians and public health scholars similarly routinely describe the known futility of the masks employed during influenza 1918, often referencing the famous quote that "it is like trying to keep out dust with chicken wire."

111.    The physical impossibility of filtering the SARS-CoV-2 virus with masks is exacerbated by the lack of any seal between the wearer's face and the mask, which allows breath to exit wholesale sans any filtering whatsoever into the air around the wearer to be breathed in by others.

112.    The Occupational Safety and Health Agency sets standards for the use of certain specific masks to prevent infection by viruses in particular settings.  These OSHA certified masks seal effectively around the nose and mouth and prevent the inhalation or exhalation of viruses into the air by those wearing them but can only be used with an external source of oxygen being pumped into the mask, much like a diver wearing an oxygen tank.

113.    The face coverings available to children and the public at large are not the same as these OSHA certified masks, and are not designed to, nor do they, prevent or reduce infection by the SARS-CoV-2 virus.

114.    Recently, Dr. Michael Osterholm, the Director for Infectious Disease Research and Policy at the University of Minnesota who served on the Biden transition team's COVID-19 task force, appeared on several news programs to discuss the lack of science justifying mask policy in the United States.

115.    In a PBS interview held August 3, 2021, Dr. Osterholm revisited his concern about the lack of scientific data justifying mask mandates and policy. He explained that the theories based on droplet reduction are outdated now that it is universally understood that SARS-CoV-2 is spread by aerosols. "People thought it was transmitted by respiratory droplets

falling within six feet of us. Today we know that is not the science. We know these are transmitted with aerosols. If you want to know the difference – all those plexiglass plates you saw that were put up that supposedly separated you from me with six feet have no real purpose today at all. To understand and really the best way I can tell people…if you are in a room with someone and they are smoking and you smell it, you are getting basically inhaled aerosols."[4]

116.    Anyone who wears a cloth mask with a normal sense of smell can attest that they are still able to smell aromas through the mask. They are therefore able to catch and pass on SARS-CoV-2.

117.    Even the Dr. Wallensky from the CDC, and other officials who were vigorously and according to many unethically pushing the school mask mandates have finally publicly acknowledged that cloth masks have cannot mitigate the spread of COVID-19.

118.    Though Dr. Wallensky's recommendation is now to try to upgrade to a better medical mask, studies do not support the theory that surgical or KN95 masks will be effective to stop the spread in school communities to any meaningful degree either.

***Scholarly Studies Establish Masks Cannot Mitigate the Spread of COVID-19***

119.    Scholarly studies reflect the physical reality that masks cannot stop the transmission of SARS-CoV-2.

120.    The first and only randomized, controlled trial evaluating the impact of mask-wearing on the spread of SARS-CoV-2 in six thousand individuals concluded that there was no statistically significant difference among the masked and unmasked controls sufficient to show that masks are effective in reducing or preventing infection from SARS-CoV-2.[5]

---

[4] Christiane Amanpour, PUBLIC BROADCASTING SERVICE, https://www.pbs.org/wnet/amanpour-and-company/video/do-masks-provide-much-protection-we-think-bglhwy/ (last visited Sept. 7, 2021).

[5] Henning Bundgaard et al., *Effectiveness of Adding a Mask Recommendation to Other Public Health Measures to Prevent SARS-*

121.     A study by the Centers for Disease Control published in the *Emerging Infectious Disease Journal* in May 2020 found that ten randomized control trial studies of the use of face masks to control the influenza virus, a virus essentially the same size as the SARS-CoV-2 virus, showed no significant reduction in influenza transmission with the use of face masks.[6] These studies covered a wide range of environmental settings from University dorms to households, but the results were the same in each context.

122.     Similarly, a study of nearly two thousand United States Marine Corp recruits published in the *New England Journal of Medicine* on November 11, 2020, indicated that masks did not reduce or prevent the spread of SARS-CoV-2.[7]

123.     The WHO announced in 2020 that "at present, there is no direct evidence (from studies on COVID-19) on the effectiveness face masking of healthy people in the community to prevent infection of respiratory viruses, including COVID-19."[8]

124.     The CDC conducted a shoddy and much-criticized non-peer reviewed observational "study" in Arizona, claiming to have found that schools with mask mandates reduced COVID-19 infections to a significant degree.

125.     This study has now been decisively debunked and is even roundly criticized by

---

*CoV-2 Infection in Danish Mask Wearers: A Randomized Controlled Trial*, 174 ANNALS OF INTERNAL MEDICINE 335 (2021) available at https://www.acpjournals.org/doi/pdf/10.7326/M20-6817 (last visited on Aug. 3, 2021).

[6] Xiao J, et al., *Nonpharmaceutical Measures for Pandemic Influenza in Nonhealthcare Settings—Personal Protective and Environmental Measures*, 26 EMERGING INFECTIOUS DISEASES 967(2020), available at https://wwwnc.cdc.gov/eid/article/26/5/19-0994_article (last visited on Aug. 3, 2021).

[7] Andrew G. Letizia, M.D. et al., *SARS-CoV-2 Transmission among Marine Recruits during Quarantine*, 383 The New England Journal of Medicine 2407 (2020), available at https://www.nejm.org/doi/full/10.1056/NEJMoa2029717 (last visited on Aug. 3, 2021).

[8] *Advice on the use of masks in the context of COVID-19: interim guidance, 5 June 2020*, WORLD HEALTH ORGANIZATION (2020), available at https://apps.who.int/iris/handle/10665/332293 (last visited on Aug. 3, 2021).

publications that typically express strong preferences in support of masks.

126.    For example, the Atlantic recently published a long article addressing the growing consensus that the CDC's "Arizona" study, which CDC previously repeatedly stated showed that school mask policies were effective, is deeply flawed and cannot be responsibly relied on to advocate for school mask mandate. Dozens of prominent experts were interviewed for the article, and the article details the many flaws with the logic and data of the CDC's non peer-reviewed       data       and       conclusions.    *See,*       *e.g.,* https://www.theatlantic.com/science/archive/2021/12/mask-guidelines-cdc-walensky/621035/ "Noah Haber, an interdisciplinary scientist and a co-author of a systematic review of COVID-19 mitigation policies, called the research 'so unreliable that it probably should not have been entered into the public discourse'…The agency's decision to trumpet the study's dubious findings, and subsequent lack of transparency, raise questions about its commitment to science-guided policy."

127.    To the extent that masks have any impact on mitigating the spread of COVID-19, even these outlets that have been fierce advocates for mask mandates, such as the Atlantic, admit that though they still want to believe masks can offer some protection "the precise extent of that protection, particularly in schools, remains unknown—and it might be very small." *Id.*

### Prolonged or Improper Mask Use Can Cause Harm

128.    Politically, it is popular to dismiss the lack of science and follow slogans such as "something is better than nothing." However, not only does the data show that masks are ineffective, they also show that prolonged, or improper use of masks can cause harm to the wearer and increase risk of serious respiratory disease.

129.    For example, a randomized, controlled trial conducted on 1,607 health care

workers in 2015 found that "the rate of influenza-like illness is significantly higher" in the cloth mask controls than in those who wore no mask. The study concluded that "moisture retention, reuse of cloth masks and poor filtration made cloth masks more likely to lead to increased risk of infection for the wearer" and finished by stating that "cloth masks should not be recommended" and "guidelines need to be updated."[9]

130.    During a pandemic for a virus that is usually mild but can in some cases develop into a deadly respiratory illness, any intervention which could increase the likelihood of severe respiratory symptoms would understandably be unacceptable to some people, particularly the parent of a child who is at risk of serious respiratory complications.

131.    Another study shows that the temperature of the perioral skin rises after use of face masks for even one hour.[10] Coupled with prolonged casual use, moisture retention, reuse, and touching, the Mask Mandate creates the perfect breeding ground for dangerous viral, bacterial, and fungal infections. These again can lead to increased respiratory illness and death.

132.    A study by Anthony Fauci, M.D. and others in 2008 established that most of the deaths in the pandemic of 1918 were not from influenza, but rather from secondary bacterial infections that developed into pneumonia.[11]

---

[9] C. Raina MacIntyre et al., *A cluster randomised trial of cloth masks compared with medical masks in healthcare workers*, 5 British Medical Journal e006577 (2015), available at https://pubmed.ncbi.nlm.nih.gov/25903751/ (last visited on Aug. 3, 2021).

[10] Scarano A., et al., *Facial Skin Temperature and Discomfort When Wearing Protective Face Masks: Thermal Infrared Imaging Evaluation and Hands Moving the Mask*, 17 *Int J Environ Res Public Health* 4624 (2020), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7369838/ (last visited on Sept. 7, 2021).

[11] Morens D.M., et al., *Predominant role of bacterial pneumonia as a cause of death in pandemic influenza: implications for pandemic influenza preparedness*, 198 *J Infect Dis.* 962 (2008), available at https://pubmed.ncbi.nlm.nih.gov/18710327/ (last visited Sept. 7, 2021).

133.    Certainly, any intervention that creates increased risk of localized bacterial and fungal infections should be avoided during a pandemic.

134.    Many COVID-19 deaths are also associated with secondary fungal infection. A recent study from India found that cloth mask use significantly increases the risk of developing Coronavirus disease-associated mucormycosis ("CAM")(a deadly fungal infection of the lungs seen in primarily in COVID-19 patients in India sometimes referred to as "Black Fungus" infection).[12] "Use of surgical or cloth masks for prolonged periods was found to be associated with an increased risk of CAM."

135.    In short, science does not support the proposition that the School Mask Mandate can or will reduce or prevent the spread of SARS-CoV-2; rather, it shows it may cause increased risk of viral, bacterial, and fungal infection and put children more at risk.

136.    Masks have become a political, not a scientific issue. Virtue signaling, shaming and rejection of any discussion of the actual evidence have become common in the public discourse and to a large extent the messaging from public health officials, who universally cautioned at the start of the pandemic that prolonged use of masks in healthy and asymptomatic people could lead to worse public health outcomes. They have no basis for changing these early recommendations now other than the political pressure that they are under.

137.    Dr. Osterholm describes the politicization of mask mandates as hindering honest and evidence-based recommendations: "needless to say, [mask policy] is a political hot button the likes of which I have never seen."[13]

---

[12] Umang Arora, et al., *Novel risk factors for Coronavirus disease-associated mucormycosis (CAM): a case control study during the outbreak in India,* MEDRXIV (forthcoming 2021), available at https://doi.org/10.1101/2021.07.24.21261040 (last visited on Sept. 7, 2021).

[13] PUBLIC BROADCASTING SERVICE, *Do Masks Provide as Much Protection as We Think?*, available at https://www.pbs.org/wnet/amanpour-and-company/video/do-masks-provide-much-protection-we-think-bglhwy/

138.    The current political narrative is that the WHO, CDC, and Anthony Fauci and all other public health officials did think that masks, including cloth masks, were safe and effective at the start of the pandemic, but they each initially intentionally lied to the public when they advised against prolonged mask use in order to conserve PPE for medical professionals.

139.    But the evidence, when examined, does not support this political theory. In fact, as will be shown at trial, the evidence at the start of the pandemic showed that mask use by healthy or asymptomatic people *is* more harmful than helpful on an individual and general level just as most public health officials initially admitted. The evidence has not changed in any major way. Internal emails from Dr. Fauci reflect that he understood this very well at the time, and that he was not making a false public statement about masks in an attempt to merely conserve resources for healthcare workers.

140.    In sum, the evidence shows that the initial recommendations from public health officials that healthy people should not wear masks *was* based in science while the current recommendation is based in politics.

141.    Though use of cloth masks may provide a false sense of security and hope that is comforting to some people in the face of a pandemic, the evidence does not support masking as a real tool to combat COVID-19. Placing vulnerable children, like Sarah, at risk of unnecessary harm is not justified by the emotional needs of adults who long for a security blanket.

142.    Breathing is one of the most important and necessary physiological functions to sustain life and health. The human body requires a continuous and adequate oxygen supply to all

---

(last visited Sept. 7, 2021); *see, also*, Michael T. Osterholm, COMMENTARY: My views on cloth face coverings for the public for preventing COVID-19, UNIV. OF MINNESOTA CENTER FOR INFECTIOUS DISEASE RESEARCH AND POLICY, available at https://www.cidrap.umn.edu/news-perspective/2020/07/commentary-my-views-cloth-face-coverings-public-preventing-covid-19 (last visited Sept. 7, 2021) .

organs and cells for normal function and survival.  Breathing is also an essential process for removing metabolic byproducts, like carbon dioxide, occurring during cell respiration.

143.    Masks are detrimental to human breathing function because they force users to rebreathe their own expelled air over extended periods of time, increasing levels of carbon dioxide and other detrimental elements in the body. They also impede the airflow and make it difficult to breathe, particularly for people with anxiety or respiratory issues. These concepts, though sometimes vilified by the public discourse as overblown, are not hard to prove and can easily be established in a hearing.

144.    As will be further developed at trial, serious health effects that can be induced by prolonged mask use include but are not limited to fungal, bacterial and viral infection in the mouth and respiratory tract, fatigue, loss of concentration, headaches, loss of brain function, long-term neurodegenerative disease, lack of normal cognitive development, increased susceptibility to viral infections and illnesses, cardiovascular disease, hypertension, exacerbation of existing chronic disease, premature aging, premature death, hypoxia, hypercapnia, shortness of breath, increased lactate concentration, acidosis, toxicity, chronic inflammation, self-contamination, increase in stress hormone levels, increased muscle tension, immunosuppression, panic attacks, anxiety, claustrophobia, mood disturbances, and compromised cognitive performance.

145.    Sarah has experienced many of these adverse impacts and cannot medically tolerate wearing a face covering for extended periods.

146.    Moreover, school mask mandates cause psychological, emotional and other harms and interferes with learning.

147.    Other countries are beginning to rollback or question the safety and efficacy of any mask mandates for school children.

148.     Early last year, Ireland's Department of Health announced it won't require masks in schools because they "may exacerbate anxiety or breathing difficulties for some students." This is precisely the reason that Sarah needs a medical exemption.

149.     In the U.K., elementary students are not generally required to wear masks at all. An article published in the New York Times August 27, 2021 (updated September 1, 2021) quoted a well-respected British specialist explaining the reasons for the differing policy on face masks in the U.K.

> "The U.K. has always, from the beginning, emphasized they do not see a place for face coverings for children if it's avoidable," said Dr. Shamez Ladhani, a pediatric infectious-disease specialist at St. George's Hospital in London and an author of several government studies on the virus and schools. The potential harms exceed the potential benefits, he said.[14]

150.     In addition to adverse physical repercussions, prolonged mask use imposes psychological trauma on many children, including Sarah.

151.     In fact, in most of Europe, children are not subjected to mask mandates in school, and tellingly, these countries are not seeing larger outbreaks in schools than in the United States.

152.     The European Centre for Disease Prevention and Control specifically recommends *against* the use of masks for any children in primary school.

153.     One of the many reasons that the European public health authorities recommend against mask use in schools is because of the known and unknown risks of physical, emotional, mental, and sociological harm to children from wearing a mask all day.

154.     Historically, masks have been used as a form of torture in prisons, to isolate prisoners from one another and to dehumanize them.

---

[14] Dana Goldstein, *In Britain, Young Children Don't Wear Masks in School*, THE NEW YORK TIMES (published on Aug. 27, 2021), available at https://www.nytimes.com/2021/08/27/us/students-masks-classrooms-britain.html (last visited Sept. 7, 2021).

155.    Masks break down the social structure that human beings naturally require and can lead to depression, feelings of disconnection and other serious psychological consequences.

156.    No peer-reviewed data has established that use of masks in schools is safe for children, physically or psychologically.

157.    The few studies of masks on children were not peer reviewed, and only measured effects for a few minutes, not hours a day every day. They also did show harm, even from the few minutes, from use of the masks allowed pursuant to the mask mandates in New York (harm was less apparent during the minutes long observation period for children who had masks with electric fans blowing air out, but these masks are not permitted under New York's Mask Mandate).

158.    No reliable studies have been done on children with disabilities to determine that prolonged mask mandates are safe for all children other than paraplegics.

159.    Sarah's licensed physician certifies that she is at risk of harm and requires a mask exemption to safeguard her health.

160.    There is no rational reason, leave aside compelling reason, for the School District or the state to override Sarah's doctor's clinical determination that she needs a mask exemption.

### *The Mask Mandate Violates Federal Law Governing Experimental Use Products and Devices.*

161.    Pursuant to federal law, all masks and face coverings are regulated devices and require FDA approval or authorization when used for a medical purpose. Mitigating the spread of infectious disease is defined as a medical purpose.

162.    None of the currently available masks or face coverings for COVID-19 is approved or licensed by the federal government for use by children. Pursuant to FDA regulation, all face coverings for use by children are only allowed conditionally by Emergency Use

Authorization ("EUA").

163.   By the express terms of their EUA letters, and the governing statutes that regulate EUA products, a primary condition of this authorization is that masks may not be mandated or coerced.

164.   The EUA letters issued by the FDA clarify that masks and face coverings, even surgical masks, have not been established as safe or effective for use in mitigating infection.

165.   In fact, the FDA has labeled masks experimental devices requiring, *inter alia*, that the user must be advised of his right to refuse to use the experimental device or product. *See* 21 U.S.C. § 360bbb-3(e)(1)(A) ("Section 360bbb-3").

166.   The Mask Mandate violates and is preempted by federal law.

167.   The FDA takes the position that the terms and conditions of EUAs preempt state and local laws. *See* 21 U.S.C. § 360(k)(a), "GENERAL RULE Except as provided in subsection (b), no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement that would impose obligations that are inconsistent with those terms and conditions." *See, also,* Emergency Use Authorization of Medical Products and Related Authorities: Guidance for Industry and Other Stakeholders at 39-40 available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/emergency-use-authorization-medical-products-and-related-authorities:

> "FDA believes that the terms and conditions of an EUA issued under section 564 preempt state or local law, both legislative requirements and common-law duties, that impose different or additional requirements on the medical product for which the EUA was issued in the context of the emergency declared under section 564… To the extent state or local law may impose requirements different from or in addition to those imposed by the EUA for a particular medical product within the scope of the declared emergency or threat of emergency (e.g., requirements on prescribing, dispensing, administering, or labeling of the medical product), such law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and 'conflicts with the exercise of Federal authority under [§ 564].'"

Complaint for Declaratory and Injunctive Relief

168.    The Mask EUAs also each specify that "emergency use of face masks must be consistent with, and may not exceed, the terms of this letter….".

169.    Further, the Mask EUAs state that the products must not be labeled in such a manner that would misrepresent the product's intended use; for example, the labeling must not state or imply that the product is intended for antimicrobial or antiviral protection or related uses or is for use such as infection prevention or reduction.

170.    Similarly, in its Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency (Revised),[15] the FDA stated in three instances that face masks are not intended to reduce or prevent infection:

> The product is not intended for any use that would create an undue risk in light of the public health emergency, for example the labeling does not include uses for antimicrobial or antiviral protection or related uses *or uses for infection prevention or reduction or related uses* and does not include particulate filtration claims.

*Id.* at 7-8.

171.    Congressional records also show that Congress intended to create a private right of enforcement for Emergency Use Authorization products and intended informed consent provisions in the EUA governing statutes to preempt state and local law or policies.

172.    The NYSDOH School Mask Mandate and subsequent communication to Sarah from the School District not only misleads Sarah's family and the public by implying that masks can be used for antiviral protection and to stop the spread of COVID-19, but conflicts with the EUA's terms and is preempted under the Supremacy Clause.

***The Use of Face Coverings by the General Population is Experimental, and the Mask***

---

[15] FOOD AND DRUG ADMINISTRATION, *Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency* (Revised May 2020), https://www.fda.gov/media/136449/download (last visited on Aug. 3, 2021).

### Mandate is a Forced Human Experiment.

173.    The School Mask Mandate is a grand experiment on our children that robs families of the right to decide whether to be subjected to medical experimentation in direct violation of international, federal, and state law.

174.    Masks are traditionally worn by healthcare workers, who are trained in their use, and who typically only wear them for single use in limited circumstances and for short periods of time, replacing them frequently and refraining from touching them or putting them down.

175.    The function of masks in healthcare is generally to keep secretions and droplets from falling into sterile surgical procedures, not to prevent the spread of airborne viruses.

176.    Before the COVID-19 pandemic, the only time masks were required for use by lay people in public spaces in the United States was during the 1918 flu pandemic.  Even then, they were only mandated in certain cities for a matter of a few weeks – certainly not for months or years.

177.    Scientific consensus on the short-term and long-term medical and psychological impact on the public (and children in particular) from large-scale, forced, prolonged use of face coverings does not exist.

178.    The existing data tends to show that masks are ineffective and potentially unsafe when used by the general public to stop the spread of disease.

179.    While there is insufficient data to support mask use by adults, the complete dearth of studies examining the safety or effectiveness of mask use for children is shocking given the rush to impose mandates on kids and to deny and overrule treating physicians who certify that a mask is not safe for a particular child.

180.    Children are still developing and in addition to being subject to different

psychological and physiological health impacts than adults, children are inherently less able to observe strict protocols, such as washing and sterilizing hands before putting a mask on or taking it off, refraining from ever touching a mask, replacing a mask after a certain number of hours, or whenever it is inadvertently touched, ensuring a tight seal around the mask, and all of the other rules governing mask use in hospital settings.

181.    A paper published in February 2021 reviewing available data on the safety of face masks for children found that there had only been two studies done on children regarding mask use, and neither was relevant. "The lack of paediatric studies" forced the authors to look at adult studies and hope that the same findings would apply to children. The paper stressed that further study was needed to provide any evidence-based guidelines for mask-use in child populations.[16]

182.    A recent opinion published by leading experts in the field states in no uncertain terms that there is no evidence to support mask mandates.[17] The authors of the opinion are Dr. Marty Makary, a professor at the John's Hopkins School of Medicine and editor-in-chief of Medpage Today, and Dr. H. Cody Meissner, chief of pediatric infectious diseases at Tufts Children's Hospital and advisor on the FDA advisory panel for COVID-19. Noting the potential for serious psychological and physical harm, the authors concluded that forced mask use on children is impermissible medical experimentation and constitutes "child abuse" in their expert opinions.

---

[16]  Martin Eberhart, Stefan Orthaber & Reinhold Kerbl, *The impact of face masks on children—A mini review,* 110 ACTA PAEDIATRICA 1778) (2021), available at https://onlinelibrary.wiley.com/doi/10.1111/apa.15784 (last visited on Sept. 7, 2021).

[17] Marty Makary & H. Cody Meissner, *Opinion: The Case Against Masks for Children*, THE WALL STREET JOURNAL (published Aug. 8, 2021), available at https://www.wsj.com/articles/masks-children-parenting-schools-mandates-covid-19-coronavirus-pandemic-biden-administration-cdc-11628432716?reflink=desktopwebshare_permalink (last visited Sept. 7, 2021).

183.    It is by now well-settled that medical experiments, better known in modern parlance as clinical research, may not be performed on human subjects without the prior, free, and informed consent of the individual.

184.    Yet, though scientists and public health agencies continue to conduct observational and other studies on school populations, they have not obtained consent, and they do not allow children to opt out of using the experimental products.

185.    Coerced use of experimental medical products are so universally recognized as unethical, illegal, and abhorrent that the right of informed consent constitutes a *jus cogens* norm under international law.

186.    The globally recognized standards established under international law are binding upon the United States and, when violated, create a cause of action enforceable by citizens of the United States damaged thereby.

***A Brief History of the Universal Prohibition on Human Experimentation Without Consent.***

187.    One of the chilling horrors that emerged from the rubble of World War II was the discovery that Nazi doctors had been conducting medical experiments, including experiments with various vaccines, on unwilling victims in concentration camps.

188.    On August 8, 1945, the prevailing Allies, acting "in the interest of All the United Nations" established an International Military Tribunal (the "IMT").

189.    Under the aegis of this law, U.S. military tribunals tried "lower-level" war criminals, such as doctors accused of conducting medical experiments without their subjects' consent. [18]

---

[18] Sources for the historical facts set forth herein can be found in *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009), which explains in detail the history and reasons why the prohibition against nonconsensual human experimentation should be regarded as a *jus cogens* norm.

190.    In August 1947, Military Tribunal 1, staffed by American Judges and prosecutors and conducted under American procedural rules, issued final judgment against fifteen doctors who were found guilty of war crimes and crimes against humanity for conducting nonconsensual experiments, which included the testing of drugs for immunization against malaria, epidemic jaundice, smallpox, and cholera, as well as use of experimental medical devices.

191.    Seven of the convicted doctors were sentenced to death and the remaining eight were sentenced to terms of imprisonment. Their argument that the experimentation was for the greater good was unavailing.

192.    The tribunal emphasized that "in every instance appearing in the record, subjects were used who did not consent to the experiments; indeed, as to some of the experiments, it is not even contended by the defendants that the subjects occupied the status of volunteers."

193.    The final Judgment concluded that "manifestly human experiments under such conditions are contrary to the principles of the law of nations as they result from usages established among civilized peoples, from the laws of humanity, and from the dictates of public conscience." The doctors were convicted of war crimes and crimes against humanity.

194.    As part of its final judgment, to alert the world that it is a war crime to subject people to medical treatments and experiment without their free and informed consent, the tribunal promulgated the Nuremberg Code on Permissible Medical Experiments. Point One of the Nuremberg Code states: "**The voluntary consent of the human subject is absolutely essential.**"

195.    This universal acceptance of informed consent as the most basic and fundamental human right has since been repeatedly ratified and adopted around the globe, in laws, treaties, regulations, and ethical guidelines for medical research. For example, in 1964, the World Medical Association adopted the Declaration of Helsinki, which provides that human subjects "must be

volunteers and informed participants in the research project." Declaration of Helsinki at Art. 20.

196.    Although themselves non-binding, the principles underlying the Declaration of Helsinki and the Nuremberg Code have been incorporated into international conventions, as well as the laws and regulations of countries around the world, including the United States of America, which are binding in United States courts.

197.    The International Covenant on Civil and Political Rights of the United Nations ("ICCPR"), which went into effect in 1976, provides in Article I that "all peoples have the right of self-determination" and in Article 7 that "no one shall be subjected without his free consent to medical or scientific experimentation."

198.    The informed consent principles of the Declaration of Helsinki were also incorporated by a 2001 Directive of the European Parliament and the Council of the European Union.

199.    In addition, 35 members of the Council of Europe have signed the Convention on Human Rights and Biomedicine, which provides that informed consent is required for a subject's involvement in medical research.

200.    In 2005, the General Conference of UNESCO adopted the Universal Declaration on Bioethics and Human Rights, requiring prior, free, and informed consent for participation in medical treatments and research.

201.    The United States clearly regards itself as bound by the provisions of the Nuremberg Code and the Declaration of Helsinki.

202.    The highest courts in the United States also recognize that the right to informed consent codified in the Nuremberg Code is a fundamental right guaranteed by the U.S. Constitution.

203.     These principles have been adopted by statutes and regulations in the United States as well as case law.

204.     In 1979, the Department of Health, Education and Welfare issued the Belmont Report, which addressed the issue of informed consent in the human experimentation setting. The Report identified respect for self-determination by "autonomous persons" as the first of three "basic ethical principles" which "demands that subjects enter into the research voluntarily and with adequate information."

205.     Ultimately, the principles of the Belmont Report, which itself was guided by the Nuremberg Code and the Declaration of Helsinki, were adopted by the FDA in its regulations requiring the informed consent of human subjects for medical research. *See* 21 C.F.R. § 50.20.[19]

206.     The Department of Health and Human Services has similarly adopted this standard in its regulations governing grants for medical research. *See* 45 C.F.R. § 46.116.

207.     The State of New York has also adopted the principle of informed consent for all medical interventions. *See* § 2805-d NY Pub Health L § 2440 (2012) of the New York Public Health Law (requiring informed consent for medical treatment). Additionally, New York recognizes a common law right to informed consent, under which forced medical interventions are batteries.

208.     For these and other reasons, the prohibition against nonconsensual human experimentation must be regarded not only as established by U.S. law and regulations, but also as so broadly recognized by all nations as to constitute a *jus cogens* norm under international law.

---

[19] The exceptions to this standard are extremely narrow, and require certification by a researcher and an independent physician that, for example, "[t]he human subject is confronted with a life-threatening situation necessitating the use of the test article"; informed consent cannot be obtained from the subject; time does not permit obtaining informed consent from the subject's legal representative; and "there is available no alternative method of approved or generally recognized therapy that provides an equal or greater likelihood of saving the life of the subject." 21 C.F.R. § 50.23. *See also* 21 C.F.R. § 50.24 (providing a similarly narrow exception to informed consent requirements for emergency research).

209.    The Nuremberg Code, and the subsequent international, national, and local laws that were universally adopted to enforce it, were not meant to be limited only to protect victims of the Holocaust.

210.    Rather, the fundamental right to informed consent was meant to establish a floor that no nation and no locality could violate.

211.    Plaintiff does not consent to allow her daughter to be part of an experiment or to wear an EUA mask that is causing her daughter harm.

212.    Sarah was severely harmed by her school's refusal to honor her medical exemption last year. Sarah has not recovered from that trauma yet. She is still severely underweight, and she suffers from crippling anxiety as well as depression and fear about the upcoming year.

213.    Her mother fears for her physical, mental, and emotional safety.

214.    During the course of this litigation, after the Court indicated in oral arguments that it was likely that some preliminary injunctive relief would be offered, the School District finally agreed, as a temporary measure, to allow Sarah to wear a mesh mask.

215.    Sarah is having an easier time wearing the mesh mask. She can breathe a little better, and she is having fewer attacks. Moreover, it has helped that the principal and other employees of the School District have considerably scaled back their harassment and retaliation efforts against her.

216.    However, the mesh mask is not enough of an accommodation. Sarah still has trouble breathing sometimes, and even the mesh mask has caused her to develop fungal rashes, causing her to miss school, or have to temporarily wear another mask that caused more breathing problems.

217.    Sarah does not pose a substantial risk of significant harm to her classmates by not

wearing a mask. She would be no more of a danger to her classmates if her medical exemption were honored in full.

218.    The School District does not believe the mesh mask can stop or mitigate any more transmission of disease than no mask.

219.    The mesh mask is merely a symbol to the school, and they require it not for safety, but to keep up appearances that they are fully enforcing their official policy of not honoring any medical exemptions except for paraplegic children.

220.    Sarah needs this Court's intervention to protect her health and her rights.

221.    All conditions precedent to bringing this lawsuit have been performed, excused, or waived.

## COUNT I

### DECLARATORY JUDGMENT ACTION BASED UPON
### FEDERAL PREEMPTION / VIOLATION OF THE SUPREMACY CLAUSE
*Against All Defendants*

222.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

223.    Federal laws and regulations governing the use and administration of masks preempts any and all contrary or inconsistent laws or policies of the States and/or local governments.

224.    The Mask Mandate is patently contrary to United States law, and thus preempted and invalid.

225.    Title 21 United States Code, section 360bbb-3(e)(1)(A)(ii), and regulations and internal protocols of the United States Food and Drug Administration promulgated thereunder, provide in relevant part that all individuals to whom an investigational product is to be

administered under an Emergency Use Authorization be informed "of the option to accept or refuse administration of the product. . .."

226.    Because the masks at issue in this mandate are each investigational products, only permitted for use under an Emergency Use Authorization, the laws and regulations of the United States prohibit state and local governments from requiring them for any person who does not consent to their administration, including Plaintiff and her daughter.

227.    Plaintiff does not consent to allow her daughter to be forced to use this experimental device, especially as it would be against the medical advice of her child's treating physician.

228.    As well, Title 21, Part 50 of the Code of Federal Regulations governs the protection of human subjects in the conduct of all clinical investigations regulated by the U.S. Food and Drug Administration.

229.    21 C.F.R. section 50.20 provides that, "[e]xcept as provided in §§ 50.23 and 50.24, no investigator may involve a human being as a subject in research covered by these regulations unless the investigator has obtained the legally effective informed consent of the subject or the subject's legally authorized representative."

230.    Masks are experimental and still under investigation pursuant to the terms of their EUAs. Studies are being conducted on a population-wide basis, including studies examining New York State school children such as Sarah.

231.    None of the exemptions provided in sections 50.23 and 50.24 apply to Plaintiff or her daughter. Plaintiff is a fit parent and thus competent to make a decision concerning medical treatment and experimentation for her daughter.

232.    The Mask Mandate violates federal law and regulations governing the administration of experimental medicine and is preempted.

WHEREFORE, Plaintiff respectfully requests that the Court enter a declaratory judgment that the Mask Mandate violates and is preempted by the laws and regulations of the United States governing the administration of investigational medical products, issue an order permanently enjoining enforcement of the Mask Mandate against any child who submits a medical exemption from a licensed medical provider, award actual, consequential, nominal, and punitive damages to Plaintiffs, and award attorney's fees and costs to Plaintiffs and for such other further relief as this Court deems just and proper.

## COUNT II

**VIOLATION OF PLAINTIFFS**
**FUNDAMENTAL RIGHT TO REFUSE MEDICAL INTERVENTIONS THAT PLACE**
**THE CHILD AT RISK OF HARM AS DOCUMENTED BY A LICENSED PHYSICIAN**
**42 U.S.C. § 1983**

*Against All Defendants*

233.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

234.    Plaintiff has a protected Fourteenth Amendment right to life, and to protect her daughter's life and health, secured by the Due Process Clause of the United States Constitution, which includes the right to refuse non-consensual administration of any objectionable medical product, and/or to be free from the forced administration of medical procedures and devices that Plaintiff reasonably believes may cause her daughter harm.

235.    As well, or in the alternative, Plaintiff has protected liberty rights against infringement of liberty interests deemed "fundamental" in nature, which the Mask Mandate unconstitutionally infringes.

236.    These fundamental rights include, but are not limited to: the fundamental right to refuse medical interventions, even those that save one's life, the fundamental right of fit parents to

make medical decisions for their children rather than the state or a third party, the fundamental right to a medical exemption from medical devices that a licensed physician has certified may place a person at risk of harm, the fundamental right to refuse medical interventions that are experimental in nature, and the fundamental right to make medical decisions in accordance with one's chosen physician absent state or third-party interference.

237.    Binding precedent from the Supreme Court of the United States holds that states cannot condition acceptance of a medical exemption written by a state-licensed physician on the consent of the state or any third party. *See, e.g., See, e.g.*, *Doe v. Bolton*, 410 U.S. 179 (1973) (holding that a state cannot overrule or impose corroboration requirements on medical exemptions written by state-licensed physicians); *Whalen v. Roe*, 429 U.S. 589 (1977) (citing *Doe* for the well-recognized holding that states cannot condition a person's right to follow their chosen physician's medical advice on the consent of the state or a third party and affirming that this holding is applicable to any medical decision making, not just to abortion related medical decisions).

238.    The School District is violating the Plaintiffs' right to make medical decisions in accordance with the advice of her chosen licensed physician through the adoption of an official policy to review and overrule all medical exemptions written by state-licensed physicians as a blanket matter other than for paraplegics.

239.    To the extent that the Commissioner has issued or encouraged an unofficial policy instructing schools to review or deny medical exemptions written by a state-licensed physician, the Commissioner is also violating Plaintiffs' fundamental right in the same regard by conditioning the right to follow medical advice on the consent of the state or a third-party.

240.    As well, or in the alternative, Plaintiff has protected liberty interests, secured by the Due Process Clause of the United States Constitution, international protocols and treaties adopted

by and entered into by the United States, and by the laws and regulations of the United States, to informed consent.

241.     The Commissioner's promulgation of the School Mask Mandate violates several of these related fundamental and internationally protected rights, including but not limited to the right to be free from forced medical experimentation (also referred to as the right to "informed consent" or the right to "bodily integrity").

242.     This right of informed consent and bodily integrity, particularly in the context of experimental products, is not only acknowledged as a fundamental right pursuant to United States Supreme Court jurisprudence but is also recognized as a *jus cogens* norm under the laws of nations.

243.     As set forth more fully above, masks are defined as experimental products and their forced *or coerced* use constitutes unlawful coerced participation in medical experimentation. No government actor can lawfully force or coerce the use of these experimental products without violating the most fundamental international and constitutional rights.

244.     As well, or in the alternative, Plaintiff has fundamental right, secured by the Due Process Clause of the Fourteenth Amendment of the United States Constitution, to make medical decisions on behalf of her daughter. Plaintiff has not been found to be an unfit parent, and thus is vested with the authority to choose between competing medical opinions about what is safest for her daughter, and whether to consent to allow her daughter to participate in using an experimental medical product. This right adheres not only to the parent but to the child as well, whose best interest is served by loving fit parents having control over medical decisions impacting the child.

245.     The School District and Commissioner Bassett are violating Plaintiffs' fundamental parental rights by attempting to usurp the mother's authority to decide between competing medical opinions and follow the advice of her treating physician.

246.    As well, or in the alternative, the Mask Mandate violates the fundamental right to refuse medical interventions. This right has been deemed fundamental by the Supreme Court and is even protected and upheld in circumstances where the intervention will concededly help rather than harm a patient. In this case, where the intervention is certified by a treating physician as placing the child at risk of harm, the Child must be allowed to refuse the medical intervention.

247.    Both facially and as applied, the Mask Mandate promulgated by Commissioner Bassett and applied by the School District, is not sufficiently tailored to impose the least amount of harm on fundamental protected rights. Nor does it serve a compelling interest.

248.    Public health will not be imperiled if children who submit medical exemptions from licensed physicians are allowed to opt out of the mask mandate.

249.    Public health will not be imperiled if Sarah is allowed to opt out of the mask mandate.

250.    Considering the serious rights at stake, and the dearth of evidence to show this policy is effective or necessary, there is no rational reason to mandate masks in school for any child. This is doubly true for children who are at risk of harm from the mask. Inflexibly mandating a child to use an experimental medical device when her licensed physician has certified she may be at harm from the device simply shocks the conscience.

251.    Pursuant to the Unconstitutional Conditions Doctrine, Defendants cannot force or coerce the use of a mask on a child who is at risk of harm. This means they cannot condition receipt of a benefit, such as access to school and educational opportunities, on waiver of the right to a medical exemption from a mask.

WHEREFORE, Plaintiff respectfully requests that the Court enter a declaratory judgment that Defendants' Mask Mandate violates Plaintiff's fundamental rights under the substantive due

process clause, issue an order permanently enjoining enforcement of the Mask Mandate against any child who submits a medical exemption from a licensed medical provider, award actual, consequential, nominal, and punitive damages to Plaintiffs, and award attorney's fees and costs to Plaintiffs and for such other further relief as this Court deems just and proper.

## COUNT III

### VIOLATION OF NEW YORK STATE'S RECOGNIZED COMMON LAW RIGHTS TO REFUSE UNWANTED MEDICAL TREATMENT AND MAKE MEDICAL DECISIONS FOR ONE'S CHILDREN

*Against All Defendants*

252.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

253.    New York law recognizes the long-established common law right to refuse unwanted medical care. *See, e.g.*, *Matter of Westchester Cty. Med. Ctr. on Behalf of O'Connor*, 72 N.Y.2d 517, 528 (1988) ("It has long been the common-law rule in this State that a person has the right to decline medical treatment, even life-saving treatment, absent an overriding State interest….").

254.    Under New York law, the state also recognizes the concurrent parental right to determine the course of a child's care when there are conflicting medical opinions about what is best for the child. *See, e.g.*, *Matter of Hofbauer*, 47 N.Y.2d 648 (1979) (citing *Doe v. Bolton*, 410 U.S. 179, 199 (1973), for the holding that fit parents have a protected right under NY and federal law to decide on the course of treatment and to select which physician's advice to follow in cases of disagreement between physicians).

255.     Informed consent is further protected pursuant to New York Public Health Law §2805-d (the "Medical Malpractice Act") which codifies the principle of informed consent from common law into a statutory protection. Pursuant to the Medical Malpractice Act, and related sections of the Public Health Law, the School District, which is forcing Plaintiff's daughter to use an experimental medical product against the advice of her treating physician, has failed to disclose the risks and lack of data on mask use in children generally, and more specifically in children suffering from anxiety, migraines and asthma, and has failed to obtain consent to override the treating physician's recommendation against use of masks. To the extent that the School District believes that Sarah's asthma will be better treated by using a mask, that decision is not supported by science and cannot be forced on Sarah or her family. Nor is the school in the position to provide Sarah's family with sufficient information to be able to follow their unsolicited medical advice.

256.     Pursuant to the Medical Malpractice Act, and related sections of the Public Health Law, the NYC experimental medical product against the advice of her treating physician, has failed to disclose the risks and lack of data on mask use in children generally, and more specifically in children suffering from anxiety, migraines, and asthma, and has failed to obtain consent to override the treating physician's recommendation against use of masks.

257.     To the extent that the School District believes that Sarah's asthma will be better treated by using a mask, that decision is not supported by science and cannot be forced on Sarah or her family.

258.     Nor is the school or the school district doctor, who has never met Sarah and refuses to speak to her mother, in the position to provide Sarah's family with sufficient information to be able to follow their unsolicited yet forced medical advice.

259.     To the extent that the School District has adopted a policy of overruling doctors for all disabled children seeking a mask exemption other than paraplegics, they are not only practicing medicine without a license, but also recklessly endangering disabled children.

260.     The School District is also committing medical malpractice, as they are not qualified to overrule the treating physician, nor are they basing their decision to overrule the treating physician on adequate data, standards of care or responsible medicine.

261.     By overruling Sarah's treating physician and mandating an experimental medical product against medical advice, Defendants have irreparably harmed Sarah.

262.     Plaintiff has no plain, adequate nor complete remedy to protect the legal rights and redress the wrongs and illegal acts complained of herein, other than to seek immediate and continuing injunctive relief.

WHEREFORE, Plaintiff respectfully requests that the Court issue an order permanently enjoining enforcement of the Mask Mandate against any child who submits a medical exemption from a licensed medical provider, award actual, consequential, nominal, and punitive damages to Plaintiffs, and award attorney's fees and costs to Plaintiffs and for such other further relief as this Court deems just and proper.

## COUNT IV

## DECLARING THE MASK MANDATE UNCONSTITUTIONAL UNDER THE UNITED STATES CONSTITUTION AND CORRESPONDING SEPARATION OF POWERS CLAUSE OF THE NEW YORK CONSTITUTION

### *Against All Defendants*

263.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

264.     NYSDOH regulations, including the mask mandate issued by Commissioner Zucker pursuant to powers given through emergency NYSDOH regulation, have the force of law commensurate with a statute.

265.     The United States Constitution establishes three separate but equal branches of government: the legislative branch makes the laws, the executive branch enforces the laws, and the judicial branch interprets the laws. The Framers structured the government in this way to prevent one branch of government from becoming too powerful and to create a system of checks and balances.

266.     The Constitution of the State of New York similarly requires that statutes be passed by each separate house of the New York legislature before they can have the force of law.

267.     Specifically, Article III, section 13 of the Constitution of the State of New York provides that "The enacting clause of all bills shall be 'The People of the State of New York, represented in Senate and Assembly, do enact as follows,' and no law shall be enacted except by bill."

268.     The Mask Mandate, issued by emergency declaration by Commissioner Zucker, through executive branch department action taken over two months after the state disaster emergency was declared over, unbalances this constitutional framework by allowing the executive branch to issue directives mandating the use of experimental medical devices with the force of law without proper delegation from the legislature. In addition to civil penalties, violations of the Mask Mandate can result in criminal penalties.

269.     The School District cannot legally enforce this unconstitutional mandate, made through administrative agency fiat rather than legislative process.

270.     Neither Commissioner Bassett nor the NYSDOH have been delegated specific authority to issue laws *sua sponte* mandating the use of experimental face coverings.

271.     The school mask mandate violates the Supremacy Clause of the United States Constitution as well as the New York State Constitution. *See, e.g.*, *Boreali v. Axelrod*, 71 N.Y.2d 1, 517 (1987) (Public Health Council exceeded its authority under enabling statute when it promulgated code banning smoking indoors).

272.     Plaintiff has no plain, adequate nor complete remedy to protect the constitutional and/or legal rights and redress the wrongs and illegal acts complained of herein, other than to seek immediate and continuing injunctive relief.

WHEREFORE, Plaintiff respectfully requests that the Court enter a declaratory judgment that Defendant's Mask Mandate is unconstitutional and beyond the scope of permissibly delegated powers of the NYSDOH, issue an order permanently enjoining enforcement of the Mask Mandate against any child who submits a medical exemption from a licensed medical provider, award actual, consequential, nominal and punitive damages to Plaintiffs, and award attorney's fees and costs to Plaintiffs and for such other further relief as this Court deems just and proper.

### COUNT V: VIOLATION OF TITLE II
### OF THE AMERICANS WITH DISABILITIES ACT - 42 U.S.C. § 12101 ET SEQ. –
### FAILURE TO PROVIDE REASONABLE ACCOMODATIONS
*Against All Defendants*

273.     Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

274.     Title II of the Americans with Disabilities Act ("ADA") mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; see also 28 C.F.R. § 35.130.

275. Title II of the ADA further provides that a public entity shall make reasonable modifications to its policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7)(i).

276. Title II of the ADA applies to all activities of public entities, including providing education. Each Defendant is either a public entity subject to Title II of the ADA or an official responsible for supervising the operations of a public entity subject to Title II of the ADA. 42 U.S.C. § 12131(1).

277. While there are no specific ADA regulations concerning the education of disabled children, the ADA has been interpreted co-extensively with the Rehabilitation Act's special education requirements. *R.B. ex rel. L.B. v. Board of Educ. of the City of New York*, 99 F. Supp. 2d 411, 419 (S.D. N.Y. 2000). A parent of a disabled child may file an action for violation of the child's educational rights under the ADA or Section 504. *See* 20 U.S.C. § 1415(*l*). Section 504 and the ADA both prohibit discrimination based on disability. *See* 29 U.S.C. § 794.

278. At all times relevant to this action, Sarah Doe, a ten-year-old girl, had physical disabilities. She suffers from asthma and serious respiratory issues, which substantially limit the major life activity of breathing. Further, acute respiratory attacks caused by her asthma can result in severe anxiety for Sarah, limiting her ability to think, to concentrate and to learn when enduring a respiratory attack.

279. Sarah was and is a qualified individual with a disability within the meaning of the ADA. At all times relevant to this Complaint, Sarah was physically present in Nassau County, New York and was otherwise qualified to participate in or benefit from the programs or services offered by the Franklin Square Union Free School District ("School District") in her home school district in Nassau County, where she attends the Johns Street School. As a school-age resident of

the School District, Sarah is eligible for educational services provided by the School District, and, by virtue of her disability, is qualified for the protections of the ADA.

280.    Defendants Franklin Square Union Free School District, and Commissioner Bassett, in her official capacity as Commissioner of the New York State Department of Health ("NYSDOH"), were, at all times relevant to this action, the public entity and individual obligated to (i) ensure that Ms. Doe, a qualified individual with a disability, was afforded the opportunity to participate in the programs, services and activities offered by the Franklin Square School District without being discriminated against and (ii) make reasonable modifications in policies, practices, or procedures when necessary to avoid disability-related discrimination.

281.    Pursuant to emergency powers granted temporarily to the executive branch, in 2020 the NYSDOH issued emergency guidance and orders requiring all students to wear masks at school. Each of these temporary orders stated, "[s]tudents who are unable to medically tolerate a mask, including students where such mask would impair their physical health or mental health are not subject to the required use of a mask."

282.    Because she is unable to medically tolerate a mask, and because wearing a mask in school impairs her physical health, Plaintiff has requested the accommodation of not wearing a mask in school, an accommodation available to her under the NYSDOH temporary orders.

283.    The requested accommodation is not only reasonable but is an accommodation proposed by NYSDOH itself for students with disabilities who cannot physically tolerate wearing a mask. Sarah's treating physician has provided an expert opinion regarding Sarah's disabilities and her inability to safely wear a mask in school, detailing specific aspects of her disabilities and providing a basis for the requested accommodation.

284.   Under the ADA, Defendants must demonstrate that a person with a disability poses a significant risk of substantial harm to the health or safety of others in the school environment if provided a requested accommodation. Defendants here cannot successfully support a defense that Sarah presents a unique threat to the health or safety of others because the requested accommodation was proposed by the NYSDOH itself for students with disabilities who are unable to medically tolerate wearing a mask in school. Defendants cannot at once claim that a student who does not wear a mask poses a risk of substantial harm to the health and safety of others while also allowing for an exemption from the mask requirement for students with disabilities like Sarah's in these exact circumstances.

285.   Moreover, Defendants have already acknowledged that Sarah does not pose a substantial risk of significant harm to others by allowing her to wear a mesh mask, which the School District alleges cannot stop transmission of COVID-19.

286.   If Defendants were to claim that Sarah's presence in school while not wearing a mask poses a unique threat to the health and safety of others, such a claim would negate any application of the proposed NYSDOH accommodation of an exemption from the mask requirement. If an exemption from the mask requirement in itself would result in a direct threat to the health and safety of others by any student granted such an exemption, then no student could possibly be granted the proposed exemption. Such a position would clearly contradict the NYSDOH order and guidance upon which Defendants must comply.

287.   Because medical exemptions to the mask requirement were included as a part of the NYSDOH emergency guidance, Defendants cannot reasonably claim that providing a medical exemption in this case would impose an undue hardship on Defendants. It is an accommodation

offered by Defendants themselves. The requested accommodation is therefore objectively reasonable and does not present an undue hardship on Defendants.

288.    At all times relevant to this action, the Commissioner of Health, as well as personnel employed in the Franklin Square School District, had notice that Sarah Doe has asthma, a physical disability, as well as respiratory issues, that she could not medically tolerate masks and that use of the masks was impairing her physical and mental health. Despite being aware of Sarah's disabilities and her inability to safely wear a mask, Defendants refused to provide the requested accommodation to Sarah during the 2020-2021 or the 2021-2022 school years.

289.    Among other things, Defendants failed to provide the reasonable accommodation of exempting Sarah from the mask requirement. Defendants failed to provide this reasonable accommodation despite specific language in the NYSDOH emergency guidance that the mask policy only applied to children whose physical or mental health would not be impaired by wearing a mask.

290.    Consistently throughout the Spring and Summer of 2021, Sarah's mother, Jane Doe, explained repeatedly to Defendants that her daughter, when forced to comply with the mask requirement, became dizzy, was unable to concentrate, was having increasingly frequent and serious asthma attacks and other respiratory problems, experienced severe anxiety, and was frequently unable to breathe while wearing a mask at school. Jane Doe explained to Defendants that Sarah's disabilities are exacerbated when her mouth and/or nose are obstructed, resulting in both obstruction of her normal breathing as well as inducing panic attacks that further limit her ability to breathe, as well as her ability to think, to concentrate and to learn at school. Sarah cannot physically tolerate wearing a mask at school.

291.    On or about April 27, 2021, Jane Doe submitted a letter from Sarah's treating physician detailing his expert opinion in support of Sarah's request for a medical exemption from the masking requirement, in light of the specific character of Sarah's disabilities. Defendants verbally denied this request, summarily asserting that it is the School District's policy not to give any child a medical exemption from the masking mandate, in direct violation of the specific language of the NYSDOH emergency guidance and the provisions of the ADA as referenced herein.

292.    On June 8, 2021, the School District provided Jane, Sarah's mother, with a written denial of the request for a medical exemption, stating: "[t]he medical note that your doctor provided was reviewed by our district physician, Dr. Marino, and after speaking with Sarah's doctor it was determined by Dr. Marino that the mask was not creating difficulty with her asthma; therefore, there was no reason for this medical accommodation." In a subsequent statement, Sarah's treating physician contradicted this report from Dr. Marino, noting that Dr. Marino simply "overruled" the treating physician's request for a medical exemption for Sarah without offering any medical evidence addressing Sarah's specific disabilities.

293.    The determination of whether a particular modification is "reasonable" involves a fact-specific, case-by-case inquiry. Defendants bear the burden of showing that they cannot accommodate a disabled child's request for accommodation because the child would pose a direct threat, or because it would be an undue hardship to accommodate the request.

294.    Defendants here have failed to undertake any individualized inquiry into whether Sarah is a direct threat. Nor have they advanced any theory about why it would be an undue hardship to accommodate her as her doctor advises.

295.    Instead Defendants rely on a simple conclusory statement rejecting her well-founded request, which was allegedly issued by a doctor employed by Defendant School District itself, who has never met Sarah, and whose conclusion followed the School Principal's instant denial and declaration that the School District does not honor medical exemptions as a matter of blanket policy. This denial of Sarah's requested accommodation did not reflect the necessary iterative, individualized process required under the ADA and supported by caselaw in this jurisdiction.

296.    Instead of providing the requested reasonable accommodation for Sarah's disability, that is, an exemption from the masking requirement, the Defendants admit that they relied upon stereotypes and generalized and generic presumptions about asthma, without specifically addressing Sarah's particular disabilities and how asthma affects her ability to wear a mask.

297.    In rejecting Sarah's request, amply supported by her treating physician, Defendants have provided only general statements and guidance from non peer-reviewed internet searches about people with asthma generally, without reference to Sarah's disabilities and her particular circumstances. Although it may or may not be true that some people with different or milder forms of asthma may in some circumstances be able to physically tolerate wearing a mask for some unspecified periods of time, Sarah's particular disabilities make wearing a mask physically intolerable. Defendants have not countered with specific medical evidence that Sarah can in fact safely wear a mask despite her disabilities, while Sarah has provided a medical opinion based on her own experience as a person with complex disabilities. She is not relying on general internet guidance. She has provided specific evidence related to her personal circumstances and disabilities

certified by her licensed treating physician, who has treated her since she was born and is in the best position to determine her medical needs.

298.    The School District Defendants have illegally rejected Sarah's request for a reasonable accommodation, specifically her request to for an exemption from the mask requirement, without undertaking an individualized assessment of Sarah's disabilities as required under the ADA.

299.    To the extent that the NYSDOH permits and encourages school districts to overrule treating physicians based on generalized and non-specific vague language from CDC websites, which are not meant to substitute for medical advice from a child's treating physician, the Mask Mandate itself violates Plaintiffs rights and should be declared facially unlawful.

300.    In reviewing facial sufficiency, courts must review not only the text of a law, but the manner in which it is generally implemented.

301.    A statute can be saved from facial insufficiency on the basis of implementing policies and practices, but only where the enforcement agency gives clear guidance prohibiting unlawful application.

302.    Here, the state has hidden behind vague guidance and encouragement to violate disabled children's rights, or create a substantial risk thereof, by allowing school districts to make medical decisions about whether to overrule treating physicians.

303.    Because the Commissioner's office has indicated that they are not willing to issue guidance to school districts stating that vague generalized statements from the CDC cannot replace a treating physician's determination, declaratory and injunctive relief are sought against all Defendants.

WHEREFORE, Plaintiff respectfully requests that the Court enter a declaratory judgment that pursuant to the ADA, the Defendants have violated her rights and the rights of all other students denied reasonable accommodation, issue an order permanently enjoining enforcement of the Mask Mandate against any child who submits a medical exemption from a licensed medical provider, award actual, consequential, nominal and punitive damages to Plaintiffs, and award attorney's fees and costs to Plaintiffs and for such other further relief as this Court deems just and proper.

**COUNT VI: VIOLATIONS OF SECTION 504**
**OF THE REHABILITATION ACT OF 1973 – 29 U.S.C. § 794 ET SEQ.**
*Against All Defendants*

304.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

305.    Section 504 of the Rehabilitation Act of 1973 ("Section 504") provides that otherwise qualified individuals with disabilities shall not, "solely by reason of their disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

306.    On information and belief, the School District, and the New York State Department of Health (NYSDOH) receive federal financial assistance and is thus subject to the requirements of Section 504.

307.    On information and belief, as a condition of receipt of federal funds, the School District and NYSDOH are required to certify that each is in compliance with federal civil rights statutes, including Section 504's requirement that governmental entities not discriminate against individuals with disabilities. In summarily denying Sarah's request for an accommodation without evidence, Defendants are acting in direct violation of Section 504.

308.    Through the acts and omissions described above and alleged above, the Defendants discriminated against Sarah solely based on her physical disability.  Were it not for the School District's failure to accommodate Sarah's disabilities, she would not have been forced to endure severe respiratory attacks, anxiety and difficulties thinking, concentrating and learning as the direct result of the Defendants' failure to comply with her request for a medical exemption from the mask requirement.

309.    Moreover, Sarah has repeatedly been excluded from class for significant periods each day as the only way she can "take a mask break" when she starts to have serious trouble breathing.

310.    The failure to accommodate Sarah's disability has deprived Sarah of her right to an education as a person with a disability.

311.    The retaliation and harassment of Sarah due to her disability constitutes another violation of the Rehabilitation Act.

312.    School District Defendants made no attempt to articulate or prove any undue hardship in reasonably accommodating Sarah's need for a mask exemption.

313.    School District Defendants did not engage in a good faith attempt to reasonably accommodate Sarah's mask exemption.

314.    The Commissioner's office encouraged and allowed Sarah to be discriminated against and harassed and refused to issue guidance confirming that school districts should not deny reasonable accommodations based on vague and non-specific statements on CDC websites, which is not meant to be substituted for medical advice from a treating physician, is not meant to replace individualized medical decisions, and on its face suggests that people consult with their own medical professionals.

WHEREFORE, Plaintiff respectfully requests that the Court enter a declaratory judgment that pursuant to the Rehabilitation Act, the Defendants have violated her rights and the rights of all other students denied reasonable accommodation, issue an order permanently enjoining enforcement of the Mask Mandate against any child who submits a medical exemption from a licensed medical provider, award actual, consequential, nominal and punitive damages to Plaintiffs, and award attorney's fees and costs to Plaintiffs and for such other further relief as this Court deems just and proper.

## COUNT VII: VIOLATIONS OF THE NEW YORK STATE HUMAN RIGHTS LAW
*Against School District Defendants*

315. Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

316. The New York State Human Rights Law ("NYSHRL"), New York State Executive law §290 et seq, prohibits discrimination against students with disabilities, including students like Sarah, whose disabilities are medically documented and prevent her from safely wearing a mask all day at school each day.

317. Pursuant to NYSHRL, failure to reasonably accommodate disabled students constitutes unlawful discrimination.

318. Pursuant to NYSHRL, it is also a separate violation of law to harass or allow harassment of any student on the basis of their disability or request or need for accommodation.

319. For the reasons set forth above, the School District discriminated against Sarah by failing to reasonably accommodate her need to have a mask exemption, as documented by her treating physician.

320. For the reasons set forth above, the School District also harassed Sarah by allowing employees, including high level employees such as the principal of the school and other decision-

makers, to continuously harass, punish, retaliate against, and even film and insult Sarah for asking for reasonable accommodation due to her breathing difficulties and anxiety in a mask.

WHEREFORE, Plaintiff respectfully requests that the Court enter a declaratory judgment that pursuant to the New York State Human Rights Law, the Defendants have violated her rights and the rights of all other students denied reasonable accommodation, issue an order to permanently enjoin enforcement of the Mask Mandate against any child who submits a medical exemption from a licensed medical provider, award actual, consequential, nominal and punitive damages to Plaintiffs, and award attorney's fees and costs to Plaintiffs and for such other and further relief this Court deems just and proper.

### JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury for all matters so triable.

DATED this 20th day of January 2022.

Gibson Law Firm, PLLC

*/s/ Sujata S. Gibson*

**Sujata S. Gibson,**
*Attorney for Plaintiff*
Gibson Law Firm, PLLC
408 W Martin Luther King, Jr. Street
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law

Robert F. Kennedy, Jr., Children's Health Defense, *Of Counsel pending admission*
Mary Holland, Children's Health Defense, *Of Counsel pending admission*

Complaint for Declaratory and Injunctive Relief