## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE on behalf of herself and her minor child SARAH DOE, | Case No. 2:21-cv-5012 |
| Plaintiffs, | **SECOND AMENDED COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| FRANKLIN SQUARE UNION FREE SCHOOL DISTRICT. | |
| Defendant. | |

*"Liberty is the soul's right to breathe and, when it cannot take a long breath, laws are girdled too tight."* Henry Ward Beecher (1858)

Plaintiff, JANE DOE[1], by and through her undersigned counsel, sues Defendant, Franklin Square Union Free School District(the "District"), on behalf of herself and her minor daughter Sarah Doe. Plaintiff alleges as follows:

### PRELIMINARY STATEMENT

1.      Plaintiff is the mother of Sarah Doe ("Sarah"), a ten-year-old child with disabilities, including asthma and anxiety, which prevent her from medically tolerating a mask.

2.      Sarah has had serious respiratory challenges since birth. She has ended up in the emergency room more than once due to severe asthma attacks. Sarah also suffers from anxiety, which was exacerbated by her struggles to breathe when wearing a mask.

---

[1] To protect the child's medical privacy, the names of the child and her mother are changed in this complaint to pseudonyms. A motion to proceed by pseudonym is being filed concurrently with this complaint.

3.      Beginning during the 2020-2021 school year, the Commissioner of the New York State Department of Health ("NYSDOH") issued a series of mask mandates covering schools in New York.

4.      Each version of the mask mandate provided for medical accommodation.

5.      It quickly became apparent that Sarah required accommodation from the mask mandate due to her disabilities.

6.      Plaintiff repeatedly requested medical accommodation for her child.

7.      This case arises because the District failed to provide reasonable accommodation to Sarah, causing her and her family severe harm.

<u>**JURISDICTION AND VENUE**</u>

8.      This Court has jurisdiction to hear the claims asserted in this case under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts to hear suits arising under the laws and Constitution of the United States.

9.      This Court has the authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief under 28 U.S.C. § 1343(a); and attorneys' fees and costs under 42 U.S.C. § 1988.

10.     The United States District Court for the Eastern District of New York is the appropriate venue for this action pursuant to 28 U.S.C. § 1391(b)(1) and (2) because it is the district in which Defendant deprived Plaintiff and her daughter of their rights and liberties under the laws and Constitution of the United States and violated the laws and Constitution of the State of New York, as further alleged herein.

11.     The Eastern District of New York is also the district in which a substantial part of the events giving rise to Plaintiff's claims occurred and continue to occur.

## PARTIES

12.    Plaintiff Jane Doe is the mother of Sarah Doe. She lives in Nassau County, New York and has standing to bring this case, which presents a justiciable issue for the Court, on behalf of herself and her daughter.

13.    Plaintiff Sarah Doe ("Sarah") is a ten-year-old child with disabilities who requires a medical exemption from the mask mandate to safeguard her from harm and whose medical exemption to the school mask mandate is nonetheless not being honored. She lives with her family in Nassau County and attended the John Street School in the Franklin Square Union Free School District at all times relevant to the issues litigated herein.

14.    Defendant Franklin Square Union Free School District ("School District") is a municipal corporation organized pursuant to the laws of the State of New York and as such, may sue and be sued.

## FACTUAL BACKGROUND

15.    During the 2020-2021 school year, pursuant to emergency powers granted temporarily to the executive branch, the NYSDOH issued emergency guidance requiring all students who could medically tolerate a mask to wear masks at school.

16.    Each of these temporary orders stated, "[s]tudents who are unable to medically tolerate a mask, including students where such mask would impair their physical health or mental health are not subject to the required use of a mask."

17.    A FOIL request to the NYSDOH in late 2020 revealed that the NYSDOH did not rely on or possess any documents or studies establishing that masks are safe or effective for adults or children.

18.    As the school year progressed, it became apparent that Sarah, then a fifth-grade

student at the John Street School, could not medically tolerate masks.

19.     Prolonged use of the masks was impairing Sarah' physical, mental and emotional health.

20.     Sarah suffers from asthma and serious respiratory issues, which she has had since she was a baby.

21.     The EEOC defines asthma as a disability.

22.     Sarah's asthma acutely impairs her respiratory function, causing her to be unable to breathe when she is having an attack.

23.     At times, her attacks have been so severe that she could not be treated in the doctor's office and had to be transferred from her pediatrician's office to the emergency room in critical condition.

24.     Though Sarah was only ten years old, she had to start carrying her asthma pump to school and she began needing to administer it to herself more and more frequently as her breathing became increasingly difficult due to the mask requirement.

25.     Sarah also suffers from anxiety.

26.     Sarah's anxiety became substantially worse due to the District's refusal to allow her a mask exemption.

27.     As Sarah struggled to breathe with a mask on, and was refused any accommodation, her anxiety became so crippling that she developed disordered eating.

28.     Sarah lost so much weight during the period that the District refused her accommodation that she became dangerously thin.

29.     Her hair also started falling out in clumps.

30.     Sarah's disordered eating, developed at such a young age and during such intense

trauma, continues to plague her to this day.

31.    It is very difficult to overcome an eating disorder when it is developed at such a young age as a response to trauma, as Sarah's condition appears to have been.

32.    Sarah's disordered eating was proximately caused by the District's refusal to provide Sarah with reasonable accommodation, despite repeated requests and her increasingly debilitating symptoms.

33.    Eating disorders and anxiety are both defined by the EEOC as disabilities.

34.    Early on, when it became apparent that Sarah was struggling with the mask due during the 2020-2021 school year, Jane attempted (unsuccessfully) for months to work with the school to provide a reasonable accommodation to her daughter to no avail.

35.    First, Jane requested an exemption from masks for her daughter during physical activity.

36.    Sarah was having increasingly frequent attacks after running with a mask, and her mother became scared.

37.    Another child in the class with similar respiratory issues even collapsed during gym class because he could not breathe properly with a mask on.

38.    The School District would not even agree to allow Sarah (or the other child) to take masks off during gym class while running.

39.    The World Health Organization recommends that masks be avoided during exercise, even for people who do not suffer from asthma and other respiratory disabilities.[3]

40.    As the school year progressed, Sarah's condition got worse.

41.    The attacks increased; she began suffering from repeated migraines and grew

---

[3] WORLD HEALTH ORGANIZATION, https://www.who.int/images/default-source/health-topics/coronavirus/myth-busters/mythbuster---masks-and-exercise.png (last visited Sept. 7, 2021).

anxious and depressed.

42.    Before the mask mandate, Sarah had gotten all A's and was a model student.

43.    After the mask mandate, her grades and school performance began slipping.

44.    Sarah had never had any disciplinary issues before the Mandate.

45.    After the mandate, she was frequently told to go to the principal's office for pulling down her mask to try to breathe.

46.    Sarah previously loved school, but after the District refused her accommodation, she began telling her mother that she was miserable and depressed and that she hated school.

47.    As the mask mandate made it harder and harder for her to breathe, Sarah's anxiety became crippling.

48.    Jane attempted to help her daughter comply with the school's rules and to work with the school to accommodate her child.

49.    But sometimes it got so bad that Sarah reported she almost passed out from lack of breath.

50.    She started to get more frequent and more serious attacks.

51.    As her symptoms got worse, Sarah's mother became terrified for her safety.

52.    When Sarah's attacks progress beyond a certain point, they can become life-threatening and cannot be solved by her inhaler or doctor's office interventions.

53.    Jane repeatedly begged the Superintendent and other representatives of the District to accommodate her child, alerting them that it had become clear that Sarah needed a full mask exemption.

54.    Jane pointed out the language of the emergency policies, which clearly specified that the mask policy only applied to children whose physical or mental health was not impaired.

55.    Jane explained to various school administrators that her daughter was dizzy, unable to concentrate, having increasingly frequent and serious asthma attacks, was anxious, and was unable to breathe.

56.    The District repeatedly ignored and/or denied Jane's requests to exempt her asthmatic child from the mask exemption or accommodate her in any way,

57.    Jane then involved Sarah's pediatrician, a New York State licensed physician who has treated Sarah since she was a baby.

58.    Sarah's pediatrician shared Jane's concern about Sarah's safety and immediately agreed that Sarah needed an exemption.

59.    Jane submitted the first letter from her daughter's physician on or about April 27, 2021.

60.    Soon after, Jane received a call from Jared T. Bloom, the Superintendent of the School District ("Superintendent Bloom").

61.    Superintendent Bloom stated that the District had adopted an official policy not to give *any child* a mask exemption.

62.    He informed Jane that Sarah's exemption was therefore denied, since he would not consider any exemptions at all.

63.    School district attorneys subsequently affirmed during proceedings in this Court that the official policy in the Franklin Square Union Free School District is to deny any medical exemption, but added that there was a narrow exception only in cases where a child is a paraplegic or quadriplegic and cannot physically take the mask off on their own.

64.    No peer-reviewed science supports this position that no other children could need accommodation other than only quadriplegic or paraplegic students

65. Superintendent Bloom suggested to Jane that if Sarah was struggling, she could "request" a mask break and would have to separate herself from her classmates during any break and could not participate in school while taking a break. He noted this was allegedly the policy for all students (not any special accommodation).

66. Jane reminded Superintendent Bloom that the so-called "requested" mask breaks were not realistic, or sufficient, and were not being honored for the most part.

67. Sarah often requested a mask break, only to be denied and sometimes disciplined.

68. Superintendent Bloom ignored Jane's concern and maintained his position that the District would not consider any mask exemptions or any of Jane's other requested accommodations, including trying a mesh mask, or even allowing Sarah to join online learning, which was offered as an option to all students, not just disabled students, at the time.

69. Jane received follow-up calls from the school nurse, who called her to report Sarah for taking mask breaks.

70. The nurse reiterated that pursuant to official district policy, "no medical exemptions would be allowed" from the mask mandate.

71. Jane called the NYSDOH and the Nassau County local health department. Both confirmed that the state and local health departments do not have a policy of reviewing or denying mask exemption requests and that the regulations simply allow students to opt out if they are having trouble breathing or feel that the mask is impairing their physical or mental health.

72. Jane was forced to email the Superintendent and other administrators from the school to ask that their denial of her daughter's medical exemption be put in writing, again reiterating that New York State guidelines which are followed by Nassau County provide for a medical exemption for students and provide that any student whose mental or physical health

might be impaired by wearing a mask could opt out.

73.     Superintendent Bloom did not initially issue a written denial, instead he repeatedly told Jane that the NYSDOH did not allow exemptions and advised her to call the NYSDOH.

74.     When Jane called the NYSDOH, they would tell her that they do not review or deny medical exemptions from doctors and that she is entitled to have a medical exemption if her daughter's doctor submits an exemption.

75.     Jane continued to reiterate her request that the District put the denial in writing throughout the month of May and into June of 2021

76.     The District put Jane off, claiming that updated guidelines on masks were expected any day and that they may be dropping the mask requirement entirely.

77.     During that time period, the NYSDOH publicly acknowledged that there was a lack of science supporting continued school mask mandates.

78.     On June 4, 2021, Commissioner Zucker wrote a letter to Dr. Walensky, Director of the United States Centers for Disease Control ("CDC"), alerting the CDC that the NYSDOH planned to ease mask restrictions to comport with the more lenient recommendations the CDC recommended for summer camp participants.

79.     Dr. Zucker indicated in the letter that based on the lack of scientific support for masking in schools, NYSDOH intended to make mask use optional for all students.

80.     The letter concluded, "[i]f there is any data or science that you are aware of that contradicts moving forward with this approach, please let me know as soon as possible. We plan to make this guidance effective on Monday June 7."

81.     The CDC did not present any data or science to Commissioner Zucker to support a renewal of the Mask Mandate for the following school year.

82.     Upon information and belief, no reliable peer-reviewed data or science *exists* that would establish that it was safe to mandate masks all day, especially for disabled children,

83.     Nor does any reliable peer-reviewed data or science support the District's contention that mask mandates are an effective way of stopping Covid-19.

84.     The District made no independent investigation about whether it was safe or effective to mandate a mask for Sarah and had no data to support that it was.

85.     Nonetheless, on June 8, 2021, the District provided Jane with a written denial of the medical exemption for Sarah.

86.     The denial stated: "[t]he medical note that your doctor provided was reviewed by our district physician, Dr. Marino, and after speaking with Sarah's doctor it was determined by Dr. Marino that the mask was not creating difficulty with her asthma; therefore, there was no reason for this medical accommodation."

87.     Dr. Marino is the District's hired consultant. He

88.     Dr. Marino has never met or treated Sarah.

89.     Dr. Marino is a Doctor of Osteopathy (DO), not a Doctor of Medicine (MD), and he has no special expertise or experience treating Sarah's particular combined disabilities.

90.     Dr. Marino refused to even speak to Sarah's mother about Sarah's conditions though Jane asked to speak to him.

91.     Dr. Marino is unqualified to make any determination about Sarah's medical needs or to provide sufficient informed consent under New York State law to override a treating doctor's opinion about use of an experimental medical product.

92.     The District's denial letter also grossly misstated the facts.

93.     Sarah's doctor had never suggested that that the mask was not exacerbating

Sarah's asthma. In fact, Sarah's doctor stated the opposite.

94.     Alarmed at the misrepresentation in the District's letter, Sarah's doctor wrote a

follow up letter correcting the record on his position about Sarah's need for a mask:

> "I requested a mask exemption for [Sarah]. After speaking with Dr. Marino, he
> refused to grant it. It was not my decision to deny her mask medical exemption.
> Dr. Ron Marino made the decision to deny her medical exemption. He overruled
> my request for my patient's medical needs."

95.     Nothing in the law or in the emergency regulations requires schools to review or

deny mask medical exemptions written by licensed treating physicians.

96.     The decision to subject medical exemptions written by doctors to school district

review and denial is a discretionary policy adopted by the defendant District.

97.     Despite the second letter from Sarah's doctor clarifying that Sarah does need an

exemption, the District still refused to honor Sarah's mask exemption.

98.     The District also continued to refuse even the option of Jane joining the online

education program.

99.     The Superintendent gave no other explanation than: "virtual will not likely be the

best option."

100.    On June 11, 2021, Jane submitted a 504-plan requesting that Sarah's classroom

receive air conditioning and that Sarah could wear a face shield or mesh mask rather than a regular

cloth mask. At that point, it was over 90 degrees most days, which made it even harder for Sarah

to breathe in a mask.

101.    Sarah was being denied mask breaks.

102.    School teachers and administrators were frequently yelling at Sarah and harassing

her when she took her mask down to try to breathe.

103.    Sarah was frightened and traumatized and losing more and more weight.

104.    One employee of the District even began following Sarah around and filming her and denigrating her for needing to take down her mask to breathe.

105.    Jane alerted Sarah's Principal and the Superintendent that this filming and harassment was occurring and that it was traumatizing her daughter.

106.    The District refused to put a stop to the harassment.

107.    Instead, Sarah's principal encouraged this behavior and even at times joined in, disciplining Sarah and calling her in to the principal's office to reprimand her for trying to take mask breaks, even outside.

108.    Sarah suffered severe anxiety and emotional harm from the continued harassment at the hands of District employees.

109.    Sarah stopped being able to eat very much due to the anxiety from being unable to breathe, and from the constant harassment at school.

110.    She lost so much weight from the stress that she became dangerously underweight.

111.    Sarah's doctor advised that she might need to attend a special program to get to a safe weight again.

112.    On June 16, 2021, the District told Jane that her request for any accommodation – including air conditioning, mesh mask, or even joining the already existing remote learning option – were denied.

113.    The District asserted that the only thing they could offer was that if Sarah had a severe attack and went to the nurse rather than administer the inhaler herself as she'd been doing, they might allow a short exemption during the attack if the nurse concurred during the attack that it was severe enough for Sarah to need an exemption.

114.    The school nurse is not a licensed physician or pulmonologist and has no expertise

in Sarah's conditions.

115.    The school nurse is not qualified to treat or diagnose asthma and anxiety.

116.    The school nurse is not qualified to prescribe treatment plans for these conditions.

117.    The school nurse is not qualified to override Sarah's treating physician's medical advice.

118.    Jane was not willing to allow her daughter to get to the point of a "severe" attack or risk serious harm so that a nurse could decide whether to honor Sarah's treating physician's advice.

119.    Jane does not have the means to hire an attorney.

120.    Nonetheless, with great difficulty, Jane retained the firm of Siri Glimstad for the limited (and far more affordable) purpose of assisting her with communication and negotiations with the school regarding the mask exemption.

121.    The attorneys at Siri Glimstad wrote a letter to the District on June 16, 2021. The letter alerted the District that their policies were unlawful and constituted violations of Sarah's constitutional and statutory rights.

122.    Sarah's attorneys demanded that the District institute an exemption for the remainder of the school year and respond with a confirmation that they would provide an exemption for the following year.

123.    School ended for the year soon thereafter.

124.    During the summer, there was no mask mandate.

125.    On June 24, 2021, Governor Cuomo announced that the state disaster emergency was over, and with it, his emergency orders were no longer in effect.

126.    Before the start of the following school year, Jane attempted to ascertain whether

there would be a new mask mandate imposed for the 2021-2022 academic year.

127.    The District informed her that no guidance had been issued yet but that guidance might be forthcoming.

128.    Proactively, Jane submitted another medical exemption from Sarah's pediatrician through counsel on August 24, 2021.

129.    In this request, Sarah's doctor certified that she was not medically able to tolerate a mask and required a full mask exemption if a new mask mandate were to be put in place.

130.    On August 27, 2021, attorneys for the District sent an email response stating that they were waiting for updated guidance from the NYSDOH and would send a response about whether masks would be required, and Sarah's medical exemption accepted or denied the following week.

131.    On September 2, 2021, counsel for the District sent a letter stating that the exemption would be denied based on the recommendation of Dr. Marino.

132.    Dr. Marino has never treated Sarah.

133.    In the denial letter, the District admitted that Dr. Marino overruled Sarah's long-time physician's medical determination based on his narrow interpretation of generic language from an FAQ page on the CDC's website, which makes vague representations about asthma and face masks.

134.    Specifically, the District's denial letter stated that "in its guidance dated April 7, 2021, the CDC has taken the position that people with moderate to severe asthma are at an increased risk to be hospitalized for COVID-19 and therefore should wear a mask to cover their nose and mouth to reduce the risk of severe illness. *See CDC Guidance: People with Moderate to Severe Asthma* (last updated 4.7.2021) (https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html)."

135.    The website cited by the District's counsel, and apparently relied upon by the District doctor, is vague and contains generalized statements that are not evidence-based or reliable and have nothing to do with whether Sarah poses a direct threat to others. Nothing on the page cited in the letter provides a reasonable basis to conclude that all children with asthma and anxiety can safely wear a mask all day at school.

136.    Rather, the page simply offers that some people (it is unspecified if they mean adults or children) with asthma should wear a mask to avoid the risk of COVID-19 for themselves.

137.    Because some people with asthma can tolerate a mask for an unspecified period of time or purpose does not mean that all people with asthma can tolerate a mask all the time.

138.    Nor does it mean that Sarah specifically can tolerate a mask all day every day at school without risk to her physical, emotional or mental health.

139.    The District did not rely on any peer-reviewed data or science that proves that wearing a mask all day is safe for children with Sarah's disabilities before denying Sarah an accommodation.

140.    There is no peer reviewed evidence that establishes to any reliable degree that prolonged daily mask use for children with asthma, anxiety or other disabilities is safe in all cases.

141.    The District did not rely on any data or science that proves that it would be safe for Sarah specifically to wear a mask all day at school.

142.    The CDC "FAQ" pages on masks that Dr. Marino relied on are not a substitute for medical advice from a treating physician and offer no links to any studies or reputable data to support the assertions made therein.

143.    Rather, the CDC webpages invariably conclude that people should talk to their doctors if they have concerns.

144.   It is not safe to substitute generalized internet advice for the clinical judgment of a treating physician.

145.   Jane scrambled to get representation in place to file a federal suit as quickly as possible after the denial. It was extremely difficult, as she does not have money to provide any retainer.

146.   On September 7, 2021, she filed a complaint.

147.   On September 8, 2021, she filed an emergency motion.

148.   Shortly after filing for relief, Sarah started school for the 2021-2022 school year.

149.   Once again, her condition deteriorated rapidly under the stress and difficulty breathing.

150.   In addition to remaining dangerously underweight, and unable to eat properly due to her anxiety caused by the mask mandate, Sarah started losing her hair in clumps and developing depression.

151.   Sarah began to feel despair, and was deeply scared and traumatized by the District's failure to accommodate her.

***The District's Refusal to Accommodate Sarah Lacked Scientific Support***

152.   The District did not rely on any data or science to determine that it would be an undue hardship to accommodate Sarah or that Sarah would pose a direct threat if accommodated.

153.   There was no peer-reviewed or reliable data to suggest that Sarah would pose a direct threat to anyone if she were to be granted a mask exemption.

154.   The Mandate itself allows for exceptions, on its face.

155.   The District did not assert undue hardship as a basis for denial.

156.   Use of masks to prevent getting or spreading COVID-19 is simply not supported

by hard data.

157.    In fact, early on, public health authorities discouraged the use of masks outside of hospital settings.

158.    The consensus in the scientific community at the time was that prolonged use of masks by the general public could do more harm than good.

159.    Dr. Robert Redfield, director of the Centers for Disease Control ("CDC") testified before the House Foreign Affairs Subcommittee to advise against use of masks outside of hospital settings.

160.    The World Health Organization advised that use of masks by untrained healthy people outside of hospitals was likely to do more harm than good and was not recommended.

161.    Dr. Anthony Fauci, director of the National Institutes of Allergy and Infectious Disease (NIAID) testified to the United States Senate that healthy people should not wear masks. He also went on national television and stated the same, specifying that it might make people "feel" better (using air quotes) but might have unintended consequences and do more harm than good.

162.    These initial recommendations universally issued by all of the public health authorities were evidence-based.

163.    The science does not support an assumption that masks can stop the spread of a virus as small as COVID-19 or that prolonged mask use by the general public (especially children) is safe.

***The Physical Properties of Masks Establish That They Cannot Prevent Transmission of SARS CoV-2.***

164.    From a physical standpoint, the properties of masks versus the SARS-CoV-2 virus prove that masks simply cannot prevent the virus from exiting the nose and mouth of infected individuals into the air around them to be breathed in by others.

165.    The SARS-CoV-2 virus has a diameter of 60 nm to 140 nm [nanometers (a billionth of a meter)].

166.    Medical and non-medical facemasks' thread diameter, on the other hand, ranges from 55 μm to 440 μm [micrometers (one millionth of a meter)], which is more than 1,000 times larger than the diameter of the virus.

167.    Due to the difference in sizes between SARS-CoV-2 diameter and facemasks thread diameter, SARS-CoV-2 can easily pass through any face mask.

168.    Scientists and experts in this field routinely describe the physical impossibility of stopping a virus with a mask as "like trying to stop a mosquito by putting up a chain link fence."

169.    Historians and public health scholars similarly routinely describe the known futility of the masks employed during influenza 1918, often referencing the famous quote that "it is like trying to keep out dust with chicken wire."

170.    The physical impossibility of filtering the SARS-CoV-2 virus with masks is exacerbated by the lack of any seal between the wearer's face and the mask, which allows breath to exit wholesale sans any filtering whatsoever into the air around the wearer to be breathed in by others.

171.    The Occupational Safety and Health Agency sets standards for the use of certain specific masks to prevent infection by viruses in particular settings.

172.    These OSHA certified masks seal effectively around the nose and mouth and prevent the inhalation or exhalation of viruses into the air by those wearing them but can only be used with an external source of oxygen being pumped into the mask, much like a diver wearing an oxygen tank.

173.    The face coverings available to children and the public at large are not the same as these OSHA certified masks.

174.    The masks available to children at the timewere not designed to, nor could they, meaningfully prevent or reduce infection or spread of the SARS-CoV-2 virus.

175.    While the District was denying Sarah relief, Dr. Michael Osterholm, the Director for Infectious Disease Research and Policy at the University of Minnesota who served on the Biden transition team's COVID-19 task force, appeared on several news programs to discuss the lack of science justifying mask policy in the United States.

176.    In a PBS interview held August 3, 2021, Dr. Osterholm revisited his concern about the lack of scientific data justifying mask mandates and policy.

177.    He explained that the theories based on droplet reduction are outdated now that it is universally understood that SARS-CoV-2 is spread by aerosols, stating: "People thought it was transmitted by respiratory droplets falling within six feet of us. Today we know that is not the science. We know these are transmitted with aerosols. If you want to know the difference – all those plexiglass plates you saw that were put up that supposedly separated you from me with six feet have no real purpose today at all. To understand and really the best way I can tell people…if you are in a room with someone and they are smoking and you smell it, you are getting basically inhaled aerosols."[4]

178.    Anyone who wears a cloth mask with a normal sense of smell can attest that they are still able to smell aromas through the mask. They are therefore able to catch and pass on SARS-CoV-2.

---

[4] Christiane Amanpour, PUBLIC BROADCASTING SERVICE, https://www.pbs.org/wnet/amanpour-and-company/video/do-masks-provide-much-protection-we-think-bglhwy/ (last visited Sept. 7, 2021).

179.    Even Dr. Wallensky from the CDC, and other officials who were vigorously and  pushing the school mask mandates despite the lack of evidence to support them, have finally publicly acknowledged that cloth masks have cannot mitigate the spread of COVID-19.

***Scholarly Studies Establish Masks Cannot Mitigate the Spread of COVID-19***

180.    Scholarly studies reflect the physical reality that masks cannot stop the transmission of SARS-CoV-2.

181.    The first and only randomized, controlled trial evaluating the impact of mask-wearing on the spread of SARS-CoV-2 in six thousand individuals concluded that there was no statistically significant difference among the masked and unmasked controls sufficient to show that masks are effective in reducing or preventing infection from SARS-CoV-2.[5]

182.    A study by the Centers for Disease Control published in the *Emerging Infectious Disease Journal* in May 2020 found that ten randomized control trial studies of the use of face masks to control the influenza virus, a virus essentially the same size as the SARS-CoV-2 virus, showed no significant reduction in influenza transmission with the use of face masks.[6] These studies covered a wide range of environmental settings from University dorms to households, but the results were the same in each context.

183.    Similarly, a study of nearly two thousand United States Marine Corp recruits published in the *New England Journal of Medicine* on November 11, 2020, indicated that

---

[5] Henning Bundgaard et al., *Effectiveness of Adding a Mask Recommendation to Other Public Health Measures to Prevent SARS-CoV-2 Infection in Danish Mask Wearers: A Randomized Controlled Trial*, 174 ANNALS OF INTERNAL MEDICINE 335 (2021) available at https://www.acpjournals.org/doi/pdf/10.7326/M20-6817 (last visited on Aug. 3, 2021).

[6] Xiao J, et al., *Nonpharmaceutical Measures for Pandemic Influenza in Nonhealthcare Settings—Personal Protective and Environmental Measures*, 26 EMERGING INFECTIOUS DISEASES 967(2020), available at https://wwwnc.cdc.gov/eid/article/26/5/19-0994_article (last visited on Aug. 3, 2021).

masks did not reduce or prevent the spread of SARS-CoV-2.[7]

184.    The WHO announced in 2020 that "at present, there is no direct evidence (from studies on COVID-19) on the effectiveness face masking of healthy people in the community to prevent infection of respiratory viruses, including COVID-19."[8]

185.    The CDC conducted a shoddy and much-criticized non-peer reviewed observational "study" in Arizona, claiming to have found that schools with mask mandates reduced COVID-19 infections to a significant degree.

186.    This study has now been decisively debunked and is even roundly criticized by publications that typically express strong preferences in support of masks.

187.    For example, the Atlantic published a long article addressing the growing consensus that the CDC's "Arizona" study, which CDC previously repeatedly stated showed that school mask policies were effective, is deeply flawed and cannot be responsibly relied on to advocate for school mask mandate.

188.    Dozens of prominent experts were interviewed for the article, and the article details the many flaws with the logic and data of the CDC's non peer-reviewed data and conclusions. *See, e.g., https://www.theatlantic.com/science/archive/2021/12/mask-guidelines-cdc-walensky/621035/* "Noah Haber, an interdisciplinary scientist and a co-author of a systematic review of COVID-19 mitigation policies, called the research 'so unreliable that it probably should not have been entered into the public discourse'…The agency's decision to

---

[7] Andrew G. Letizia, M.D. et al., *SARS-CoV-2 Transmission among Marine Recruits during Quarantine*, 383 The New England Journal of Medicine 2407 (2020), available at https://www.nejm.org/doi/full/10.1056/NEJMoa2029717 (last visited on Aug. 3, 2021).

[8] *Advice on the use of masks in the context of COVID-19: interim guidance, 5 June 2020*, WORLD HEALTH ORGANIZATION (2020), available at https://apps.who.int/iris/handle/10665/332293 (last visited on Aug. 3, 2021).

trumpet the study's dubious findings, and subsequent lack of transparency, raise questions about its commitment to science-guided policy."

189.    To the extent that masks have any impact on mitigating the spread of COVID-19, even the outlets that have been fierce advocates for mask mandates, such as the Atlantic, admit that though they still want to believe masks can offer some protection "the precise extent of that protection, particularly in schools, remains unknown—and it might be very small." *Id.*

190.    Studies did not support the theory that surgical or KN95 masks will be effective to stop the spread in school communities to any meaningful degree either.

***Prolonged or Improper Mask Use Can Cause Harm***

191.    Politically, at the time, it was popular to dismiss the lack of science and follow slogans such as "something is better than nothing."

192.    However, not only does the data show that masks are ineffective, they also show that prolonged, or improper use of masks can cause harm to the wearer and increase risk of serious respiratory disease.

193.    For example, a randomized, controlled trial conducted on 1,607 health care workers in 2015 found that "the rate of influenza-like illness is significantly higher" in the cloth mask controls than in those who wore no mask.

194.    The study concluded that "moisture retention, reuse of cloth masks and poor filtration made cloth masks more likely to lead to increased risk of infection for the wearer" and finished by stating that "cloth masks should not be recommended" and "guidelines need to be updated."[9]

---

[9] C. Raina MacIntyre et al., *A cluster randomised trial of cloth masks compared with medical masks in healthcare workers*, 5 British Medical Journal e006577 (2015), available at https://pubmed.ncbi.nlm.nih.gov/25903751/ (last visited on Aug. 3, 2021).

195.    During a pandemic for a virus that is usually mild but can in some cases develop into a deadly respiratory illness, any intervention which could increase the likelihood of severe respiratory symptoms would understandably be unacceptable to some people, particularly the parent of a child who is at risk of serious respiratory complications.

196.    Another study shows that the temperature of the perioral skin rises after use of face masks for even one hour.[10]

197.    Coupled with prolonged casual use, moisture retention, reuse, and touching, the Mask Mandate creates the perfect breeding ground for dangerous viral, bacterial, and fungal infections. These again can lead to increased respiratory illness and death.

198.    A study by Anthony Fauci, M.D. and others in 2008 established that most of the deaths in the pandemic of 1918 were not from influenza, but rather from secondary bacterial infections that developed into pneumonia.[11]

199.    Certainly, any intervention that creates increased risk of localized bacterial and fungal infections should be avoided during a pandemic.

200.    Many COVID-19 deaths are also associated with secondary fungal infection. A recent study from India found that cloth mask use significantly increases the risk of developing Coronavirus disease-associated mucormycosis ("CAM") (a deadly fungal infection of the lungs seen in primarily in COVID-19 patients in India sometimes referred to as "Black

---

[10] Scarano A., et al., *Facial Skin Temperature and Discomfort When Wearing Protective Face Masks: Thermal Infrared Imaging Evaluation and Hands Moving the Mask*, 17 *Int J Environ Res Public Health* 4624 (2020), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7369838/ (last visited on Sept. 7, 2021).

[11] Morens D.M., et al., *Predominant role of bacterial pneumonia as a cause of death in pandemic influenza: implications for pandemic influenza preparedness*, 198 *J Infect Dis.* 962 (2008), available at https://pubmed.ncbi.nlm.nih.gov/18710327/ (last visited Sept. 7, 2021).

Fungus" infection).[12] "Use of surgical or cloth masks for prolonged periods was found to be associated with an increased risk of CAM."

201.    In short, science does not support the proposition that the School Mask Mandate can or will reduce or prevent the spread of SARS-CoV-2; rather, it shows it may cause increased risk of viral, bacterial, and fungal infection and put children more at risk.

202.    Masks have become a political, not a scientific issue.

203.    Masks became a symbol of political party affiliation.

204.    Democrats viewed those who declined to wear a mask as affiliated with the Republican party or with conservative movements, and typically vilified them as dangerous Trump supporters.

205.    Virtue signaling, shaming and rejection of any discussion of the actual evidence became common in the public discourse.

206.    Public health officials had universally cautioned at the start of the pandemic that prolonged use of masks in healthy and asymptomatic people could lead to worse public health outcomes.

207.    Yet, as masks became a symbol of party affiliation, the CDC began zealously recommending them.

208.    The CDC had no scientific basis to change course and begin pushing masks on children. Rather, they were guided by politics.

209.    In a published piece in 2021, Dr. Osterholm described the politicization of mask

---

[12] Umang Arora, et al., *Novel risk factors for Coronavirus disease-associated mucormycosis (CAM): a case control study during the outbreak in India,* MEDRXIV (forthcoming 2021), available at https://doi.org/10.1101/2021.07.24.21261040 (last visited on Sept. 7, 2021).

mandates as hindering honest and evidence-based recommendations: "needless to say, [mask policy] is a political hot button the likes of which I have never seen."[13]

210.    The evidence had not changed in any major way to justify a switch in positions.

211.    Internal emails from Dr. Fauci reflect that he understood this very well at the time that he switched positions on masks that masks do not work

212.    Though use of cloth masks may provide a false sense of security and hope that is comforting to some people in the face of a pandemic, the evidence did not support masking as a real tool to combat COVID-19.

213.    Placing vulnerable children, like Sarah, at risk of unnecessary harm was not justified by the emotional needs those looking for a security blanket or lock step compliance with symbols of party affiliation.

214.    Breathing is one of the most important and necessary physiological functions to sustain life and health.

215.    The human body requires a continuous and adequate oxygen supply to all organs and cells for normal function and survival.

216.    Breathing is also an essential process for removing metabolic byproducts, like carbon dioxide, occurring during cell respiration.

217.    Masks can be detrimental to human breathing function because they force users to rebreathe their own expelled air over extended periods of time, increasing levels of carbon

---

[13] PUBLIC BROADCASTING SERVICE, *Do Masks Provide as Much Protection as We Think?*, available at https://www.pbs.org/wnet/amanpour-and-company/video/do-masks-provide-much-protection-we-think-bglhwy/ (last visited Sept. 7, 2021); *see, also*, Michael T. Osterholm, COMMENTARY: My views on cloth face coverings for the public for preventing COVID-19, UNIV. OF MINNESOTA CENTER FOR INFECTIOUS DISEASE RESEARCH AND POLICY, available at https://www.cidrap.umn.edu/news-perspective/2020/07/commentary-my-views-cloth-face-coverings-public-preventing-covid-19 (last visited Sept. 7, 2021) .

dioxide and other detrimental elements in the body.

218.   Masks can also impede the airflow and make it difficult to breathe, particularly for people like Sarah, who have anxiety or respiratory issues.

219.   As will be further developed at trial, serious health effects that can be induced by prolonged mask use include but are not limited to fungal, bacterial and viral infection in the mouth and respiratory tract, fatigue, loss of concentration, headaches, loss of brain function, long-term neurodegenerative disease, lack of normal cognitive development, increased susceptibility to viral infections and illnesses, cardiovascular disease, hypertension, exacerbation of existing chronic disease, premature aging, premature death, hypoxia, hypercapnia, shortness of breath, increased lactate concentration, acidosis, toxicity, chronic inflammation, self-contamination, increase in stress hormone levels, increased muscle tension, immunosuppression, panic attacks, anxiety, claustrophobia, mood disturbances, and compromised cognitive performance.

220.   Sarah has experienced many of these adverse impacts and could not medically tolerate wearing a face covering for extended periods.

221.   Moreover, evidence available at the time showed that school mask mandates can cause psychological, emotional and other harms and interfere with learning.

222.   Many other countries did not mask children Sarah's age, or only briefly did, quickly rolling back mandates and openly questioning the safety and efficacy of any mask mandates for school children.

223.   For example, Ireland's Department of Health announced it wouldn't require masks in schools because they "may exacerbate anxiety or breathing difficulties for some students." This is precisely the reason that Sarah needs a medical exemption.

224.    In the U.K., elementary students were not generally required to wear masks at all. An article published in the New York Times August 27, 2021 (updated September 1, 2021) quoted a well-respected British specialist explaining the reasons for the differing policy on face masks in the U.K.

> "The U.K. has always, from the beginning, emphasized they do not see a place for face coverings for children if it's avoidable," said Dr. Shamez Ladhani, a pediatric infectious-disease specialist at St. George's Hospital in London and an author of several government studies on the virus and schools. The potential harms exceed the potential benefits, he said.[14]

225.    In addition to adverse physical repercussions, prolonged mask use imposes psychological trauma on some children, including Sarah.

226.    In fact, in most of Europe, children were not subjected to mask mandates in school during the pandemic, and tellingly, these countries did not experience larger outbreaks in schools than the United States schools with mandates did.

227.    The European Centre for Disease Prevention and Control specifically recommended *against* the use of masks for any children in primary school.

228.    One of the many reasons that the European public health authorities recommend against mask use in schools is because of the known and unknown risks of physical, emotional, mental, and sociological harm to children from wearing a mask all day.

229.    Historically, masks have been used as a form of torture in prisons, to isolate prisoners from one another and to dehumanize them.

230.    Masks break down the social structure that human beings naturally require and can lead to depression, feelings of disconnection and other serious psychological consequences.

---

[14] Dana Goldstein, *In Britain, Young Children Don't Wear Masks in School*, THE NEW YORK TIMES (published on Aug. 27, 2021), available at https://www.nytimes.com/2021/08/27/us/students-masks-classrooms-britain.html (last visited Sept. 7, 2021).

231.    No peer-reviewed data has established that use of masks in schools is safe for children, physically or psychologically.

232.    The few studies of masks on children were not peer reviewed, and only measured effects for a few minutes, not hours a day every day.

233.    These studies also did show harm, even from the few minutes, from use of the masks by children.

234.    For example, one study that the District produced to oppose Sarah's preliminary injunction request in 2021 showed that all of the types of masks studied showed harmful effect on the children, even though the children only wore them for a few minutes each.

235.    This study concluded only that theharm was less apparent during the minutes long observation period for children who had masks with electric fans blowing air out.

236.    Pursuant to federal law, and New York's mask mandate, children were not allowed to use masks that had electric fans in them, so could not take advantage of this relatively lower level of harm from those types of masks.to

237.    Additionally, no reliable studies have been done on children with disabilities to determine that prolonged mask mandates are safe for all children other than paraplegics

238.    Each disabled person has unique needs, and it is not safe to lump them altogether and say that because one person with a particular impairment does not need a particular accommodation, none do.

239.    Sarah's licensed physician certifies that she is at risk of harm and requires a mask exemption to safeguard her health.

240.    Sarah was at risk of serious harm due to her disability.

241.    Sarah was not only at risk of harm but actually was harmed due to the District's

refusal to accommodate her.

242.    There was no rational reason, leave aside compelling reason, for the School District to override Sarah's doctor's clinical determination that she needed a mask exemption.

***The Mask Mandate Violates Federal Law Governing Experimental Use Products and Devices.***

243.    Pursuant to federal law, all masks and face coverings are regulated devices and require FDA approval or authorization when used for a medical purpose.

244.    Mitigating the spread of infectious disease is defined by statute as a medical purpose.

245.    All masks used for virus mitigation are regulated by the FDA and must be licensed or approved for such use.

246.    None of the then available masks or face coverings for COVID-19 is approved or licensed by the federal government for use by children.

247.    Pursuant to FDA regulation, any face coverings for use by children are only allowed conditionally by Emergency Use Authorization ("EUA").

248.    By the express terms of their EUA letters, and the governing statutes that regulate EUA products, a primary condition of this authorization is that masks may not be mandated or coerced.

249.    The EUA letters issued by the FDA clarify that masks and face coverings, even surgical masks, have not been established as safe or effective for use in mitigating infection.

250.    In fact, the FDA has labeled masks experimental devices requiring, *inter alia*, that the user must be advised of his right to refuse to use the experimental device or product. *See* 21 U.S.C. § 360bbb-3(e)(1)(A) ("Section 360bbb-3").

251.    The Mask Mandate violates and is preempted by federal law.

252.    The FDA takes the position that the terms and conditions of EUAs preempt state and local laws. *See* 21 U.S.C. § 360(k)(a), "GENERAL RULE Except as provided in subsection (b), no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement that would impose obligations that are inconsistent with those terms and conditions." *See, also,* Emergency Use Authorization of Medical Products and Related Authorities: Guidance for Industry and Other Stakeholders at 39-40 available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/emergency-use-authorization-medical-products-and-related-authorities:

> "FDA believes that the terms and conditions of an EUA issued under section 564 preempt state or local law, both legislative requirements and common-law duties, that impose different or additional requirements on the medical product for which the EUA was issued in the context of the emergency declared under section 564… To the extent state or local law may impose requirements different from or in addition to those imposed by the EUA for a particular medical product within the scope of the declared emergency or threat of emergency (e.g., requirements on prescribing, dispensing, administering, or labeling of the medical product), such law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and 'conflicts with the exercise of Federal authority under [§ 564].'"

253.    The Mask EUAs also each specify that "emergency use of face masks must be consistent with, and may not exceed, the terms of this letter….".

254.    Further, the Mask EUAs state that the products must not be labeled in such a manner that would misrepresent the product's intended use; for example, the labeling must not state or imply that the product is intended for antimicrobial or antiviral protection or related uses or is for use such as infection prevention or reduction.

255.    Similarly, in its Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency (Revised),[15] the FDA stated in three instances that face masks are not intended to reduce or prevent infection:

> The product is not intended for any use that would create an undue risk in light of the public health emergency, for example the labeling does not include uses for antimicrobial or antiviral protection or related uses *or uses for infection prevention or reduction or related uses* and does not include particulate filtration claims.

*Id.* at 7-8.

256.    Congressional records also show that Congress intended to create a private right of enforcement for Emergency Use Authorization products and intended informed consent provisions in the EUA governing statutes to preempt state and local law or policies.

257.    The NYSDOH School Mask Mandate and subsequent communication to Sarah from the District not only misleads Sarah's family and the public by implying that masks can be used for antiviral protection and to stop the spread of COVID-19, but conflicts with the EUA's terms and is preempted under the Supremacy Clause.

***The Use of Face Coverings by the General Population is Experimental, and the Mask Mandate is a Forced Human Experiment.***

258.    The School Mask Mandate is a grand experiment on our children that robs families of the right to decide whether to be subjected to medical experimentation in direct violation of international, federal, and state law.

---

[15] FOOD AND DRUG ADMINISTRATION, *Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency* (Revised May 2020), https://www.fda.gov/media/136449/download (last visited on Aug. 3, 2021).

259.    Masks are traditionally worn by healthcare workers, who are trained in their use, and who typically only wear them for single use in limited circumstances and for short periods of time, replacing them frequently and refraining from touching them or putting them down.

260.    The function of masks in healthcare is generally to keep secretions and droplets from falling into sterile surgical procedures, not to prevent the spread of airborne viruses.

261.    Before the COVID-19 pandemic, the only time masks were required for use by lay people in public spaces in the United States was during the 1918 flu pandemic.  Even then, they were only mandated in certain cities for a matter of a few weeks – certainly not for months or years.

262.    Scientific consensus on the short-term and long-term medical and psychological impact on the public (and children in particular) from large-scale, forced, prolonged use of face coverings does not exist.

263.    The existing data at the time to showed that masks are ineffective and potentially unsafe when used by the general public to stop the spread of disease.

264.    While there is insufficient data to support mask use by adults, there is no evidence to support mask use by children.

265.

266.    Children are still developing and in addition to being subject to different psychological and physiological health impacts than adults, children are inherently less able to observe strict protocols, such as washing and sterilizing hands before putting a mask on or taking it off, refraining from ever touching a mask, replacing a mask after a certain number of hours, or whenever it is inadvertently touched, ensuring a tight seal around the mask, and all of the other rules governing mask use in hospital settings.

267.    A paper published in February 2021 reviewing available data on the safety of face masks for children found that there had only been two studies done on children regarding mask use.

268.    Neither was relevant to whether it was safe for Sarah to wear a mask.

269.    "The lack of paediatric studies" forced the authors to look at adult studies and hope that the same findings would apply to children. The paper stressed that further study was needed to provide any evidence-based guidelines for mask-use in child populations.[16]

270.    A recent opinion published by leading experts in the field states in no uncertain terms that there is no evidence to support mask mandates.[17]

271.     The authors of the opinion are Dr. Marty Makary, a professor at the John's Hopkins School of Medicine and editor-in-chief of Medpage Today, and Dr. H. Cody Meissner, chief of pediatric infectious diseases at Tufts Children's Hospital and advisor on the FDA advisory panel for COVID-19.

272.    Noting the potential for serious psychological and physical harm, the authors concluded that forced mask use on children is impermissible medical experimentation and constitutes "child abuse" in their expert opinions.

273.    It is by now well-settled that medical experiments, better known in modern parlance as clinical research, may not be performed on human subjects without the prior, free, and informed consent of the individual.

---

[16]  Martin Eberhart, Stefan Orthaber & Reinhold Kerbl, *The impact of face masks on children—A mini review,* 110 ACTA PAEDIATRICA 1778) (2021), available at https://onlinelibrary.wiley.com/doi/10.1111/apa.15784 (last visited on Sept. 7, 2021).

[17] Marty Makary & H. Cody Meissner, *Opinion: The Case Against Masks for Children*, THE WALL STREET JOURNAL (published Aug. 8, 2021), available at https://www.wsj.com/articles/masks-children-parenting-schools-mandates-covid-19-coronavirus-pandemic-biden-administration-cdc-11628432716?reflink=desktopwebshare_permalink (last visited Sept. 7, 2021).

274.    Yet, though scientists and public health agencies continue to conduct observational and other studies on school populations, they have not obtained consent, and they do not allow children to opt out of using the experimental products.

275.    Coerced use of experimental medical products are so universally recognized as unethical, illegal, and abhorrent that the right of informed consent constitutes a *jus cogens* norm under international law.

276.    The globally recognized standards established under international law are binding upon the United States and, when violated, create a cause of action enforceable by citizens of the United States damaged thereby.

### A Brief History of the Universal Prohibition on Human Experimentation Without Consent.

277.    One of the chilling horrors that emerged from the rubble of World War II was the discovery that Nazi doctors had been conducting medical experiments, including experiments with various vaccines, on unwilling victims in concentration camps.

278.    On August 8, 1945, the prevailing Allies, acting "in the interest of All the United Nations" established an International Military Tribunal (the "IMT").

279.    Under the aegis of this law, U.S. military tribunals tried "lower-level" war criminals, such as doctors accused of conducting medical experiments without their subjects' consent. [18]

280.    In August 1947, Military Tribunal 1, staffed by American Judges and prosecutors and conducted under American procedural rules, issued final judgment against fifteen doctors who were found guilty of war crimes and crimes against humanity for conducting nonconsensual

---

[18] Sources for the historical facts set forth herein can be found in *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009), which explains in detail the history and reasons why the prohibition against nonconsensual human experimentation should be regarded as a *jus cogens* norm.

experiments, which included the testing of drugs for immunization against malaria, epidemic jaundice, smallpox, and cholera, as well as use of experimental medical devices.

281.    Seven of the convicted doctors were sentenced to death and the remaining eight were sentenced to terms of imprisonment. Their argument that the experimentation was for the greater good was unavailing.

282.    The tribunal emphasized that "in every instance appearing in the record, subjects were used who did not consent to the experiments; indeed, as to some of the experiments, it is not even contended by the defendants that the subjects occupied the status of volunteers."

283.    The final Judgment concluded that "manifestly human experiments under such conditions are contrary to the principles of the law of nations as they result from usages established among civilized peoples, from the laws of humanity, and from the dictates of public conscience." The doctors were convicted of war crimes and crimes against humanity.

284.    As part of its final judgment, to alert the world that it is a war crime to subject people to medical treatments and experiment without their free and informed consent, the tribunal promulgated the Nuremberg Code on Permissible Medical Experiments. Point One of the Nuremberg Code states: "**The voluntary consent of the human subject is absolutely essential.**"

285.    This universal acceptance of informed consent as the most basic and fundamental human right has since been repeatedly ratified and adopted around the globe, in laws, treaties, regulations, and ethical guidelines for medical research. For example, in 1964, the World Medical Association adopted the Declaration of Helsinki, which provides that human subjects "must be volunteers and informed participants in the research project." Declaration of Helsinki at Art. 20.

286.    Although themselves non-binding, the principles underlying the Declaration of Helsinki and the Nuremberg Code have been incorporated into international conventions, as well

as the laws and regulations of countries around the world, including the United States of America, which are binding in United States courts.

287.    The International Covenant on Civil and Political Rights of the United Nations ("ICCPR"), which went into effect in 1976, provides in Article I that "all peoples have the right of self-determination" and in Article 7 that "no one shall be subjected without his free consent to medical or scientific experimentation."

288.    The informed consent principles of the Declaration of Helsinki were also incorporated by a 2001 Directive of the European Parliament and the Council of the European Union.

289.    In addition, 35 members of the Council of Europe have signed the Convention on Human Rights and Biomedicine, which provides that informed consent is required for a subject's involvement in medical research.

290.    In 2005, the General Conference of UNESCO adopted the Universal Declaration on Bioethics and Human Rights, requiring prior, free, and informed consent for participation in medical treatments and research.

291.    The United States clearly regards itself as bound by the provisions of the Nuremberg Code and the Declaration of Helsinki.

292.    The highest courts in the United States also recognize that the right to informed consent codified in the Nuremberg Code is a fundamental right guaranteed by the U.S. Constitution.

293.    These principles have been adopted by statutes and regulations in the United States as well as case law.

294.    In 1979, the Department of Health, Education and Welfare issued the Belmont

Report, which addressed the issue of informed consent in the human experimentation setting. The Report identified respect for self-determination by "autonomous persons" as the first of three "basic ethical principles" which "demands that subjects enter into the research voluntarily and with adequate information."

295.    Ultimately, the principles of the Belmont Report, which itself was guided by the Nuremberg Code and the Declaration of Helsinki, were adopted by the FDA in its regulations requiring the informed consent of human subjects for medical research. *See* 21 C.F.R. § 50.20.[19]

296.    The Department of Health and Human Services has similarly adopted this standard in its regulations governing grants for medical research. *See* 45 C.F.R. § 46.116.

297.    The State of New York has also adopted the principle of informed consent for all medical interventions. *See* § 2805-d NY Pub Health L § 2440 (2012) of the New York Public Health Law (requiring informed consent for medical treatment). Additionally, New York recognizes a common law right to informed consent, under which forced medical interventions are batteries.

298.    For these and other reasons, the prohibition against nonconsensual human experimentation must be regarded not only as established by U.S. law and regulations, but also as so broadly recognized by all nations as to constitute a *jus cogens* norm under international law.

299.    The Nuremberg Code, and the subsequent international, national, and local laws that were universally adopted to enforce it, were not meant to be limited only to protect victims of the Holocaust.

---

[19] The exceptions to this standard are extremely narrow, and require certification by a researcher and an independent physician that, for example, "[t]he human subject is confronted with a life-threatening situation necessitating the use of the test article"; informed consent cannot be obtained from the subject; time does not permit obtaining informed consent from the subject's legal representative; and "there is available no alternative method of approved or generally recognized therapy that provides an equal or greater likelihood of saving the life of the subject." 21 C.F.R. § 50.23. *See also* 21 C.F.R. § 50.24 (providing a similarly narrow exception to informed consent requirements for emergency research).

300.    Rather, the fundamental right to informed consent was meant to establish a floor that no nation and no locality could violate.

301.    Plaintiff did not consent to allow her daughter to be part of an experiment or to wear an EUA mask that was causing her daughter harm.

***Post-filing facts***

302.    Sarah was severely harmed by her school's refusal to honor her medical exemption.

303.    Sarah has not recovered from that trauma yet.

304.    She is still severely underweight, and she suffers from crippling anxiety as well as depression and fear of school.

305.    Her mother still fears for her physical, mental, and emotional safety.

306.    During the course of this litigation, after the Court indicated in oral arguments that it was likely that some preliminary injunctive relief would be offered, the District finally agreed, as a temporary measure, to allow Sarah to wear a mesh mask.

307.    On October 19, 2021, the District issued a 504 plan for Sarah due to her difficulty with the mask, which stated: "Your child has a disability under Section 504 of the Rehabilitation Act that requires an accommodation plan to ensure full access to all school activities."

308.    Pursuant to the 504 plan, the District gave Sarah the accommodation of wearing a "mesh mask."

309.    The administrators who decided the 504 plan were aware that a mesh mask cannot stop the spread of Covid-19.

310.    The Superintendent had previously told Jane that the mesh mask was unacceptable because it cannot stop the spread of Covid-19.

311.    The District's own attorneys had acknowledged that the District did not think that the mesh mask could stop the spread of Covid-19.

312.    But still, the District would not allow Sarah a full exemption pursuant to her 504 plan, only a mesh mask accommodation.

313.    Sarah tried the mesh mask accommodation in good faith.

314.    Within a matter of weeks, it became apparent that Sarah could not tolerate the mesh mask.

315.    Sarah still had trouble breathing in the mesh mask, and even the mesh mask has caused her to develop fungal rashes, causing her to miss school, or have to temporarily wear another mask that caused more breathing problems.

316.    Jane requested that Sarah be able to have a full mask accommodation since the mesh mask was not working for her.

317.    Sarah's attorney also requested through counsel that Sarah be able to have a full mask accommodation since the mesh mask was ineffective to accommodate her.

318.    The District refused to allow Sarah a full accommodation.

319.    Sarah did not pose a substantial risk of significant harm to her classmates by not wearing a mask.

320.    She would have been no more of a danger to her classmates if her medical exemption were honored in full rather than onlky through a mesh mask.

321.    The District admitted that mesh masks do not stop transmission of disease more than no mask.

322.    The District knew that mesh masks did not stop transmission of Covid-19 any better than no mask.

323.    Sarah needs this Court's intervention to protect her health and her rights and to make her whole for the harm she has suffered

324.    All conditions precedent to bringing this lawsuit have been performed, excused, or waived.

## COUNT I

**VIOLATION OF PLAINTIFFS'
FUNDAMENTAL RIGHT TO REFUSE MEDICAL INTERVENTIONS THAT PLACE
THE CHILD AT RISK OF HARM AS DOCUMENTED BY A LICENSED PHYSICIAN
42 U.S.C. § 1983[20]**

325.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

326.    Plaintiff has a protected Fourteenth Amendment right to life, and to protect her daughter's life and health, secured by the Due Process Clause of the United States Constitution, which includes the right to refuse non-consensual administration of any objectionable medical product, and/or to be free from the forced administration of medical procedures and devices that Plaintiff reasonably believes may cause her daughter harm.

327.    As well, or in the alternative, Plaintiff has protected liberty rights against infringement of liberty interests deemed "fundamental" in nature, which the Mask Mandate unconstitutionally infringes.

328.    These fundamental rights include, but are not limited to: the fundamental right to refuse medical interventions, even those that save one's life, the fundamental right of fit parents to make medical decisions for their children rather than the state or a third party, the fundamental right to a medical exemption from medical devices that a licensed physician has certified may

---

[20] This count has been dismissed by the District Court, and the dismissal was upheld by the Second Circuit. It remains in only because there is a pending petition before the U.S. Supreme Court. If the Supreme Court does not reverse the Second Circuit's determination, this claim is acknowledged to be dismissed.

place a person at risk of harm, the fundamental right to refuse medical interventions that are experimental in nature, and the fundamental right to make medical decisions in accordance with one's chosen physician absent state or third-party interference.

329.    Binding precedent from the Supreme Court of the United States holds that states cannot condition acceptance of a medical exemption written by a state-licensed physician on the consent of the state or any third party. *See, e.g., See, e.g.*, *Doe v. Bolton*, 410 U.S. 179 (1973) (holding that a state cannot overrule or impose corroboration requirements on medical exemptions written by state-licensed physicians); *Whalen v. Roe*, 429 U.S. 589 (1977) (citing *Doe* for the well-recognized holding that states cannot condition a person's right to follow their chosen physician's medical advice on the consent of the state or a third party and affirming that this holding is applicable to any medical decision making, not just to abortion related medical decisions).

330.    The District is violating the Plaintiffs' right to make medical decisions in accordance with the advice of her chosen licensed physician through the adoption of an official policy to review and overrule all medical exemptions written by state-licensed physicians as a blanket matter other than for paraplegics.

331.    As well, or in the alternative, Plaintiff has protected liberty interests, secured by the Due Process Clause of the United States Constitution, international protocols and treaties adopted by and entered into by the United States, and by the laws and regulations of the United States, to informed consent.

332.    The District's requirement that Sarah wear a mask, and refusal to accommodate her request for exemption, violate several of these related fundamental and internationally protected rights, including but not limited to the right to be free from forced medical experimentation (also referred to as the right to "informed consent" or the right to "bodily integrity").

333.    This right of informed consent and bodily integrity, particularly in the context of experimental products, is not only acknowledged as a fundamental right pursuant to United States Supreme Court jurisprudence but is also recognized as a *jus cogens* norm under the laws of nations.

334.    As set forth more fully above, masks are defined as experimental products and their forced *or coerced* use constitutes unlawful coerced participation in medical experimentation. No government actor can lawfully force or coerce the use of these experimental products without violating the most fundamental international and constitutional rights.

335.    As well, or in the alternative, Plaintiff has fundamental right, secured by the Due Process Clause of the Fourteenth Amendment of the United States Constitution, to make medical decisions on behalf of her daughter.

336.    Plaintiff has not been found to be an unfit parent, and thus is vested with the authority to choose between competing medical opinions about what is safest for her daughter, and whether to consent to allow her daughter to participate in using an experimental medical product.

337.    This right adheres not only to the parent but to the child as well, whose best interest is served by loving fit parents having control over medical decisions impacting the child.

338.    The District violated Plaintiffs' fundamental parental rights by attempting to usurp the mother's authority to decide between competing medical opinions and follow the advice of her treating physician.

339.    As well, or in the alternative, the District's policies violate the fundamental right to refuse medical interventions.

340.    This right has been deemed fundamental by the Supreme Court and is even protected and upheld in circumstances where the intervention will concededly help rather than

harm a patient. In this case, where the intervention is certified by a treating physician as placing the child at risk of harm, the Child must be allowed to refuse the medical intervention.

341.    Both facially and as applied, the Mask Mandate as applied by the District, is not sufficiently tailored to impose the least amount of harm on fundamental protected rights. Nor does it serve a compelling interest.

342.    Public health will not be imperiled if children who submit medical exemptions from licensed physicians are allowed to opt out of the mask mandate.

343.    Public health will not be imperiled if Sarah is allowed to opt out of the mask mandate.

344.    Considering the serious rights at stake, and the dearth of evidence to show this policy is effective or necessary, there is no rational reason to mandate masks in school for any child.

345.    This is doubly true for children who are at risk of harm from the mask.

346.    Inflexibly mandating a child to use an experimental medical device when her licensed physician has certified she may be at harm from the device simply shocks the conscience.

347.    The unconstitutionality is compounded by the fact that this is an EUA product, and the District was prohibited by federal law from mandating it.

348.    The District, which is a state actor, lacks a legitimate state interest (leave aside a compelling one) in breaking federal law.

349.    Pursuant to the Unconstitutional Conditions Doctrine, the District cannot force or coerce the use of a mask on a child who is at risk of harm.

350.    This means the District could not condition receipt of a benefit, such as access to school and educational opportunities, on waiver of the right to a medical exemption from a mask.

Yet, the District did condition access to school on Plaintiffs' waiver of fundamental rights.

## COUNT II

## VIOLATION OF TITLE II
## OF THE AMERICANS WITH DISABILITIES ACT - 42 U.S.C. § 12101 ET SEQ. –
## FAILURE TO PROVIDE REASONABLE ACCOMODATIONS

351.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

352.    The District has violated Plaintiff's rights under the American's with Disabilities Act ("ADA").

353.    Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; see also 28 C.F.R. § 35.130.

354.    Title II of the ADA further provides that a public entity shall make reasonable modifications to its policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7)(i).

355.    Title II of the ADA applies to all activities of public entities, including providing education. Defendant is a public entity subject to Title II of the ADA subject to Title II of the ADA. 42 U.S.C. § 12131(1).

356.    While there are no specific ADA regulations concerning the education of disabled children, the ADA has been interpreted co-extensively with the Rehabilitation Act's special education requirements. *R.B. ex rel. L.B. v. Board of Educ. of the City of New York*, 99 F. Supp. 2d 411, 419 (S.D. N.Y. 2000).

357.    A parent of a disabled child may file an action for violation of the child's educational rights under the ADA or Section 504. *See* 20 U.S.C. § 1415(*l*).

358.    Section 504 and the ADA both prohibit discrimination based on disability. *See* 29 U.S.C. § 794.

359.    At all times relevant to this action, Sarah Doe, a ten-year-old girl, had physical disabilities. She suffers from asthma and serious respiratory issues, which substantially limit the major life activity of breathing. Further, acute respiratory attacks caused by her asthma can result in severe anxiety for Sarah, limiting her ability to think, to concentrate and to learn when enduring a respiratory attack.

360.    Sarah also suffers from anxiety, disordered eating and other stress and trauma related issues that substantially limit her life activities as described herein.

361.    Sarah was and is a qualified individual with a disability within the meaning of the ADA.

362.    EEOC guidance defines multiple conditions that Sarah has as disabilities.

363.    The District acknowledged that Sarah is a disabled individual pursuant to the Rehabilitation Act and required accommodation from the mask mandate in her 504 plan.

364.    The definition of whether someone is "disabled" is the same under the Rehabilitation Act and the ADA.

365.    At all times relevant to this Complaint, Sarah was physically present in Nassau County, New York and was otherwise qualified to participate in or benefit from the programs or services offered by the Franklin Square Union Free School District ("School District") in her home school district in Nassau County, where she attended the Johns Street School.

366.    As a school-age resident of the School District, Sarah is eligible for educational services provided by the District.

367.    By virtue of her disability, Sarah was qualified for the protections of the ADA to ensure that she could have access to educational services.

368.    Defendant was at all times relevant to this action the public entity and individual obligated to (i) ensure that Ms. Doe, a qualified individual with a disability, was afforded the opportunity to participate in the programs, services and activities offered by the Franklin Square School District without being discriminated against and (ii) make reasonable modifications in policies, practices, or procedures when necessary to avoid disability-related discrimination.

369.    Pursuant to emergency powers granted temporarily to the executive branch, in 2020 the NYSDOH issued emergency guidance and orders requiring all students to wear masks at school. Each of these temporary orders stated, "[s]tudents who are unable to medically tolerate a mask, including students where such mask would impair their physical health or mental health are not subject to the required use of a mask."

370.    Because she is unable to medically tolerate a mask, and because wearing a mask in school impairs her physical health, Plaintiff requested the accommodation of not wearing a mask in school, an accommodation available to her under the NYSDOH temporary orders.

371.    The requested accommodation was not only reasonable but is an accommodation proposed by NYSDOH itself for students with disabilities who cannot physically tolerate wearing a mask.

372.    Sarah's treating physician provided an expert opinion regarding Sarah's disabilities and her inability to safely wear a mask in school, detailing specific aspects of her disabilities and providing a basis for the requested accommodation.

373.    Under the ADA, Defendants must demonstrate that a person with a disability poses a significant risk of substantial harm to the health or safety of others in the school environment if provided with  accommodation.

374.    Defendants failed to demonstrate or even argue that Sarah would pose a direct threat if accommodated.

375.    Defendant *cannot* successfully support a defense that Sarah presents a unique threat to the health or safety of others because the requested accommodation was proposed by the NYSDOH itself for students with disabilities who are unable to medically tolerate wearing a mask in school.

376.    Moreover, Defendants have already acknowledged that Sarah does not pose a substantial risk of significant harm to others by allowing her to wear a mesh mask, which the District admitted and is aware cannot stop transmission of COVID-19.

377.    If Defendants were to claim that Sarah's presence in school while not wearing a mask posed a unique threat to the health and safety of others, such a claim would negate any application of the proposed NYSDOH accommodation of an exemption from the mask requirement.

378.    Because medical exemptions to the mask requirement were included as a part of the NYSDOH emergency guidance, Defendants cannot reasonably claim that providing a medical exemption in this case would impose an undue hardship.

379.    At all times relevant to this action, Defendant had notice that Sarah Doe has asthma, a physical disability, as well as other impairments, that she could not medically tolerate masks and that use of the masks was impairing her physical and mental health.

380.    Despite being aware of Sarah's impairments and her inability to tolerate a mask, Defendants refused to provide the requested accommodation to Sarah during the 2020-2021 or the 2021-2022 school years.

381.    Defendants failed to provide the reasonable accommodation of exempting Sarah from the mask requirement despite specific language in the NYSDOH emergency guidance that the mask policy only applied to children whose physical or mental health would not be impaired by wearing a mask.

382.    During the 2020-2021 school year, Defendants also failed to accommodate Sarah by allowing her to take her mask off during physical activity, have an air conditioner installed, or try an alternative type of mask, or to enroll in online education.

383.    Consistently throughout the Spring and Summer of 2021, Sarah's mother, Jane Doe, explained repeatedly to Defendants that her daughter, when forced to comply with the mask requirement, became dizzy, was unable to concentrate, was having increasingly frequent and serious asthma attacks and other respiratory problems, experienced severe anxiety, and was frequently unable to breathe while wearing a mask at school.

384.    Jane Doe explained to Defendants that Sarah's disabilities are exacerbated when her mouth and/or nose are obstructed, resulting in both obstruction of her normal breathing as well as inducing panic attacks that further limit her ability to breathe, as well as her ability to think, to concentrate and to learn at school. Sarah cannot physically tolerate wearing a mask at school.

385.    On or about April 27, 2021, Jane Doe submitted a letter from Sarah's treating physician detailing his expert opinion in support of Sarah's request for a medical exemption from the masking requirement, in light of the specific character of Sarah's disabilities. Defendants verbally denied this request, summarily asserting that it is the School District's policy not to give

any child a medical exemption from the masking mandate, in direct violation of the specific language of the NYSDOH emergency guidance and the provisions of the ADA as referenced herein.

386.    On June 8, 2021, the School District provided Jane, Sarah's mother, with a written denial of the request for a medical exemption, stating: "[t]he medical note that your doctor provided was reviewed by our district physician, Dr. Marino, and after speaking with Sarah's doctor it was determined by Dr. Marino that the mask was not creating difficulty with her asthma; therefore, there was no reason for this medical accommodation." In a subsequent statement, Sarah's treating physician contradicted this report from Dr. Marino, noting that Dr. Marino simply "overruled" the treating physician's request for a medical exemption for Sarah without offering any medical evidence addressing Sarah's specific disabilities.

387.    The determination of whether a particular modification is "reasonable" involves a fact-specific, case-by-case inquiry.

388.    Defendants bear the burden of showing that they cannot accommodate a disabled child's request for accommodation because the child would pose a direct threat, or because it would be an undue hardship to accommodate the request.

389.    Defendants failed to undertake any individualized inquiry into whether Sarah was a direct threat.

390.    Nor did Defendants advance any theory about why it would be an undue hardship to accommodate her as her doctor advised.

391.    Instead, Defendants relied on a simple conclusory statement rejecting her well-founded request, which was allegedly issued by a doctor employed by Defendant School District itself, who has never met Sarah, and whose conclusion followed the School Principal's instant

denial and declaration that the School District does not honor medical exemptions as a matter of blanket policy.

392.   This denial of Sarah's requested accommodation did not reflect the necessary iterative, individualized process required under the ADA and supported by caselaw in this jurisdiction.

393.   Instead of providing the requested reasonable accommodation for Sarah's disability, that is, an exemption from the masking requirement, the Defendants admit that they relied upon stereotypes and generalized and generic presumptions about asthma, without specifically addressing Sarah's particular disabilities and how asthma affects *her* ability to wear a mask.

394.   In rejecting Sarah's request, amply supported by her treating physician, Defendants have provided only general statements and guidance from non-peer-reviewed internet searches about people with asthma generally, without reference to Sarah's disabilities and her particular circumstances.

395.   Although it may or may not be true that some people with different or milder forms of asthma may in some circumstances be able to physically tolerate wearing a mask for some unspecified periods of time, Sarah's particular disabilities make wearing a mask physically intolerable.

396.   Defendants did not provide specific medical evidence that Sarah could in fact safely wear a mask despite her disabilities, while Plaintiffs provided a medical opinion based on Sarah's own experience as a person with complex disabilities. She is not relying on general internet guidance. She provided specific evidence related to her personal circumstances and disabilities

certified by her licensed treating physician, who has treated her since she was born and is in the best position to determine her medical needs.

397.    The School District rejected Sarah's request for a reasonable accommodation, specifically her request to for an exemption from the mask requirement, without undertaking an individualized assessment of Sarah's disabilities as required under the ADA.

398.    The District also discriminated against Sarah by making assumptions about whole categories of disabled children, rather than individually assessing Sarah's unique constellation of needs as a disabled individual.

## COUNT III

## VIOLATIONS OF SECTION 504
## OF THE REHABILITATION ACT OF 1973 – 29 U.S.C. § 794 ET SEQ.

399.    Plaintiff incorporates by reference the foregoing allegations as if set forth fully herein.

400.    Defendant also violated Sarah's rights secured under the Rehabilitation Act of 1973.

401.    Section 504 of the Rehabilitation Act of 1973 ("Section 504") provides that otherwise qualified individuals with disabilities shall not, "solely by reason of their disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

402.    The School District receives federal financial assistance and is thus subject to the requirements of Section 504.

403.    As a condition of receipt of federal funds,The School District is required to certify that each is in compliance with federal civil rights statutes, including Section 504's requirement that governmental entities not discriminate against individuals with disabilities.

404.     Through the acts and omissions described above and alleged above, the Defendants discriminated against Sarah solely based on her physical disability.

405.     Were it not for the School District's failure to accommodate Sarah's disabilities, she would not have been forced to endure severe respiratory attacks, anxiety and difficulties thinking, concentrating and learning, and disordered eating as the direct and proximate result of the Defendants' failure to comply with her request forreasonable medical accommodation from the mask requirement.

406.     Moreover, Sarah has repeatedly been excluded from class for significant periods each day as the only way she can "take a mask break" when she starts to have serious trouble breathing.

407.     The failure to accommodate Sarah's disability deprived Sarah of her right to an education as a person with a disability.

408.     The District also discriminated against Sarah by making sweeping generalizations about whole categories of disabled individuals rather than assessing Sarah's unique needs as a disabled person with a constellation of impairments.

409.     While some people with asthma may not need accommodation from mask mandates, it was discriminatory and unlawful for the District to assume this meant all people with asthma, including Sarah, can safely tolerate a mask.

410.     The District further violated the law by retaliating against Sarah for trying to seek accommodation, and and harassing her due to her disability.

411.     The District knew that its' employees were harassing Sarah, filming her, calling her into the principal's office for attempting to take mask breaks, and humiliating her.

412.    Yet, the principal and superintendent allowed and encouraged this to continue even after Jane pleaded with them to make this stop.

413.    Moreover, School District Defendants made no attempt to articulate or prove any undue hardship in reasonably accommodating Sarah's need for a mask exemption.

414.    School District Defendants did not engage in a good faith attempt to reasonably accommodate Sarah's mask exemption.

415.    Even after the District acknowledged that Sarah needs accommodation from the mask mandate due to her disability, it retaliated against her by refusing to allow her a reasonable accommodation when it became clear the mesh mask did not work.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter a declaratory judgment that the District violated Sarah's rights secured under the ADA, Rehabilitation Act and the United States Constitution, issue an order to permanently enjoin enforcement of the Mask Mandate against Sarah if a future mask mandate should occur, award actual, consequential, and nominal damages to Plaintiffs, and award attorney's fees and costs to Plaintiffs and for such other and further relief this Court deems just and proper.

<strong>JURY TRIAL DEMAND</strong>

Plaintiff hereby demands a trial by jury for all matters so triable.

DATED this 23rd day of October 2024.

Gibson Law Firm, PLLC

*/s/ Sujata S. Gibson*

**Sujata S. Gibson,**
*Attorney for Plaintiff*
Gibson Law Firm, PLLC
120 E. Buffalo St, Suite 2
Ithaca, NY 14850
(607) 327-4125

sujata@gibsonfirm.law